# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

NIKE, INC.,

                        Plaintiff,

    v.

S2, INC. D/B/A THE SHOE SURGEON;
SURGEON WORLDWIDE, INC., DOMINIC
CHAMBRONE A/K/A DOMINIC CIAMBRONE,
AND DALLAS IMBIMBO

                        Defendants.

Case No.

**COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiff Nike, Inc. ("Nike" or "Plaintiff") for its Complaint against defendants S2, Inc. d/b/a The Shoe Surgeon, Surgeon Worldwide, Inc. (together with S2, Inc., the "Defendant Entities"), Dominic Chambrone a/k/a Dominic Ciambrone a/k/a "The Shoe Surgeon" ("Ciambrone"), and Dallas Imbimbo ("Imbimbo," and together with the Defendant Entities and Ciambrone, the "Defendants") alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action for trademark infringement, counterfeiting, dilution, unfair competition and related claims stemming from Defendants' unauthorized wholesale usurpation of the Nike brand.  As detailed herein, this is not a case concerning only Ciambrone's large-scale infringement of Nike's rights through his "Shoe Surgeon" customization business.  Rather, Nike seeks to enjoin Ciambrone and the other Defendants in their attempts to build an entire multifaceted retail empire through their unauthorized use of Nike's trademark rights and the associated goodwill that Nike spent decades accruing.  What may have begun several years ago as Ciambrone's relatively uncontroversial "one-of-one customizations on commission" has now, with the help and direction of former customer turned business partner Imbimbo, transformed into

an egregious display of widespread infringement that has even crossed into willful counterfeiting of iconic Nike products.

2.      Today, Defendants are brazenly conducting and enriching themselves as if they have the unfettered right to use Nike's trademarks and trade dress.  They modify and offer for sale large quantities of Nike-branded products.  They enter into Nike-focused collaborations with other rightsholders using Nike's intellectual property.  They ink digital rights agreements based on Nike trademarks.  They advertise and sell "shoe-making" kits that contain materials and instructions to make bootleg versions of Nike's iconic Air Jordan 1, Air Force 1, Air Jordan 3, and Air Jordan 4 silhouettes.  Defendants even teach the public how to create brand new fake "Nike"-branded shoes from scratch—down to cutting and sewing fake "Swooshes"—through downloadable classes that cost hundreds of dollars, and in-person seminars held in this jurisdiction that cost thousands of dollars to attend.  A "humble self-taught cobbler" no more.

### Defendants' Illicit "Nike" Empire



3.      To make matters worse, Defendants are engaging in all of this behavior while falsely leading consumers to believe that Nike is affiliated with their businesses or has otherwise authorized their conduct.  But Nike has not authorized any of Defendants' complained-of conduct, and this conduct—coupled with the false air of credibility Defendants are intentionally creating— is likely to cause and is already causing confusion in the marketplace that the parties are associated, when they are not.  This dupes Nike consumers and harms the Nike brand.

4.      Indeed, just steps away from this Manhattan courthouse in the popular South Street Seaport neighborhood and tourist destination Defendants operate a brick-and-mortar retail location.  In that store, Defendants sell "Nike"-branded shoes, including shoes that Defendants have made **from scratch**.  Despite the fact that these shoes are covered in Nike's famous trademarks and ape Nike's iconic silhouettes, Nike had nothing to do with these shoes, which are, by definition, counterfeit.

5.      Even worse, Defendants call their Seaport location an "academy" to reflect that they use it to teach consumers how to make their own "custom" shoes.  Some of the steps taught by Ciambrone or his staff to make a fake Air Jordan 1 shoe include:



6.      A side-by-side of a genuine Air Jordan 1 shoe and Defendants' counterfeit version of that shoe is below:



| Nike Air Jordan 1 | Defendants' Counterfeit "Nike" Shoes |

7.      Defendants' "academy" does not just innocently teach consumers how to customize their own shoes. Instead, consumers pay Defendants to learn how to manufacture brand-new shoes comprised of trade dress and trademarks substantially indistinguishable from Nike's registered trade dress and trademarks. Defendants are thus teaching a course in "Nike Counterfeiting 101."

8.      Defendants charge an astronomical price of $3,000-$5,000 per person to attend their counterfeiting academy. At that price, Defendants' customers are encouraged to use their newly honed counterfeiting skills to venture into their own illicit businesses manufacturing and selling fake "Nike" shoes. Defendants' proliferation of additional counterfeiting operations *de facto* harms Nike due to a loss of control of its valuable brands. These additional counterfeiting operators, who learned their illicit craft from Defendants, also harm consumers by tricking them into buying fake "Nike" shoes when they believe that they are purchasing genuine Nike shoes.

9.      Ciambrone never asked for, nor received, Nike's permission to engage in any commercial use of Nike's trademarks beyond a few limited prior engagements between the parties relating to commissioned, one-off customization projects. Instead of seeking Nike's permission (which he knew he needed), he formed the Defendant Entities with Imbimbo, grew the

customization business, and branched into multiple other business ventures, all of which exploit Nike's valuable brands.

10.     Nike has tried on multiple occasions to resolve Defendants' intellectual property violations outside of the litigation context.  Defendants even appeared at times to comply with Nike's cease and desist demands.  In actuality, Defendants were playing a shell game, removing infringing shoes from their website only to continue selling them at a later date or through alternate sales channels.

11.     Defendants do not stop there.  They also sell infringing products that combine Nike's trademarks with other rightsholders' trademarks.  These unauthorized "collaborations" are likely to cause significant consumer confusion in light of Nike's well-known practice of collaborating with companies like Dior and Louis Vuitton to create special editions of its iconic shoes.  In fact, just last month, Defendants were sued by luxury brand Goyard St-Honore for trademark infringement for selling "Nike" shoes that incorporate Goyard's trademarks and trade dress.  Nike did not authorize Defendants to make those shoes; *to the contrary*, Nike expressly demanded in an August 2023 cease-and-desist letter that Defendants remove these fake Goyard collaborations from their website, noting that they were "unauthorized customizations" containing "third-party logos, branding, and/or trademarks."

12.     For the reasons discussed herein, Nike requests that the Court swiftly and permanently enjoin Defendants from selling counterfeit and infringing "Nike" shoes, selling kits, bundles, and other materials along with instructions for making counterfeit and infringing "Nike" shoes, offering shoe-making or customization classes featuring counterfeit and infringing "Nike" shoes, entering into agreements with third parties using Nike intellectual property in order to create

counterfeit and infringing goods, and selling Nike intellectual property in the form of digital or virtual goods.

13.    Nike also seeks compensation for the harm Defendants have caused Nike and the ill-gotten profits Defendants have generated by violating Nike's intellectual property rights. Nike will establish that it is entitled to recover the maximum amount of statutory damages for Defendants' willful counterfeiting of over 30 Nike trademarks, totaling over $60 million dollars, or the profits Defendants generated from counterfeiting, trebled, along with attorneys' fees.

## THE PARTIES

14.    Nike is a corporation organized under the laws of the State of Oregon with a principal place of business at One Bowerman Drive, Beaverton, Oregon 97005.

15.    S2, Inc. is a corporation organized under the laws of the State of Delaware doing business as the "Shoe Surgeon" in California.

16.    Surgeon Worldwide, Inc. is a corporation organized under the laws of the State of Delaware with a principal place of business at 17595 Harvard Avenue C552, Irvine, California 92614.

17.    On information and belief, Dominic Ciambrone is an individual residing in Los Angeles, California and is the Chief Executive Officer and founder of Surgeon Worldwide, Inc.

18.    On information and belief, Dallas Imbimbo is an individual residing in Irvine, California and is the Secretary and Chief Financial Officer of Surgeon Worldwide, Inc.

19.    On information and belief, Defendants are the owners and operators of https://www.thesurgeon.com/ ("The Shoe Surgeon Website"), https://www.srgnacademy.com/ ("The Shoe Surgeon Academy Website"), the Instagram accounts @thesurgeon, @srgnacademy, @srgnstudios, @srgnnyc, and @srgncustoms (together, "The Shoe Surgeon Instagram"), the

YouTube account @TheShoeSurgeon ("The Shoe Surgeon YouTube"), the X account @TheShoeSurgeon ("The Shoe Surgeon X"), and the TikTok accounts @theshoesurgeon and @srgnacademy ("The Shoe Surgeon TikTok" and together with The Shoe Surgeon Instagram, The Shoe Surgeon YouTube, and The Shoe Surgeon X, "The Shoe Surgeon Social Media.")  The Defendants conduct their infringing online commercial activities through, *inter alia*, The Shoe Surgeon Social Media.

20.    Upon information and belief, Defendants also own, control or operate brick and mortar retail locations called the "SRGN Academy" in New York, Los Angeles, and Las Vegas, where they sell fake "Nike"-branded shoes from scratch and/or materially altered Nike shoes. SRGN Academies also function as counterfeiting schools where Defendants train third parties how to manufacture fake pairs of iconic Nike shoes.

## JURISDICTION AND VENUE

21.    This action arises under the trademark laws of the United States, Lanham Act, 15 U.S.C. § 1051, *et seq*.  This Court has subject matter jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because this action arises under federal trademark law.  The Court also has diversity jurisdiction under all counts under 28 U.S.C. § 1332(a) because Defendants are diverse from Nike and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction over the remaining state law statutory and common law claims pursuant to 28 U.S.C. § 1367.

22.    This Court has personal jurisdiction over Defendants because Defendants have committed and continue to commit purposeful acts of infringement and dilution in this District, have conducted, and continue to conduct, business in this District through The Shoe Surgeon Website and the Shoe Surgeon Social Media, and a brick-and-mortar retail location and

"infringement academy," offices and/or facilities located in this District, and/or Defendants have engaged in purposeful, continuous and systematic activities in this District.

23.     Specific personal jurisdiction is proper pursuant to New York C.P.L.R. § 302(a) because Defendants regularly conduct, solicit, or transact business in New York and in this District. Defendants own and operate a SRGN Academy store on Fulton Street in the New York City Seaport District where Defendants offer in-person customization classes, sell infringing or counterfeit shoes bearing the "Nike" marks, and deconstruction and reconstruction classes to materially copy Nike's most popular shoe silhouettes. Upon information and belief, hundreds of copycat shoemakers in New York have taken these classes at the SRGN Academy at the Seaport. New York is also where Ciambrone proclaims "The Shoe Surgeon" moniker was born.

24.     Defendants employ staff in New York to teach SRGN Academies and to sell retail "Nike"-branded shoes and other goods from the store. In addition, Defendants created The Shoe Surgeon Website and The Shoe Surgeon Social Media, which purposefully target consumers in New York, and direct unauthorized and infringing uses of Nike's trademarks into New York and this District.

25.     Upon information and belief, Defendants have contracted to supply goods in New York. The claims at issue arise out of their transaction of business, including sourcing and/or supplying goods directed to consumers residing in New York, and deriving substantial revenue from goods and services offered in New York. As a result, Defendants expect or reasonably should expect their infringing conduct to have direct consequences in New York.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants conduct and continue to conduct a substantial and significant amount of business in this District, a substantial part of the events giving rise to these claims arose in this District, and customer

confusion is occurring or is likely to occur in this District.  Upon information and belief,
Defendants Ciambrone and Imbimbo, as corporate principals in Surgeon Worldwide, Inc.,
personally and directly participated in the corporate activities of the Defendant Entities, including
the infringing acts asserted in this Complaint.  Nike also operates multiple flagship retail locations
within several miles of the New York SRGN Academy in this District.

## FACTUAL ALLEGATIONS

A.     *The Nike Brand is the Most Valuable and Recognizable Footwear and Apparel Brand
       In the World.*

27.     Nike's principal business activity is the design, development, and worldwide
marketing and selling of athletic footwear, apparel, equipment, accessories, and related services.

28.     Nike is the largest seller of athletic footwear and apparel in the world.  Nike markets
and sells athletic footwear and apparel with a focus on quality, performance, reliability, design,
innovation and development, as well as price.   Nike also collaborates with prominent and
influential athletes, influencers, and public figures.

29.     Nike sells athletic footwear, apparel, equipment, and other goods and services
through Nike-owned retail stores in this District, including Nike House of Innovation on Fifth
Avenue and the Nike Soho flagship.  Nike also sells footwear, apparel, equipment, and other goods
and services through authorized retailers such as Nordstrom, online channels like Nike.com and
the Nike and SNKRS Apps, and through a mix of independent distributors, licensees, and sales
representatives.

30.     As a result of decades of significant advertising, promotional, and marketing
efforts, Nike has established itself as a multibillion-dollar brand and the world's leading designer,
marketer, and distributor of athletic footwear and apparel products.

31.     Nike and its products are instantly recognizable, seen as innovative and dependable, and have achieved widespread recognition throughout the United States and the world.

32.     Nike uses trademarks on nearly all of its products and packaging, and in its marketing materials.  Nike believes that having distinctive marks that are readily identifiable is an important factor in creating a market for its goods, in identifying its brands and company, and in distinguishing its goods from the goods of others.  As a result of continuous and long-standing promotion, substantial sales, and consumer recognition, Nike has developed powerful trademarks rights, including the marks described in this Section A of the Complaint.  Nike also spends significant time, energy, and resources protecting and policing these trademarks in the marketplace to ensure that Nike maintains goodwill in its brands.

33.     Nike details below the efforts it has made to market, protect the goodwill in and grow the value of some of its most important brands, including NIKE, Swoosh Design, Jordan, Dunk, and Air Force 1, along with the trade dress in certain of Nike's iconic shoe silhouettes.  As set forth herein, Defendants have directly or contributorily infringed, counterfeited, and/or diluted each of these highly valued brands.

*1.     Nike has amassed significant goodwill in the "Nike" and "Swoosh" Marks.*

34.     All or nearly all of Nike's shoes bear the famous "NIKE" word mark and/or "Swoosh" Design mark.  Nike considers its NIKE mark and Swoosh Design mark to be among its most valuable assets.  Nike has registered the NIKE mark and Swoosh Design mark in over 190 jurisdictions worldwide.

35.     There is no serious debate that the NIKE mark and Swoosh Design mark are famous trademarks.  The U.S. Court of Appeals for the Ninth Circuit has referenced Nike's Swoosh Design as the epitome of a "famous trademark [that has] assumed an exalted status...Consumers sometimes buy products bearing marks such as the Nike Swoosh…for the appeal of the mark itself,

without regard to whether it signifies the origin or sponsorship of the product." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1067 (9th Cir. 2006); *see also Nike, Inc. v. Nikepal Int'l, Inc.,* No. 05-CV-1468, 2007 WL 2782030, at *5-6 (E.D. Cal. Sept. 18, 2007) (finding the "Swoosh" and "Nike" marks to be famous as of 1998); *Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1356 (S.D. Ga. 2003), *aff'd*, 107 F. App'x 183 (11th Cir. 2004) (affirming finding that "Swoosh" and "Nike" marks were famous along with the NIKE Air & Swoosh Design).

36.     Nike adopted and began using the NIKE word mark and Swoosh Design mark in 1971 and since then, has continuously promoted and sold products and services bearing those marks.  Since then, Nike has sold billions of products bearing the NIKE word mark and Swoosh Design mark in the United States, accounting for hundreds of billions of dollars in revenue.  Nike has also spent billions of dollars promoting both NIKE and Swoosh Design branded products in the United States.

37.     Nike has also promoted and sold products bearing the NIKE word mark and Swoosh Design mark together or in combination with other marks like "AIR".

38.     Nike has consistently been ranked as one of the most valuable brands in the world. For example, in 2020, Forbes named Nike the world's thirteenth most valuable brand and number one in the apparel category.  In 2023, Interbrand, a leading brand consultancy company, named Nike as one of the top ten most valuable global brands[1] and Brand Finance recognized Nike as the most valuable global apparel brand.[2]

39.     In the United States, Nike is the long-standing owner of the right, title, and interest in and to, *inter alia*, the following NIKE and Swoosh Design-related trademarks registered on the

---

[1] https://interbrand.com/best-global-brands/nike/
[2] https://brandirectory.com/rankings/apparel

Principal Register of the United States Patent and Trademark Office (collectively, the "NIKE and

Swoosh Trademarks"):

| Reg. No. | Title | Trademark | Reg. Date / Status | Class, Goods, and Services |
|---|---|---|---|---|
| 978,952 | NIKE | NIKE (word mark) | 2/19/1974 – Incontestable | 25- Clothing, footwear, headgear |
| 1,214,930 | NIKE | NIKE (word mark) | 11/2/1982 – Incontestable | 25- Footwear |
| 1,243,248 | NIKE | NIKE (word mark) | 6/21/1983 – Incontestable | 42- Retail footwear and apparel services |
| 6,124,779 | NIKE | NIKE (word mark) | 8/11/2020 | 35- Retail store services and on-line retail store services |
| 1,238,853 | NIKE & Swoosh Design*[3] |  | 5/17/1983 – Incontestable | 42- Retail footwear and apparel services |
| 1,325,938 | NIKE & Swoosh Design |  | 3/19/1985 – Incontestable | 25- Footwear |
| 977,190 | Swoosh Design |  | 1/22/1974 – Incontestable | 25- Footwear |
| 1,264,529 | Swoosh Design |  | 1/17/1984 – Incontestable | 42- Retail footwear and apparel services |
| 1,323,343 | Swoosh Design |  | 3/5/1985 – Incontestable | 25- Footwear |
| 5,794,674 | Swoosh Design |  | 7/2/2019 | 35- Retail store services and on-line retail store services |
| 1,571,066 | NIKE AIR & Swoosh Design |  | 12/12/1989 – Incontestable | 25 – Footwear |
| 1,284,386 | NIKE AIR & Swoosh Design |  | 7/3/1984 – Incontestable | 25 – Footwear |

---

[3] As used herein, an asterisk (*) indicates unofficial, descriptive title.

40.    These registrations for Nike's NIKE and Swoosh Trademarks are valid, subsisting, and in full force and effect.

41.    Pursuant to 15 U.S.C. § 1065, most of Nike's registrations for the NIKE and Swoosh trademark are "Incontestable," as shown in the chart above, meaning that these registrations are *prima facie* evidence of the marks' validity, Nike's ownership, and Nike's exclusive right to use these marks.

42.    As a result of Nike's extensive sales, advertising, and promotion of the NIKE and Swoosh Trademarks, along with the Jumpman Design trademark  described in Paragraphs 43-52 below, the consuming public and trade have come to associate those marks uniquely and distinctly with Nike and its high-quality merchandise.  As a result, these marks have become famous and are herein referred to as "Nike's Famous Marks."

2.    <u>*Nike has amassed significant goodwill in the Jordan Marks.*</u>

43.    Nike also designs, manufactures, markets, licenses, and sells athletic footwear and apparel under the Jordan brand, named for Nike's well-known partnership with basketball legend Michael Jordan.

44.    Michael Jordan took to the court for the first-time wearing Nike Air Jordan shoes in 1982.  Those shoes were released to the public in 1985.  Since that release, Jordan has rapidly grown into one of the world's largest brands.  Today, Nike generates over 5 billion dollars in annual revenue on the Jordan brand.

45.    Upon information and belief, Defendants infringe, counterfeit, and/or dilute a number of the most popular Air Jordan shoe models, including the Air Jordan 1 (released in 1985), the Air Jordan 3 (released in 1988), and the Air Jordan 4 (released in 1989).  These shoes each contain silhouettes that are associated with Nike to this day and introduced some of the most

recognizable Jordan-affiliated trademarks of all time like the Jumpman logo (introduced with the Air Jordan 3 and featured on every model thereafter). Nike regularly releases new colorways or limited-edition versions for these original Air Jordan shoes based on consumer demand.

46.    While the Air Jordan 1 shoe was originally marketed for basketball, its unique design and many colorways made the Air Jordan 1 shoes a lifestyle symbol and an iconic fashion good. For example, Air Jordan shoes have been worn by numerous celebrities and featured in a slew of films including *Do the Right Thing* (1989), *Space Jam* (1996), *He Got Game* (1998), *White House Down* (2013), *Spider-Man: Into the Spider-Verse* (2018), *Space Jam: A New Legacy* (2021), *and Spider-Man: Across the Spider-Verse* (2023). In 2023, Matt Damon and Ben Affleck teamed up on the Golden-Globe nominated *Air* film which details the origin of the Air Jordan shoe. Today, Air Jordan shoes are the longest continuous running athletic footwear line ever. According to Statista Market Insights, Air Jordan was the second most popular sneaker brand globally in 2022 (after Nike).[4]



[4] https://www.statista.com/chart/30540/market-share-of-sneaker-brands/

**Air Jordan 4 Shoes**

 

47.    In recent years, Nike has released Air Jordan collaborations with artists like Travis Scott and fashion icons like Louis Vuitton's Virgil Abloh and Anna Wintour of Vogue.

48.    Nike has also developed other longstanding marks for the Jordan brand, such as the "Air Jordan Wings" design that had been specially crafted for Michael Jordan's "Air Jordan" nickname to be emblazoned on the shoes and apparel, and of course the "Jumpman" design, the iconic logo featuring Michael Jordan's silhouette.  Nike has continuously and substantially used the Air Jordan Wings, Jumpman design, and Jumpman word mark in commerce since at least as early as 1988.

49.    Because of the popularity of the Jordan shoes in basketball and popular culture, they are some of the most counterfeited shoes of all-time.[5]

50.    In the United States, Nike is the owner of the right, title, and interest in and to, inter alia, the following "Air Jordan" related trademarks registered on the Principal Register of the United States Patent and Trademark Office (collectively, the "Jordan Trademarks"):

| Reg. No. | Title | Trademark | Reg. Date / Status | Class, Goods, and Services |
|---|---|---|---|---|
| 1,370,283 | AIR JORDAN | AIR JORDAN (word mark) | 11/12/1985 – Incontestable | 25- Clothing, footwear |
| 3,725,535 | Air Jordan & Wings Design* | AIR JORDAN | 12/15/2009 – Incontestable | 25- Clothing, footwear, headgear |
| 3,627,820 | JUMPMAN | JUMPMAN (word mark) | 9/11/2007— Incontestable | 25- Clothing, footwear, headgear |

---

[5] https://fashionunited.com/news/fashion/these-are-the-most-counterfeit-sneakers/2023053054114

| Reg. No. | Title | Trademark | Reg. Date / Status | Class, Goods, and Services |
|---|---|---|---|---|
| 1,558,100 | Jumpman Design | ![Jumpman] | 9/26/1989 – Incontestable | 25- Clothing, footwear |
| 1,742,019 | Jumpman Design | ![Jumpman] | 12/22/1992 – Incontestable | 25- Clothing, footwear, headgear<br>18- Leather and imitations of leather |
| 4,137,741 | Elephant Print Design* | ![Elephant Print] | 5/8/2012 – Incontestable | 25- Clothing, footwear, headgear<br>18- Backpacks |

51.    The above U.S. registrations for Nike's Jordan Trademarks are valid, subsisting, unrevoked, uncancelled, and in full force and effect.

52.    Pursuant to 15 U.S.C. § 1065, all of Nike's registrations for the Jordan Trademarks are "Incontestable," as shown in the chart above, meaning that these registrations are *prima facie* evidence the marks' validity, Nike's ownership, and Nike's exclusive right to use these marks.

3.    *Nike has amassed significant goodwill in the DUNK Mark.*

53.    Nike introduced its DUNK shoe in 1986 as a basketball shoe in connection with its "College Colors Program."  College basketball players had typically worn single color shoes (*e.g.*, white or black).  But Nike's College Colors Program offered schools the opportunity to have shoes that mirrored their school colors.  Nike's College Colors Program became wildly popular.  At that time in the 1980s, college basketball was reaching new heights among a wide age range of athletes and fans.  From East to West, rivalries were strong and network television brought college basketball, and Nike's DUNK shoes, to the masses.

**Nike Dunk Shoes**




54.    The DUNK shoes' adoption and popularity eventually spread beyond basketball culture and crossed over sports (e.g., skateboarding) and fashion, and today it is recognized as one of the most iconic and influential shoes of all time.

55.    Since the launch of the DUNK shoes in 1986, Nike has continuously and substantially exclusively used the DUNK word mark and promoted and sold shoes bearing its distinctive trade dress.

56.    Nike DUNK shoes are immensely popular.  Nike has sold tens of millions of DUNK shoes in the United States, accounting for hundreds of millions of dollars in revenue.

57.    In the United States, Nike is the owner of the right, title, and interest in and to, *inter alia*, the following DUNK trademark registered on the Principal Register of the United States Patent and Trademark Office (the "DUNK Trademark"):

| Reg. No. | Title | Trademark | Reg. Date / Status | Class, Goods, and Services |
|----------|-------|-----------|--------------------|----------------------------|
| 3,780,236 | DUNK | DUNK (word mark) | 4/27/2010 – Incontestable | 25 – Footwear |

58.    The above U.S. registration for Nike's DUNK Trademark is valid, subsisting, unrevoked, uncancelled, and in full force and effect.

59.    Pursuant to 15 U.S.C. § 1065, Nike's registration for the DUNK Trademark is "Incontestable," as shown in the chart above, meaning that this registration is *prima facie* evidence the mark's validity, Nike's ownership, and Nike's exclusive right to use this mark.

*4.    Nike has amassed significant goodwill in the "Air Force 1" Mark.*

60.    Nike released the first Air Force 1 shoe in 1982.  The Air Force 1 shoe release was groundbreaking because it was Nike's first basketball shoe to feature Nike-patented AIR technology.  A group of NBA players, now known as the "Original Six," Moses Malone, Michael Cooper, Clavin Natty, Jamaal Wilkes, Bobby Jones, and Mychal Thompson, starred in the Air

Force 1 shoe's launch campaign.  Six colorways which corresponded with the players' respective teams were released as part of the debut.

61.    In the mid-90s, the quintessential all-white Air Force 1 "Triple Whites" were released to the marketplace and cemented the shoe's silhouette as a true classic.  In the 2000s, globally recognized artists such as Nelly and Jay-Z further solidified the Air Force 1 shoes in popular culture, referencing the shoes in their lyrics and releasing limited edition collaborations with their albums.  The Air Force 1 shoes growing popularity among influential celebrities and music artists propelled it farther beyond sport and into culture.  Nike has continued to collaborate with various designers to create much-anticipated limited edition Air Force 1 styles and colorways.  For example, Nike released limited Air Force 1 shoes with DJ Clark Kent, Questlove, Eminem, Travis Scott, Serena Williams, and Lebron James, just to name a few.

**Nike Air Force 1 Shoes**



Nike Air Force 1 '07



Nike Air Force 1 x Lebron James
"Strive for Greatness"

62.    Nearly 40 years after its debut, the Air Force 1 shoes have been produced in over 1,700 color combinations, including numerous limited, special, and premium editions.  The Air Force 1 shoes remain incredibly popular.  Nike has sold hundreds of millions of Air Force 1 shoes in the United States, accounting for billions of dollars in revenue.

63.    For several decades, Nike continuously and substantially used the AIR FORCE 1 word mark, which Nike has registered on the Principal Register of the United States Patent and Trademark Office (the "AF1 Trademark"):

| Reg. No. | Title | Trademark | Reg. Date / Status | Class, Goods, and Services |
|---|---|---|---|---|
| 3,520,484 | AIR FORCE 1 | AIR FORCE 1 (word mark) | 10/21/2008 – Incontestable | 25 – Footwear |

64.    The above U.S. registration for Nike's AF1 Trademark is valid, subsisting, and in full force and effect.

65.    Pursuant to 15 U.S.C. § 1065, all of Nike's registrations for the AF1 Trademark is "Incontestable," as shown in the chart above, meaning that the registrations are prima facie evidence these marks' validity, Nike's ownership, and Nike's exclusive right to use these marks.

> 5.   *Nike protects the goodwill in the iconic silhouettes of Nike shoes through trademark registrations.*

66.    For each of the shoes bearing Nike's Nike and Swoosh Trademarks, Air Jordan Trademarks, Dunk Trademark, and the AF1 Trademark, Nike protects and enforces, not just the names and logos on the shoes, but also the shoes' iconic silhouettes that the public associates with Nike.

67.    Nike is the owner of the right, title, and interest in and to, *inter alia*, the following trade dress registered on the Principal Register of the United States Patent and Trademark Office (collectively, the "Nike Asserted Trade Dress.").

| Reg. No. | Title | Trademark | Reg. Date / Status | Class, Goods, Services |
|---|---|---|---|---|
| 3,451,904 | AF1 Trade Dress* |  | 6/24/2008 – Incontestable | 25 – Footwear |
| 3,451,905 | Air Force 1 Low* |  | 6/24/2008 – Incontestable | 25 – Footwear |

| Reg. No. | Title | Trademark | Reg. Date / Status | Class, Goods, Services |
|---|---|---|---|---|
| 5,820,374 | | | 7/30/2019 | 25 – Footwear |
| 3,451,906 | Air Force 1 Mid* | | 6/24/2008 – Incontestable | 25 – Footwear |
| 3,451,907 | | | 6/24/2008 – Incontestable | 25 – Footwear |
| 3,711,303 | | | 11/17/2009 – Incontestable | 25 – Footwear |
| 3,711,305 | Dunk Trade Dress (Low)* | | 11/17/2009 - Incontestable | 25 – Footwear |
| 3,721,064 | Nike Outsole Trade Dress | | 12/8/2009 – Incontestable | 25 – Footwear |
| 6,368,691 | Air Jordan 1 OG Trade Dress (Low)* | | 6/1/2021 | 25 - Footwear |
| 6,368,694 | Air Jordan 1 OG Trade Dress (High)* | | 6/1/2021 | 25 - Footwear |

| Reg. No. | Title | Trademark | Reg. Date / Status | Class, Goods, Services |
|---|---|---|---|---|
| 6,368,693 | Air Jordan 1 Trade Dress (Low)* |  | 6/1/2021 | 25 - Footwear |
| 6,639,127 | Air Jordan 3 Trade Dress* |  | 2/8/2022 | 25 - Footwear |
| 6,639,128 | Air Jordan 4 Trade Dress* |  | 2/8/2022 | 25 - Footwear |

68.     The above registrations for the Nike Trade Dress Marks are valid, subsisting, unrevoked, uncancelled, and in full force and effect.

69.     The Nike and Swoosh Trademarks, Jordan Trademarks, Dunk Trademark, AF1 Trademark, together with Nike's Trade Dress Marks, are the "Nike Asserted Marks" herein.

6. *Nike in the digital space.*

70.     Nike also offers interactive consumer services and experiences as well as digital products through its digital platforms bearing its trademarks and trade dress.  Nike has placed significant resources into virtual goods and other virtual collaborations and has developed strong common law rights in this space.

71.     In October 2019, Nike, through its SNKRS mobile application, partnered with 2K Sports, makers of the NBA 2K basketball videogame franchise, to offer ten "Gamer Exclusives," limited edition digital and physical Nike shoes that NBA 2K20 players can unlock through gameplay.

21

72.     On or around January 18, 2022, Nike announced to its employees the formation of Nike Virtual Studios, a new division that operates as an independent studio to further develop Nike's business around virtual products and partner with its core business.

73.     On November 14, 2022, Nike launched .SWOOSH (pronounced "dot Swoosh"), a web-3 enabled platform aimed at creating a new, inclusive digital community and a home for Nike virtual creations.  On April 13, 2023, .SWOOSH announced its first collection of Nike virtual creations built around the Air Force 1 shoe.

74.     Through .SWOOSH and Nike Virtual Studios, Nike has announced partnerships with EA Sports and Epic Games to bring Nike virtual creations to the gaming space.

75.     These partnerships enhance and personalize gaming experience for consumers through Nike's brands.  For example, in June 2023, Nike launched "Airphoria" in Fortnite, an immersive gaming experience combining the signature design elements of Nike Air Max with the dynamic and ever-evolving landscape of Fortnite where players could purchase Nike-branded digital creations in the Fortnite Item Shop.

76.     On July 25, 2023, .SWOOSH launched the utility for its first collection of .SWOOSH virtual creations – a downloadable, customizable 3D files of "Our Force 1s" (or OF1s), which are digital Air Force 1 shoes.  Nike called the release of OF1s in Nike's homage to the creativity and versatility of the Air Force 1 shoes.

77.     In January 2024, .SWOOSH announced its plans to expand its virtual products with video games through "Nike In-Game Wearables."  Nike In-Game Wearables allow video gamers to add Nike shoe collections into their favorite games.  This innovation will allow users to bring their sense of fashion and self-expression directly in video games. Nike announced that these digital collectables can be traded with other users.

78.    To protect its rights in virtual goods, in addition to its common law rights Nike has

filed applications to register the following trademarks with the United States Patent and Trademark

Office under Section 1(b) of the Lanham Act:

| App. No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| 97/095,855 | NIKE (word mark) | 9, 35, 41 | Downloadable virtual goods, namely, computer programs featuring footwear… and accessories for use online and in online virtual worlds<br><br>Retail store services featuring virtual goods, namely, footwear…for use online; online retail store services featuring virtual merchandise, namely, footwear….<br><br>Entertainment services, namely, providing online, non-downloadable virtual footwear...for use in virtual environments. |
| 97/096,950 | JORDAN (word mark) | 9, 35, 41 | Downloadable virtual goods, namely, computer programs featuring footwear… and accessories for use online and in online virtual worlds<br><br>Retail store services featuring virtual goods, namely, footwear…for use online; online retail store services featuring virtual merchandise, namely, footwear….<br><br>Entertainment services, namely, providing online, non-downloadable virtual footwear...for use in virtual environments. |
| 97/086,952 |  | 9, 35, 41 | Downloadable virtual goods, namely, computer programs featuring footwear… and accessories for use online and in online virtual worlds<br><br>Retail store services featuring virtual goods, namely, footwear…for use online; online retail store services featuring virtual merchandise, namely, footwear….<br><br>Entertainment services, namely, providing online, non-downloadable virtual footwear...for use in virtual environments. |

| App. No. | Trademark | Class | Goods and Services |
|---|---|---|---|
| 97/096,945 |  | 9, 35, 41 | Downloadable virtual goods, namely, computer programs featuring footwear… and accessories for use online and in online virtual worlds<br><br>Retail store services featuring virtual goods, namely, footwear…for use online; online retail store services featuring virtual merchandise, namely, footwear….<br><br>Entertainment services, namely, providing online, non-downloadable virtual footwear...for use in virtual environments. |
| 97/095,944 |  | 9, 35, 41 | Downloadable virtual goods, namely, computer programs featuring footwear… and accessories for use online and in online virtual worlds<br><br>Retail store services featuring virtual goods, namely, footwear…for use online; online retail store services featuring virtual merchandise, namely, footwear….<br><br>Entertainment services, namely, providing online, non-downloadable virtual footwear...for use in virtual environments. |
| 97/096,366 |  | 9, 35, 41 | Downloadable virtual goods, namely, computer programs featuring footwear… and accessories for use online and in online virtual worlds<br><br>Retail store services featuring virtual goods, namely, footwear…for use online; online retail store services featuring virtual merchandise, namely, footwear….<br><br>Entertainment services, namely, providing online, non-downloadable virtual footwear...for use in virtual environments. |

**B.    *Nike Maintains Strict Licensing and Quality Control Standards in Order To Protect Goodwill in the Nike Asserted Marks.***

79.    Nike generates revenue through license agreements that permit individuals and parties unaffiliated with Nike to manufacture and sell athletic footwear and apparel using Nike-owned trademarks.  When Nike enters into such licenses, Nike oversees and maintains strict

quality control standards by, for example, inspecting such products prior to distribution and sale. Nike does so to ensure that whatever goods are released to the public have the same high-quality functionality and style associated with Nike and the Nike Asserted Marks.

80.     Nike carefully decides who (and who not) to partner with, when, where, and how those resulting products will look, how they will be sold, as well as how many products to release.

81.     Nike has partnered with athletes and celebrities including, to name a few, LeBron James, Cristiano Ronaldo, Serena Williams, Naomi Osaka, Kevin Durant, Rafael Nadal, Megan Rapinoe, Kobe Byrant, Travis Scott, and Drake. Nike chooses these collaboration partnerships very carefully, and oversees and/or authorizes the silhouettes, colorways, and technology in the shoes that come from these partnerships. Nike is thoughtful about its collaborative efforts and strives to work with partners who reflect Nike's core values and commitments. For example, Nike has partnered with Michael J. Fox to raise awareness and over $6.7 million dollars for Parkinson's research by raffling off 89 shoes replicating the self-lacing shoes Fox wore in *Back To The Future, Part 2*. Ultimately, the decision of which public figures or brands fit with Nike is a decision that lies exclusively with Nike.

82.     Nike also collaborates with other parties outside the fashion industry like PlayStation and even the hit Netflix television show "Stranger Things." When Nike collaborates with other brands within the fashion industry, it typically selects to partner with high-end or high-culture streetwear brands such as Jacquemus, Supreme, Stussy, Tiffany & Co, and Louis Vuitton. For example, Nike and Tiffany & Co. launched special edition Air Force 1 shoes in black co-branded with Nike's Swoosh Design mark depicted in the famous Tiffany Blue® color. This shoe was packaged in a Tiffany Blue® shoe box.



Nike also released a number of bespoke sneaker collaborations with Louis Vuitton. For example, in 2022, Nike released the Louis Vuitton x Air Force 1 Low 'White Team Royal.'



83.    This collection combines Nike's Air Force 1 Trade Dress, Air Trademark, and Swoosh Design mark along with Louis Vuitton's monogram, "Louis Vuitton" on the tongue and on the heel of the shoe. The placement and use of the Nike and Louis Vuitton trademarks is carefully negotiated. When Nike collaborates with other brands, Nike ensures that each shoe looks and feels like an Air Force 1 shoe should through Nike's closely held brand guidelines, specifications, and technology. As a result, Nike directly oversees the manufacturing process when it collaborates with other brands.

84.    To maintain control over its brand, Nike polices unauthorized use of its trademarks, including by "customizers" or peddlers of "virtual goods" similar to Defendants. Nike enforces its rights both through pre-litigation efforts and publicly filed actions. For example, in 2021 Nike brought suit against MSCHF for trademark infringement and dilution resulting from its sale of the "customized" Satan Shoes. *See Nike, Inc. v. MSCHF Product Studio, Inc.*, Case No. 1:21-cv-01679, Dkt. 1 (C.D. Cal. Mar. 29, 2021). Like some of Defendants' products, the "Satan Shoes" were "customized" Nike shoes, bearing Nike's iconic Swoosh design, with several material

alterations applied to the shoes.  Days later, the court granted Nike's application for a temporary restraining order.  *Id.*, Dkt. 18 (C.D. Cal. Apr. 1, 2021).  Nike has also sought and received relief from federal courts in trademark litigations brought against others including Jeffrey Waskowiak and KickRich, LLC, Customs By Ilene, Inc., et al. d/b/a "Drip Creationz", and Reloaded Merch.

**C.    *Nike Offers Its Own Customization Services.***

85.    Nike is not anti-customization.  To the contrary, consumers that wish to customize Nike shoes are encouraged to do so within Nike-controlled parameters.

86.    In the mid-2000s, Nike created NikeiD, which allowed Nike consumers to customize virtually every aspect of the shoes while at the same time maintaining quality control of those Nike products.  NikeiD was re-branded "Nike By You," a co-creation service that permits consumers to customize and purchase Nike shoes such as Nike Dunk Low, Nike Dunk High, Nike Air Force 1 Low, Nike Air Force 1 Mid, Nike Air Force 1 High, among many others.

87.    The "Nike By You" customization service allows customers to choose the material and color of various elements of a Nike shoe, including the Toe/Tongue, the Tip/Accent, the Mid Panel/Collar, Heel, Swoosh, Backtab, Lining, Laces, Tongue Label, Midsole, Outsole, as well as the text or logo color on the Backtab.  Through "Nike By You," Nike offers customers an opportunity to customize Nike shoes while maintaining control over the design process to ensure that the quality of the customized designs meets Nike's rigorous quality control standards.

**D.    *Defendants Were On Notice That They Required Nike's Consent To Customize, Alter, Or Otherwise Use In Commerce Any of the Nike Asserted Marks.***

88.    Upon information and belief, after gaining some recognition as a customizer, Ciambrone, with the help of former client turned business partner Imbimbo, incorporated and formally launched the Defendant Entities.

89.     As far as Nike is aware, the Defendant Entities began in or about 2016 or 2017 as small operations focused on bespoke customization of shoes: an individual consumer would provide Ciambrone his or her pair of shoes to airbrush or otherwise customize per that customer's specifications, and Ciambrone would charge that consumer a commission.

90.     Nike did not interfere with these early limited scope commissions for one-of-one customizations, and actually recognized Ciambrone's talents.  In 2017, Nike entered into a limited creative services agreement with defendant S2, Inc. to customize less than three dozen shoes for a "Shoe Surgeon x Jordan 13" collaboration.  That agreement granted Ciambrone a restricted license to use Nike's marks for that specific project and only in the manner permitted by Nike.  Defendants were therefore put on notice that they required Nike's permission to use Nike's marks to customize and sell Nike products in any quantities.

91.     In 2018, Nike also commissioned Ciambrone to create a one-of-one custom pair of Nike LeBron 15 shoes to commemorate LeBron James reaching the 30,000-career points milestone.  Ciambrone adorned the Nike LeBron 15 shoes in 24 karat gold and diamonds valued at $100,000.  Nike gifted this pair of shoes to Mr. James.  And in 2023, Nike again commissioned Ciambrone to create a pair of custom Nike Lebron 20 shoes to commemorate Mr. James surpassing Kareem Abdul-Jabbar as the NBA's all-time leading scorer.  Nike again gifted this pair of shoes to Mr. James.  These commissions—limited engagements to commemorate the achievements of one of Nike's signature athletes—did not give Defendants the unfettered right to use Nike's marks to customize Nike shoes and manufacture fake "Nike" shoes from scratch, yet that's exactly what Defendants have done.

### E.     *Defendants Create A False Air Of Credibility Through Their Past Nike Dealings.*

92.     Defendants use these aforementioned prior collaborations to their advantage.  For example, the first one-off LeBron project is prominently listed at the top of the "Developments +

Partnerships" section of Defendants' thesurgeon.com website:



93.    Defendants also promote their goods and services while invoking these past limited projects with Nike.  For example, in a 2020 video interview with Sole Collector, Ciambrone was asked if he was concerned about legal trouble for customizing shoes from brands like Nike. Ciambrone promptly responded "I work with the brands.  I work with Adidas.  I work with Nike." https://www.youtube.com/watch?v=1INUPHn_xy8 at 9:57-10:18.

94.    Upon information and belief, Defendants prominently feature their prior relationships with Nike with the intent of giving their unauthorized activities an aura of authenticity and for consumers to believe that Nike has approved of their goods and services.  In light of these marketing activities, consumers have and are likely to continue to mistakenly believe that Defendants' current business ventures are approved by or associated with Nike when they are not.

***F.  Defendants Reshape Their Business Around Copying, Counterfeiting, and Relying On the Nike Asserted Marks.***

95.    Upon information and belief, in late 2017, Ciambrone brought Imbimbo in as a new business partner.  After that point and continuing progressively to the present, Defendants' operations began to expand, as Ciambrone transitioned from "cobbler" to the CEO and founder of "The Shoe Surgeon."

96.     Upon information and belief, Ciambrone and Imbimbo were the conscious, moving forces behind the decision to cease operating as a bespoke, one-of-one shoe customizer, and to build a business around Nike's brand and shoes.  Today, on information and belief, Defendants now employ a full staff of over 40 individuals.[6]

97.     As Defendants' reputation and business grew, they started to increase the scope of their collaborations with third parties to create custom "Nike" shoes bearing third party brands, and exponentially increased their social media and online presence.

98.     In or around December 2021, Defendants debuted a brick-and-mortar location in Manhattan's South Street Seaport district, offering workshops and classes through SRGN Academy.  Upon information and belief, Defendants subsequently added retail services.

99.     In or around late April/early May 2022, Defendants launched "SRGN Studios," a 16,000 square foot brick-and-mortar location in Los Angeles, California where Defendants also offer workshops and classes through the SRGN Academy and, on information and belief, retail services.  This more than quadrupled the modest space that Defendants operated previously.

**G. Defendants' Unlawful "Open Commissions" and Sale of New and Counterfeit "Nike" Shoes.**

100.     Upon information and belief, Defendants offer consumers "open commissions" through The Shoe Surgeon Website and The Shoe Surgeon Social Media to create "made-to-order" shoes bearing the Nike Asserted Marks.  They conduct these activities by either customizing a purchased Nike shoe as a base (the "Infringing New Shoes") or producing Nike-branded shoes entirely from scratch (the "Counterfeit 'Nike' Shoes").

101.     Defendants design the so-called "made to order" shoes before offering them for sale and receiving an order from a consumer.  And even though Defendants claim on their website

---

[6] https://www.wsj.com/articles/meet-the-shoe-surgeon-whose-sneaker-designs-sell-for-up-to-10-000-1523007900.

that they sell a "customization service" and not a product, their now typical practice is to purchase the shoes themselves and automatically include them in the price charged to the consumer. In the small print, Defendants artfully refer to this charge as a "sourcing fee."

102.    Defendants' material and significant alterations of existing Nike shoes to create the Infringing New Shoes caused, and is likely to continue to cause, initial interest, point of sale, and post-sale confusion as to Nike's approval and/or authorization of the Infringing New Shoes.

103.    Upon information and belief, the Infringing New Shoes contain few, if any, materials that Nike used in the manufacture of an authorized product. Rather, the Infringing New Shoes contain modified portions that Defendants fabricated using materials, stitching, and/or colorways that Nike neither manufactured nor approved. The Infringing New Shoes have been so materially altered by Defendants that the resulting shoe can no longer be considered an authorized Nike product. Despite the fact that little or no Nike materials remain in the Infringing New Shoes, the Nike Asserted Marks are prominently affixed and the Infringing New Shoes bear the Nike Asserted Trade Dress. The Infringing New Shoes are represented to the public as "Nike" shoes, as demonstrated in the examples below.



 

104.    Further, in addition to their significant modifications of existing Nike shoes, Defendants are designing and manufacturing new "Nike" shoes entirely from scratch, i.e., brand new shoes that look just like Nike shoes and contain identical or nearly identical versions of Nike's trademarks and trade dress yet were not authorized by Nike.  These are Counterfeit "Nike" Shoes.



105.    The above examples are merely illustrative, and on information and belief, Defendants have offered "open commissions" of an unknown amount of Infringing New Shoes and/or Counterfeit New Shoes bearing the Nike Asserted Marks in their brick-and-mortar locations.

106.    As recently as July 4, 2024, Defendants offered a holiday sale where dozens of "backstock" styles of Infringing New Shoes and, on information and belief, Counterfeit "Nike" Shoes were offered for sale on Defendants' website.

 

107.    On information and belief, Defendants intentionally use the Nike Asserted Marks and/or confusingly similar marks to create an association between their Infringing New Shoes or their Counterfeit "Nike" Shoes, on the one hand, and Nike, on the other hand, in order to capitalize on Nike's valuable reputation and customer goodwill.  A reasonable consumer would believe that these are genuine Nike shoes when they are not.  This is true despite the fact that Defendants often affix their own logo onto Nike's Asserted Trade Dress alongside Nike's famous Swoosh.  Not only is Defendants' branding less prominent, Defendants' inclusion of their own logo creates the false impression that Nike has entered into a collaboration with Defendants on these products.

108.    Defendants' unauthorized use of the Nike Asserted Marks on the Infringing New Shoes or the Counterfeit "Nike" Shoes falsely implies Nike's involvement in and/or authorization of Defendants' offerings.

109.    Further aggravating the likelihood of consumer confusion Defendants have caused and are causing, and in yet another way they freeride on Nike's goodwill, Defendants have used

Nike trademarks to create infringing marks that include their own branding and make it appear as though the parties have collaborated:



| Nike's Asserted Mark | Infringing New Shoes |
|---|---|
|  | [7] |
|  | [8] |
|  | [9] |

110.    Some of the Infringing New Shoes capitalize off the popularity of Nike's limited collaborative releases by offering "open commissions" of products mimicking these limited Nike releases.  For example, aligning with the 35th Anniversary of the Air Jordan, Nike collaborated with Dior to design and release the "Air Jordan 1 Dior" in June 2020.  Nike released limited quantities of this shoe—8,500 pairs of high tops and 4,700 pairs of low tops.  Both styles feature the Dior Gray color palette and are accented with Dior's signature Oblique monogram jacquard Swooshes.  Dior and Air Jordan's iconic branding were mixed on the Jordan Wings logo, tongue labels, and outsole graphics.

---

[7] https://www.instagram.com/p/C7aOu3tv0fq/?img_index=6
[8] https://www.instagram.com/p/Czjvq3qP9IY/
[9] https://www.instagram.com/p/C8AESSxphfU/?img_index=2

111.    In November 2023, Defendants announced their own unauthorized "Dior OG Collection" that look nearly identical to Air Jordan 1 Dior, including an Infringing New "Air Jordan 1 High SRGN Dior Lux" available for "commissions."

| Nike Air Jordan 1 High Dior | Defendants' Infringing New Shoe[10] |
|---|---|



112.    In March 2023, Nike collaborated with Tiffany & Co. to design and release a was highly sought after limited Air Force 1.  In May 2024, Defendants again mimicked this release:

| Air Force 1 x Tiffany & Co.[11] | Defendants' Infringing New Shoe[12] |
|---|---|



---

[10] https://www.instagram.com/thesurgeon/p/CzhLvePv-oh/?img_index=2
[11] https://www.nike.com/launch/t/air-force-1-tiffany-and-co-black
[12] https://www.instagram.com/p/C6g1av3RVL0/

113.    On information and belief, Defendants also offer the Infringing New Shoes and the Counterfeit New Shoes for sale in the retail sections of their brick-and-mortar locations.

## H. Defendants' Brand Partnerships & Unauthorized Collaborations with Third Parties Are Unlawful.

114.    Defendants have engaged in a variety of problematic behaviors using third party branding or collaborations alongside the Nike Asserted Marks which falsely imply Nike's endorsement or sponsorship, including: (1) creating custom or limited release Nike shoes with other brands and (2) combining a Nike shoe with another rights holder's marks or logos without authorization from either brand.

115.    These uses of third-party branding in connection with the Nike Asserted Marks creates the false impression that Nike is affiliated with the third-party brand or otherwise endorses or sponsors the third-party brand.

116.    Without Nike's approval or authorization, Defendants have entered into "collaborations" with other rightsholders, where Defendants combine Nike's marks and shoe designs with the other rightsholder's branding.

**Shoe Surgeon Brand Collaborations**

Chime Credit 1" by The Shoe Surgeon[13]



The Shoe Surgeon x Jack Daniel's AF1 Low[14]



---

[13] https://www.chime.com/theshoesurgeon/
[14] https://www.thesurgeon.com/pages/the-shoe-surgeon-jack-daniels-nba-all-star-2018

The Shoe Surgeon x Miami HEAT[15]



The Shoe Surgeon x eBay[16]



The Shoe Surgeon x Wingstop:
"Lemon Pepper 1"[17]



The Shoe Surgeon x Celsius[18]



The Shoe Surgeon x Ruffles[19]



The Shoe Surgeon x Twix[20]



[15] https://www.thesurgeon.com/pages/the-shoe-surgeon-miami-heat-vice
[16] https://www.thesurgeon.com/pages/developments-partnerships
[17] https://www.nicekicks.com/shoe-surgeon-x-wingstop-lemon-pepper-1/
[18] https://www.instagram.com/celsiusofficial/p/CkgYs_8OYmi/?img_index=1
[19] https://www.instagram.com/stories/highlights/17865826381661085/
[20] https://www.instagram.com/stories/highlights/17865826381661085/

117.    Defendants have also combined Nike's marks and shoe designs with another rightsholder's branding without Nike's or the other rightsholder's approval or authorization. Defendants have applied third-party logos, branding, and trademarks to Nike-branded shoes, such as Louis Vuitton, Gucci, and Goyard, and offered them for sale through bulk "commissions," creating the impression of authorized collaborations as illustrated in the below examples:

| The Shoe Surgeon's Infringing New "Air Jordan 1" Shoes with Gucci Branding[21] | The Shoe Surgeon's Infringing New "Jordan"-branded Shoes with Louis Vuitton Branding[22] |
|---|---|

 

| The Shoe Surgeon's Infringing "University Luxe Pack" – Infringing New "Air Jordan 1 Low" with Goyard branding[23] |
|---|



---

[21] https://www.instagram.com/p/C0XQqTqPu7S/
[22] https://www.instagram.com/p/C094dm9v3DB/?img_index=1
[23] https://web.archive.org/web/20230819072640/https://www.thesurgeon.com/

I.    *Defendants' Unlawful Activities In The Shoe Surgeon Workshops, Academies & Sale of "Nike"-Branded Patterns and Kits.*

118.    Defendants offer for payment a variety of in-person classes and workshops through its "SRGN Academy" brick & mortar locations in New York, Los Angeles, and Las Vegas as well as through online classes.

119.    SRGN Academy, including in the Seaport location, offers "Customization Workshops." For $200, individuals can sign up for a three-hour session to be instructed how to create their own shoes. Defendants grant attendees access to the SRGN workshop where they can choose from paints, laces, leathers, and other materials and supplies needed to create their shoes. SRGN staff are available to help attendees create their shoes. Attendees may either supply their own shoes or, in some cases, may buy shoes from Defendants. Defendants "recommend simple models like Air Force 1's, Vans, and High Top Chucks as they are the easiest to customize."[24] Upon information and belief, as part of these infringing "Customization Workshops", individuals can deconstruct Nike shoes, including by removing and replacing the Nike Swoosh and other Nike marks.

120.    Defendants also offer "Decon/Recon" classes (herein referred to as "Infringing Academies") which they describe as "a three-day comprehensive lab experience to learn how to deconstruct and reconstruct popular shoe silhouettes."[25]

121.    Defendants are currently accepting enrollment for a "Decon/Recon" class in the Surgeon Studios in NYC, where consumers can pay $3,000 to learn from the "SRGN Academy's team of certified instructors" how to "decon/recon" an infringing Air Jordan 1 or Nike SB Dunk shoe.[26] It remains unclear who "certified" these individuals and what the "certification" entails.

---

[24] https://www.srgnacademy.com/collections/customization-workshops/products/customization-workshop-new-york
[25] https://www.srgnacademy.com/collections/decon-recon
[26] https://www.srgnacademy.com/collections/decon-recon/products/decon-recon-class-nyc-august-16th-18th



"**DECON/RECON CLASS - NYC - August 16th – 18th**"[27]

122.    Moreover, for $5,000, consumers can enroll in a four-day "Decon/Recon" class due to take place in September 2024, where Defendants will teach consumers how to construct an infringing Air Jordan 4 shoe.[28]

123.    Defendants also offer an online class for $499.99 (currently on sale from $849.99). This class allows the "students" to follow along and learn how to construct custom "Nike" shoes from start to finish.[29]

124.    During this course, Ciambrone blatantly teaches the public how to make the famous Swoosh for purposes of affixing it to the shoe.  He explains that the Swoosh is a challenging logo to create and that it is therefore useful to trace a genuine Swoosh during the process, in addition to use of the Swoosh provided in the "Nike Air Jordan 1" pattern mentioned below.

---

[27] https://www.srgnacademy.com/collections/decon-recon/products/decon-recon-class-nyc-august-16th-18th
[28] https://www.srgnacademy.com/collections/decon-recon/products/jordan-4-decon-recon-class-dtla-sep-19th-22nd
[29] https://www.srgnacademy.com/pages/online-class-with-monthly



125.    Defendants also operate the online "SRGN Creator Store" which includes tools and content to "master shoe customization and creation."

126.    Amongst the products offered for sale in the "SRGN Creator Store" is The Shoe Surgeon Starter Bundle for Air Jordan 1 which "includes all the must-have tools and materials to create your own pair of custom AJ1s."[30]



---

[30] https://www.srgnacademy.com/collections/shoemaking-bundles-kits/products/air-jordan-1-shoemakers-kit

127.    The Shoemakers' Starters Bundle includes an aforementioned sewing pattern titled "NIKE AIR JORDAN 1."  This pattern includes a Nike Swoosh co-branded with a small Shoe Surgeon logo.  Ironically, the pattern includes a copyright notice that the designs—including the Nike Swoosh—are "ALL ORIGINAL WORK" by the Shoe Surgeon.



128.    In addition, Defendants offer for sale a variety of standalone patterns to create fake "Nike" shoes.  These patterns are titled with Nike Asserted Marks, including the "official Shoe Surgeon Air Jordan 1 high pattern,"[31] the "official Shoe Surgeon Air Force 1 Low pattern,"[32] and "the official Shoe Surgeon Air Jordan 3 pattern."[33]  As far as Nike is concerned, there is nothing "official" about these patterns, as Nike has not authorized or approved them.

129.    These patterns come complete with unauthorized Nike Swooshes for customers to use to create their own counterfeits:

---

[31] https://www.srgnacademy.com/collections/patterns-1/products/air-jordan-1-high-pattern
[32] https://www.srgnacademy.com/collections/patterns-1/products/air-force-1-low-pattern
[33] https://www.srgnacademy.com/collections/patterns-1/products/air-jordan-3-pattern



130.    Defendants also offer for sale through their website high density plastic shoe molds, *i.e.*, "lasts," titled with Nike Asserted Marks and specifically made for creating shoes bearing Nike Asserted Marks (together with the Shoemakers' Starter Bundle and patterns, the "Infringing Shoemaking Products").



**Air Force 1 Last for Sale on srgnacademy.com**[34]

---

[34] https://www.srgnacademy.com/collections/lasts/products/air-force-1-last

131.    Currently available are lasts that can be used to manufacture or create shoes in the silhouette of an Air Jordan 1[35], Air Jordan 3/Air Jordan 4[36], Air Force 1[37], and Air Max 1.[38]  Each of these "iconic" silhouettes is protectable trade dress and covered by the Nike Asserted Marks.

132.    To ensure that their customers can create complete shoes, Defendants also sell an "Inner Construction Material Bundle" with all the "materials you need for the inner construction of your custom designed shoes," which "can be used across all [Nike] silhouettes."

133.    Defendants use Nike Asserted Marks to market these Infringing Customization Workshops, Infringing Academies, and Infringing Shoemaking Products without Nike's authorization to make, promote, advertise, market or sell services related to the customization or wholesale creation of "Nike" shoes.

134.    Upon information and belief, through their online and/or in-person classes, Defendants are teaching third parties how to manufacture Counterfeit "Nike" Shoes from scratch, with little to no material original to any authorized Nike shoe.

135.    Upon information and belief, Defendants intentionally use the Nike Asserted Marks and/or confusing similar marks to create an association between their Infringing Customization Workshops, Infringing Academies, Infringing Shoemaking Products (including patterns, bundles, and lasts) and Nike, in order to capitalize on Nike's valuable reputation and customer goodwill. This has created, and will continue to create, confusion in the marketplace as to Nike's association and/or authorization of the Infringing Customization Workshops, Infringing Academies, and Infringing Shoemaking Products.

---

[35] https://www.srgnacademy.com/collections/lasts/products/air-jordan-1-last
[36] https://www.srgnacademy.com/collections/lasts/products/air-jordan-3-air-jordan-4-last
[37] https://www.srgnacademy.com/collections/lasts/products/air-force-1-last
[38] https://www.srgnacademy.com/collections/lasts/products/air-max-1-last

**J.      Defendants' Infringing 3D/AR Digital Renderings.**

136.    On May 22, 2024, Defendants opened a new chapter in their faux-Nike empire, announcing a partnership with swatchbook, Inc. to create a design application ("app") called "Remix."  The purpose of the Remix app is to allow the creation and customization of detailed 3D assets.  Prominently included are, of course, unauthorized assets bearing the Nike Asserted Marks. The application also offers an integrated AR feature.  Remix app users can save their design and share them with anyone directly or through social media.



**Excerpt**[39]

137.    Users of the Remix app have access to 3D assets and digital materials and apply them to individual parts of the design.  The Remix app also included an integrated AR feature.

138.    As part of the unauthorized digital collaboration, Defendants have "carefully curated" certain shoe silhouettes provided by the "Surgeon" which include a variety of 3D assets bearing Nike Asserted Marks (the "Infringing Digital Shoes") as illustrated in the below examples:

---

[39] swatchbook.us/news/srgn-academys-never-stop-creating-goes-digital-with-swatchbook



| SRGN AJ1 Low | SRGN SB DNKS | SRGN AJ1 High | AJ1 High |

139.    Just like the Infringing New Shoes, the Infringing Digital Shoes bear Nike Asserted

Marks alongside Defendants' trademarks:



**Snaphots of the "SRGN AJ1 Low" (black color added for clarity)**

140.    Defendants' unauthorized use of the Nike Asserted Marks on the Infringing Digital

Shoes falsely implies Nike's involvement in and/or authorization of Defendants' offerings.

141.    Defendants have taken systematic steps in an attempt to falsely associate the

Infringing Digital Shoes with Nike.  By using the Nike Asserted Marks and/or confusing similar

marks on the Infringing Digital Shoes, Defendants have led consumers and potential customers to

believe that Defendants' Infringing Digital Shoes are associated with and/or approved by Nike, when they are not.

**K.    *Defendants Blatantly Ignore Nike's Repeated Demands To Cease And Desist.***

142.    This trademark infringement and counterfeiting complaint follows well over a dozen attempts by Nike to resolve Defendants' unlawful conduct outside of a courtroom setting. Unfortunately, it ultimately became abundantly clear that Ciambrone had no interest in staying in his lane as a bespoke customizer, despite his repeated shows of contrition when Nike pointed out clear trademark violations.

143.    Nike's interactions with Defendants that addressed concerns over Defendants' intellectual property violations ranged from friendly meetings between business teams to legal cease and desist demands from outside counsel.  Time and again, Defendants would apologize, promise that they would respect Nike's intellectual property, and for a short period of time Defendants appeared to comply – only to revert to their infringing conduct when they thought the coast was clear.  This "rinse and repeat" pattern — (1) Nike raises concerns; (2) Defendants feign contrition and take down infringing goods; then (3) renews and expands the infringing conduct — happened at least three times in the last two years.

144.    For example, in June 2022, Nike sent several of the Defendants a letter raising concerns regarding their unauthorized conduct, and specifically requesting that they stop making, selling, and promoting unauthorized customizations that contain various material alterations including, customization containing images, branding, materials, stitching, colorways and/or third-party logos and trademarks that were never approved or authorized by Nike.

145.    In response, Defendants appeared to take some steps to address Nike's concerns, like removing certain products from their website and social media.  Following that perceived

compliance, the parties engaged in discussions concerning a potential relationship for future projects between Nike and Defendants.

146.    However, by the summer of 2023, these discussions ultimately broke down and, by August 2023, Nike became aware that Defendants resumed producing unauthorized and infringing "Nike" shoes.  Nike sent Defendants another letter in August 2023 reminding them of Nike's trademark rights and raising Nike's concerns regarding their unauthorized conduct.  Nike stated, *inter alia*, that Defendants' application of third-party logos and branding to "Nike" shoes, unauthorized use of the Nike Asserted Marks in combination with Defendants' own branding, and material alterations of genuine Nike shoes infringed Nike's intellectual property rights.  Several of the shoes highlighted in this demand letter are the subject of the recently filed *Goyard* case.

147.    Defendants again appeared to comply with Nike's August 2023 letter by removing the unauthorized and infringing "Nike" shoes from their website.  Nike later learned that while Defendants removed Nike shoes for customization from their websites, Defendants' brick-and-mortar locations continued to primarily feature Nike shoes.  More recently, Defendants escalated their infringing conduct even further and increased the volume of social media posts and product offerings infringing on the Nike Asserted Marks as described in detail herein.  Nike was left with no choice but to take formal action.

**L.     *Defendants' Conduct Causes Significant Harm To Nike.***

148.    As the rightsholder, Nike is the only company entitled to make use in commerce of its trademarks and trade dress in connection with products and services.  Yet Defendants have created an entire business model predicated on exploiting the Nike Asserted Marks for financial gain.

149.    Defendants have expanded far beyond Ciambrone's early one-of-one customization business, are encroaching on Nike's rights, and are even competing directly with genuine Nike

shoes.  Defendants have intentionally implied Nike's association with its Infringing New Shoes and Counterfeit "Nike" Shoes by attempting to legitimize their conduct through past limited engagements.  This type of conduct not only creates a likelihood of false association but also dilutes the distinctiveness of Nike's Famous Marks.  And worse still, Defendants mimic Nike's authorized and limited-edition collaborations to further create confusion over Nike's affiliation and sponsorship.

150.    Despite Defendants' representations to the public that these Infringing New Shoes and Counterfeit "Nike" Shoes are Nike products, the shoes have not been inspected by Nike nor have they been checked for compliance with Nike's quality control standards.  By applying unauthorized "customizations" to Nike's shoes, insinuating collaborations that do not exist, and applying colorways and materials that have not passed Nike's quality and design standards, Defendants have and will continue to cause substantial harm to Nike's brand and hard-earned reputation.

151.    Nike is the only company that can partner with artists, celebrities, and third-party brands to create Nike co-branded products and services.  These considerations are an integral part of Nike's branding and quality control over its designs.  Yet Defendants have chosen to partner with brands using Nike Asserted Marks without authorization, effectively usurping Nike's ability to choose who it does and does not collaborate with and creating the false impression that Nike has authorized or sponsored collaborations it has no involvement with.  Defendants' actions directly compete with Nike's ability to partner with other brands and reputationally harms Nike.

152.    Defendants intentionally use the Nike Asserted Marks and/or confusing similar marks to create an association between its Infringing Digital Shoes and Nike, in order to capitalize

on Nike's valuable reputation and customer goodwill.  This has created, and will create, confusion

in the marketplace as to Nike's association and/or authorization of the Infringing Digital Shoes.

## COUNT I
## DIRECT TRADEMARK INFRINGEMENT 15 U.S.C. § 1114
### (Against All Defendants)

153.    Nike repeats and realleges each and every allegation in the numerical paragraphs

and images both above and below as set forth fully herein.

154.    The Nike Asserted Marks are on the Principal Register of the United States Patent

and Trademark Office.  Many of them, as detailed above, are incontestable, which is *prima facie*

evidence of the marks' validity, Nike's ownership, and Nike's exclusive right to use these marks.

155.    Nike's Trade Dress Marks in particular are unique, distinctive, and non-functional

and have acquired secondary meaning as a source identifier for Nike's shoes through Nike's

extensive use.

156.    Defendants have knowingly used and continue to use the Nike Asserted Marks in

commerce, without Nike's permission or authorization, at least in the ways described herein.

157.    On information and belief, Defendants Ciambrone and Imbimbo are the moving,

active, conscious force behind the Defendant Entities' infringements.

158.    Defendants' use of the Nike Asserted Marks in connection with the Infringing New

Shoes is likely to confuse, mislead, or deceive potential consumers, purchasers of the Infringing

New Shoes, and the general purchasing public as to the source, origin, sponsorship, or affiliation

of the Infringing New Shoes to Nike, and is likely to cause people and purchasers to erroneously

believe that the Infringing New Shoes have been authorized, sponsored, approved, endorsed, or

licensed by Nike or that Defendants are in some way affiliated with Nike.

159.    Defendants' business model and use of the Nike Asserted Marks is intended to, and

does, exploit the goodwill and reputation associated with the Nike brand and its Marks.

Defendants have used Nike Asserted Marks with the knowledge of, and the express intent to call to mind and create a likelihood of confusion with regard to and/or trade off of the goodwill and fame of the Nike Asserted Marks.  As a result, Defendants' unauthorized use of the Nike Asserted Marks constitutes willful trademark infringement of Nike's federally registered trademarks, which has caused damage to Nike and the substantial business and goodwill embodied in the Nike Asserted Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

160.    As a direct and proximate result of Defendants' wrongful acts, Nike has suffered, continues to suffer, and/or is likely to suffer damage to its trademarks, business reputation, and goodwill.  Unless enjoined from using the Nike Asserted Marks pursuant to 15 U.S.C. § 1116, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, Defendants will continue to use the Nike Asserted Marks and will cause irreparable damage to Nike.

161.    Pursuant to 15 U.S.C. § 1118, Defendants should be ordered to deliver all units of the Infringing New Shoes to Nike or Nike's designee to be destroyed.

162.    Pursuant to 15 U.S.C. § 1117, Nike is also entitled to recover all damages, including attorneys' fees, that Nike has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117.

## COUNT II
## DIRECT COUNTERFEITING 15 U.S.C. § 1114
### (Against All Defendants)

163.    Nike repeats and realleges each of the numerical paragraphs and images both above and below as set forth fully herein.

164.    The Nike Asserted Marks are on the Principal Register of the United States Patent and Trademark Office.  Many of them, as detailed above, are incontestable, which is *prima facie* evidence of the marks' validity, Nike's ownership, and Nike's exclusive right to use these marks.

165.    Nike's Trade Dress Marks in particular are unique, distinctive, and non-functional and have acquired secondary meaning as a source identifier for Nike's shoes through Nike's extensive use.

166.    Defendants have knowingly used and continue to use in commerce, without Nike's permission or authorization, reproductions, substantially indistinguishable variations, counterfeit, copies, and colorable imitations of products and services that are identical to, or substantially indistinguishable from, the Nike Asserted Marks, in connection with the Counterfeit "Nike" Shoes and other counterfeit Nike-branded materials and services.

167.    Defendants has manufactured, advertised, promoted, sold, and offered for sale the Counterfeit "Nike" Shoes and services in direct competition with Nike's rightful sale of genuine products and without Nike's authorization or consent.

168.    Defendants' counterfeiting activities are likely to cause and actually are causing confusion, mistake, and deception likely to cause people and purchasers to erroneously believe that the Counterfeit "Nike" Shoes and services have been authorized, sponsored, approved, endorsed, or licensed by Nike or that Defendants are in some way affiliated with Nike. Defendants' unlawful acts are intended to reap the benefit of the immense goodwill that Nike has created in its goods and constitute counterfeiting of the Nike Asserted Marks.

169.    Defendants' conduct as described above has, at all times, been willful and/or intentional.

170.    As a direct and proximate result of Defendants action described above, unless enjoined, Nike will continue to suffer immediate and irreparable damage.

171.    As a result of Defendants' willful conduct, Nike is entitled  to elect either all monetary gains, profits and advantages obtained by Defendants as a result thereof, trebled, as well as attorneys' fees and the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b) or statutory damages of up to $2 million per counterfeit mark per type of goods or services sold, offered for sale, or distributed, including attorneys' fees and costs of this action pursuant to 15 U.S.C. § 1117(c).

## COUNT III
## CONTRIBUTORY TRADEMARK INFRINGEMENT 15 U.S.C. § 1114
### (Against All Defendants)

172.    Nike repeats and realleges each of the numerical paragraphs and images both above and below as set forth fully herein.

173.    Defendants have been and continue to materially contribute to and knowingly facilitate the sale, offers for sale, marketing, and/or distribution of shoes that infringe the Nike Asserted Marks through the Infringing Customization Workshops, Infringing Academies, and Infringing Shoemaking Products, which teach third parties how to create Infringing New Shoes.

174.    Upon information and belief these so-called "students" then create, manufacture and sell Infringing New Shoes based on the "teachings" of the Defendants in a manner that is likely to confuse, mislead, or deceive potential consumers, purchasers of the Infringing New Shoes, and the general purchasing public as to the source, origin, sponsorship, or affiliation of the Infringing New Shoes to Nike, and is likely to cause people and purchasers to erroneously believe that the Infringing New Shoes have been authorized, sponsored, approved, endorsed, or licensed by Nike or that Defendants are in some way affiliated with Nike.

175.    On information and belief, Defendants Ciambrone and Imbimbo are the moving, active, conscious force behind the decision to grow the business of the Defendant Entities to offer these Infringing Customization Workshops, Infringing Academies, and Infringing Shoemaking Products with regularity.

176.    Defendants know or have reason to know of this infringement of Nike's intellectual property, or, in the alternative, have been willfully blind to all reasonable indications of such likely infringement.

177.    Defendants have contributed to the infringing acts alleged herein without authorization, license, or consent from Nike.

178.    As a direct and proximate result of Defendants' contributory infringement, Nike has suffered, continues to suffer, and/or is likely to suffer damage to its trademarks, business reputation, and goodwill.  Unless enjoined from using the Nike Asserted Marks pursuant to 15 U.S.C. § 1116, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, Defendants will continue to use the Nike Asserted Marks and will cause irreparable damage to Nike.

179.    As a result of Defendants' contributory infringement, Nike has been and will continue to be damaged by Defendants and is entitled to all monetary gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117.

## COUNT IV
## CONTRIBUTORY COUNTERFEITING 15 U.S.C. § 1114
### (Against All Defendants)

180.    Nike repeats and realleges each of the numerical paragraphs and images both above and below as set forth fully herein.

181.    Defendants have and continue to materially contribute to and knowingly facilitate the sale, offers for sale, marketing, and/or distribution of shoes that infringe the Nike Asserted Marks through the Infringing Customization Workshops, Infringing Academies, and Infringing Shoemaking Products which teach third parties how to create Counterfeit "Nike" Shoes.

182.    Upon information and belief these third parties then create, manufacture and sell Counterfeit "Nike" Shoes based on the "teachings" of the Defendants in a manner that is likely to confuse, mislead, or deceive potential consumers, purchasers of the Counterfeit "Nike" Shoes, as to the source, origin, sponsorship, or affiliation of the Counterfeit "Nike" Shoes to Nike, and is likely to cause people and purchasers to erroneously believe that the Counterfeit "Nike" Shoes have been authorized, sponsored, approved, endorsed, or licensed by Nike or that Defendants are in some way affiliated with Nike.

183.    Upon information and belief, the Counterfeit "Nike" shoes created by students of the Defendants contain, without Nike's permission or authorization, reproductions, substantially indistinguishable variations, counterfeit, copies, and colorable imitations of products and services that are identical to, or substantially indistinguishable from, the Nike Asserted Marks, in connection with the Counterfeit "Nike" Shoes and other counterfeit Nike-branded materials and services.

184.    On information and belief, Defendants Ciambrone and Imbimbo are the moving, active, conscious force behind the Defendant Entities' offering of these Infringing Customization Workshops, Infringing Academies, and Infringing Shoemaking Products with regularity.

185.    Defendants know or have reason to know of this counterfeiting of Nike's intellectual property, or, in the alternative, have been willfully blind to all reasonable indications of such likely counterfeiting.

186.    Defendants have contributed to the counterfeit acts alleged herein without authorization, license, or consent from Nike.

187.    As a direct and proximate result of Defendants' contributory infringement, Nike has suffered, continues to suffer, and/or is likely to suffer damage to its trademarks, business reputation, and goodwill.  Unless enjoined from counterfeiting the Nike Asserted Marks pursuant to 15 U.S.C. § 1116, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, Defendants will continue to use the Nike Asserted Marks and will cause irreparable damage to Nike.

188.    As a result of Defendants' willful conduct, Nike is entitled to elect either all monetary gains, profits and advantages obtained by Defendants as a result thereof, trebled, as well as attorneys' fees and the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b) or statutory damages of up to $2 million per counterfeit mark per type of goods or services sold, offered for sale, or distributed, including attorneys' fees and costs of this action pursuant to 15 U.S.C. § 1117(c).

**COUNT V**
**UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN**
**15 U.S.C. § 1125(a)**
**(Against All Defendants)**

189.    Nike repeats and realleges each of the numerical paragraphs and images both above and below as set forth fully herein.

190.    Defendants' activities as described above constitute infringement of Nike's trademarks and trade dress, and thus constitute unfair competition, in violation of 15 U.S.C. § 1125(a).

191.    Defendants' unauthorized use of Nike's trademarks, trade dress and/or confusingly similar marks constitutes a false designation of origin that is likely to cause consumer confusion,

mistake, or deception as to the origin, sponsorship, or approval of Defendants' products and services by creating the false and misleading impression that they are produced by, authorized by, or otherwise associated with Nike.

192.    Defendants' acts of false designation of origin and unfair competition have caused, and unless enjoined, will continue to cause substantial damage to the goodwill and reputation that Nike has built and is associated with its trademarks and trade dress.

193.    Upon information and belief, Defendants' acts of false designation of origin and unfair competition have been intentional, willful, and malicious.  Defendants' bad faith is evidenced by Defendants' disregard for Nike's protests to the manufacture and release of the Infringing New Shoes, as demonstrated above, and by Defendants' continuing disregard for Nike's rights.

194.    On information and belief, Defendants Ciambrone and Imbimbo are the moving, active, conscious force behind Defendant Entities' false designations of origin and unfair competition.

195.    Nike has and will continue been damaged by Defendants and is entitled to all monetary gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117.

### COUNT VI
### FEDERAL TRADEMARK DILUTION 15 U.S.C. § 1125(c)
**(Against All Defendants)**

196.    Nike repeats and realleges each of the numerical paragraphs and images both above and below as set forth fully herein.

197.    As described herein, Nike's Famous Marks are inherently distinctive and famous. Nike, in connection with the promotion and sale of its products, has used Nike's Famous Marks

for decades on both a national and international basis.  As a result of Nike's extensive and substantial promotion of Nike's Famous Marks, along with billions of dollars in sales, the consuming public and trade have come to associate those marks uniquely and distinctly with Nike and its high-quality merchandise.

198.    In addition, prior courts have made the determination that the Nike Famous Marks are famous as a matter of trademark law. *See e.g., Nike, Inc. v. Top Brand Co.,* No. 00–CV–8179, 2005 WL 1654859, at *9 (S.D.N.Y. July 13, 2005); *Nike, Inc. v. Nikepal Int'l, Inc.,* No. 2:05–CV–1468–GEB–JFM, 2007 WL 2782030, at *5–6 (E.D .Cal. Sept. 18, 2007); *Nike, Inc. v. Variety Wholesalers, Inc.,* 274 F.Supp.2d 1352, 1372 (S.D.Ga.2003)).

199.    Long after Nike's Famous Marks became famous, Defendants, without authority from Nike, used unauthorized reproductions, counterfeits, copies, and colorable imitations of Nike's Famous Marks for their own commercial purposes, and, as set forth above, have caused the dilution of and are continuing to cause the actual dilution of the distinctive qualities associated with Nike's Famous Marks.

200.    On information and belief, Defendants Ciambrone and Imbimbo are the moving, active, conscious force behind the decision to dilute Nike's Famous Marks.

201.    Defendants willfully intended to lessen and dilute the distinctive quality of Nike's Famous Marks and to improperly trade on Nike's established reputation and goodwill, as evidenced by Defendants' disregard for Nike's disapproval of Defendants' use of Nike's Famous Marks in conjunction with the Infringing New Shoes, Counterfeit "Nike" Shoes, and related advertising and services.  Nike has no control over the significant modifications made by Defendants using components and materials that were not authorized by Nike.   These

modifications and use of non-Nike components and materials result in shoes inferior to authentic Nike shoes.

202.    Defendants' actions constitute trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

203.    On information and belief, Defendants Ciambrone and Imbimbo are the moving, active, conscious force behind the Defendant Entities' trademark dilution and are subject to personal liability for The Shoe Surgeon's trademark dilution.

204.    As a result of Defendants' unlawful acts, Nike has suffered, and continues to suffer, substantial damages and irreparable injury, which damages and injury cannot be accurately computed at this time.  Defendants' unlawful acts will continue to cause irreparable injury to Nike unless enjoined.

## COUNT VII – COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION
### (Against All Defendants)

205.    Nike repeats and realleges each of the numerical paragraphs and images both above and below as set forth fully herein.

206.    Through its prior and continuous use of its trademarks and trade dress in commerce, Nike's trademarks and trade dress have become widely known, and Nike has been identified in the public mind as the manufacturer of the products to which the Nike Asserted Marks are applied.

207.    Through its prior and continuous use of its trademarks and trade dress in commerce, Nike enjoys exclusive common law rights.

208.    Defendants' aforementioned use of Nike's trademarks and trade dress is without any permission, license, or other authorization from Nike.

209.    On information and belief, Defendants Ciambrone and Imbimbo are the moving, active, conscious force behind the Defendant Entities' infringement.

210.     Defendants, with knowledge and intentional disregard of Nike's rights, continue to advertise, promote, and sell their infringing goods and services using Nike's trademarks, trade dress and/or confusingly similar marks in bad faith.  Defendants' acts have caused, continue to cause, and/or are likely to cause confusion as to the source and/or sponsorship of Defendants' goods and services.

211.     Defendants' acts as alleged herein constitute common law trademark infringement, and have already caused Nike irreparable damage and will, unless enjoined, continue to so damage Nike, which has no adequate remedy at law.

212.     Upon information and belief, Defendants have committed the acts alleged herein in gross, wanton, willful, and conscious disregard of Nike's rights, thereby entitling Nike to exemplary and punitive damages pursuant to the common law of the State of New York in an amount sufficient to punish, deter, and make an example of Defendants.

## COUNT VIII
### INJURY TO BUSINESS REPUTATION AND DILUTION
### NEW YORK GENERAL BUSINESS LAW § 360-l
**(Against All Defendants)**

213.     Nike repeats and realleges each of the numerical paragraphs and images both above and below as set forth fully herein.

214.     Nike, on behalf of itself and the general consuming public, seeks recovery from Defendants for violation of New York's Anti-Dilution Statute, N.Y. Gen. Bus. Law § 360-l, *et seq.*

215.     The Nike Asserted Marks are commercially and conceptually strong trademarks, which have become distinctive and acquired a secondary meaning capable of dilution.

216.     The Nike Asserted Marks have become distinctive and acquired secondary meaning capable of dilution prior to Defendants' acts as alleged herein.

217.    Defendants' unauthorized and wrongful use of the Nike Asserted Marks has diluted and will, unless enjoined, continue to dilute, and is likely to dilute the distinctive quality of the Nike Asserted Marks, thereby diminishing the capacity of Nike's Asserted Marks to function as unique product identifiers for Nike's goods and services.

218.    Defendants' acts as alleged herein are intentional and willful in violation of New York's Anti-Dilution Statute, N.Y. Gen. Bus. Law § 360-l, *et seq.,* and have already caused Nike irreparable damage and will, unless enjoined, continue to so damage Nike, which has no adequate remedy at law.

219.    On information and belief, Defendants Ciambrone and Imbimbo are the moving, active, conscious force behind The Shoe Surgeon's trademark dilution and are subject to personal liability for Defendant Entities' dilution.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Nike hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Nike respectfully prays for:

1.    Judgment in favor of Nike and against Defendants on all of Nike's claims;

2.    The Defendants, its agents, servants, affiliates, representative, successors, and assigns, and all those persons or entities in active concert or participation with any of them who receive actual notice of the injunctive order, be enjoined preliminarily and permanently, pursuant to, without limitation, 15 U.S.C. § 1116(a), from:

   a.    Using Nike's Asserted Marks, Nike digital trademarks, or any other logo, name, trade dress, or designation that gives rise to a likelihood of confusion, mistake, or deception with respect to the Nike Asserted Marks  Nike's digital marks, or in any

way dilutes the distinctiveness of the Nike Asserted Marks, or the Asserted Trade Dress;

b. Offering the Infringing Customization Workshops, Infringing Academies, Infringing Shoemaking Products, and any other services related thereto;

c. Making further production, sale, or advertising of the Infringing New Shoes and Counterfeit "Nike" Shoes, and Infringing Shoemaking Products as complained herein;

d. Doing any other act likely to induce the mistaken belief that Defendants, their products, services, or commercial activities are in any way affiliated, connected, or associated with Nike or its goods or services; and

e. Otherwise infringing or diluting Nike's Asserted Marks or digital marks.

3.    Ordering Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction all infringing and counterfeit articles in Defendants' custody or control including the Infringing New Shoes, Counterfeit "Nike" Shoes, and Infringing Shoemaking Products.

4.    Pursuant to 15 U.S.C. § 1116(a), that Defendants be directed to file with the Court and serve upon Nike, within thirty (30) days after entry of the injunctive order, a report in writing and under oath setting forth in detail the manner and form by which they have complied with the provisions set forth herein.

5.    An order granting an award of damages suffered by Nike according to proof at the time of trial.

6.    An order that Defendants account to Nike for any and all profits earned as a result of Defendants' acts in violation of Nike's rights;

7.      An award of three times the amount of compensatory damages and increased profits pursuant to 15 U.S.C. § 1117(a);

8.      An award of three times such profits or damages, whichever amount is greater, together with a reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(b), or an award of maximum statutory damages pursuant to 15 U.S.C. § 1117(c) for willful counterfeiting;

9.      An order granting an award of punitive damages for the willful and wanton nature of Defendants' aforesaid acts under the New York common law;

10.     An order granting pre- and post-judgment interest on any recovery by Nike;

11.     An order granting an award of Nike's costs, expenses, and reasonable attorneys' fees; and

12.     Granting such other and further relief as is just and proper.


Dated:    July 15, 2024                      */s/ Tamar Y. Duvdevani*___
                                             Tamar Y. Duvdevani
                                             tamar.duvdevani@us.dlapiper.com
                                             Marc E. Miller
                                             marc.miller@us.dlapiper.com
                                             Joshua Schwartzman
                                             joshua.schwartzman@us.dlapiper.com
                                             Gabrielle Chasin Velkes
                                             gabrielle.velkes@us.dlapiper.com
                                             **DLA PIPER LLP (US)**
                                             1251 Avenue of the Americas 27th Fl. New
                                             York, New York 10020-1104
                                             Telephone: 212.335.4500

                                             *Attorneys for Plaintiff Nike, Inc.*