## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIKE, INC. <br><br> Plaintiff, <br><br> v. <br><br> S2, INC. D/B/A THE SHOE SURGEON; SURGEON WORLDWIDE, INC., DOMINIC CHAMBRONE A/K/A DOMINIC CIAMBRONE, AND DALLAS IMBIMBO <br><br> Defendants. | Case No.  1:24-cv-05307 <br><br> **ANSWER AND COUNTERCLAIMS** <br><br> **JURY TRIAL REQUESTED** |

Defendants S2 Services, Inc. f/k/a S2, Inc., Surgeon Worldwide, Inc. d/b/a "The Shoe Surgeon" (together with S2, Inc., the "Defendant Entities"), Dominic Chambrone a/k/a Dominic Ciambrone a/k/a "The Shoe Surgeon" ("Mr. Ciambrone"), and Dallas Imbimbo ("Mr. Imbimbo"; together with Defendant Entities and Mr. Ciambrone, the "Defendants" or "The Shoe Surgeon") by and through their attorneys, Rutan & Tucker, LLP, file their Answer and Counterclaims to the Complaint by Plaintiff Nike, Inc. ("Nike" or "Plaintiff"), as follows:

### PRELIMINARY STATEMENT

1.      Defendants admit that the Complaint purports to assert claims for trademark infringement, counterfeiting, dilution, unfair competition, and related claims but deny the substance of all alleged claims and that Plaintiff is entitled to any of the relief it seeks.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 1 of the Complaint.

2.      Defendants deny the allegations of paragraph 2 of the Complaint.

3.      Defendants deny the allegations of paragraph 3 of the Complaint.

4.     Defendants admit they have a brick-and-mortar location in the Seaport District but deny that any of their stores—whether that small location in New York or their primary location in Los Angeles—have sold Nike-branded shoes made from scratch.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 4 of the Complaint.

5.     Defendants admit that they provide classes, at both their Seaport location and in Los Angeles, referred to as SRGN "academy" to reflect teaching people how to customize shoes. Defendants deny that these classes "teach consumers how to make their own" shoes "from scratch" as in from nothing, as all classes start with a base pair of authentic shoes to customize. Making a pair of custom sneakers "from scratch" in these classes means making a custom pair from materials that include the original, authentic pair.  Defendants further deny that they have taught anyone "to make a fake Air Jordan 1 shoe"—the excerpted video images in paragraph 5 of the Complaint show that the second of eight steps was to "fully deconstruct" the original pair of authentic Nike Air Jordan 1's (as with the "decon/recon" process taught in every class).  Here, the excerpted image in Nike's Complaint (shown on the left below) reflects that Mr. Ciambrone started with and customized an authentic pair of "Air Jordan 1 Retro High" sneakers:



| __Original Shoe Deconstructed in Video__ | __Air Jordan 1 Retro High—Light Smoke Grey__ |
|---|---|

Except as expressly admitted herein, Defendants deny the allegations of paragraph 5 of the Complaint.

6.      Nike's presentation of "genuine" Air Jordan 1s ("AJ1s") next to what they label "Defendants' counterfeit version of that shoe" is inaccurate and misleading; as described above, the customized shoes depicted in the Complaint were made by Mr. Ciambrone starting with authentic AJ1s in grey.  Looking at that original grey AJ1 next to the customized version, then comparing that same original grey AJ1 to the red AJ1 Nike asserts was infringed but in grayscale to focus on the structure, it is clear that the customization maintains the same structural aspects of the original gray AJ1s intact (i.e. it has the features of any pair of AJ1s).  The customization changed was the color, which is not claimed in any of Nike's asserted trade dress registrations:



| **Base Shoe Before Customization:** **Authentic Air Jordan 1 Retro High (Gray)** | **Customized Air Jordan 1 Retro High Depicted in Complaint** |
|---|---|
| | |
| **Authentic Air Jordan 1 Retro High (Gray) In Grayscale To Focus on Structure** | **Nike's Allegedly Infringed Air Jordan 1 Retro High In Grayscale—Same Structure** |
| | |

Except as expressly admitted herein, Defendants deny the allegations of paragraph 6 of the Complaint.

7.      Defendants deny the allegations of paragraph 7 of the Complaint.

8.      Defendants deny that they charge the "astronomical price of $3,000-5,000" for any single academy class, as implied; the only offerings in that price range are multi-day programs that include the authentic shoes to customize, and which never encourage anyone "to venture into their own illicit businesses manufacturing and selling fake 'Nike' shoes."  Except as expressly admitted herein, Defendants deny the allegations of paragraph 8 of the Complaint.

9.      Defendants deny that they—or any person—requires Nike's permission to customize authentic Nike shoes into art.  Defendants admit that Mr. Ciambrone did not seek Nike's permission to start customizing Nike shoes, but thereafter, Nike repeatedly came to him to exploit his expertise and collaborate with The Shoe Surgeon on customization classes, etc., implying that Nike approved The Shoe Surgeon continuing to customize Nike shoes and offer customization classes using Nike shoes.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 9 of the Complaint.

10.     Defendants admit that they worked to address Nike's stated concerns with intellectual property per the two letters Nike sent, dated June 23, 2022 and August 21, 2023; as detailed in the Counterclaims, these two letters were followed by extensive discussions and interactions indicating that Nike was satisfied with Defendants' response.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 10 of the Complaint.

11.     Defendants admit that they have collaborated with other brands on customizing Nike shoes, and that they previously offered to customize Nike shoes using authentic fabric from

bags purchased from Goyard St-Honore, which Nike noted in its August 21, 2023 letter.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 11 of the Complaint.

12.    Defendants admit that the Complaint purports to seek an injunction but deny the substance of all alleged claims and that Plaintiff is entitled to any of the relief it seeks.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 12 of the Complaint.

13.    Defendants admit that the Complaint purports to seek $60 million in money damages from Defendants, but deny the substance of all alleged claims and that Plaintiff is entitled to any of the relief it seeks.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 13 of the Complaint.

## THE PARTIES

14.    Defendants admit that Nike is in the best position to know whether it is a corporation organized under the laws of the State of Oregon with a principal place of business at One Bowerman Drive, Beaverton, Oregon 97005.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 14 of the Complaint.

15.    Defendants deny the allegations of paragraph 14 of the Complaint.  To clarify, S2, Inc. was initially incorporated in Delaware in late 2016 to do business in California.  However, Defendants incorporated Surgeon Worldwide Inc. in early 2018 and used that entity instead of S2, Inc., such that S2, Inc. was no longer doing business in California or anywhere else.  Because whether S2, Inc.'s "Void" status with the Delaware Secretary of State renders the question of whether it was dissolved ambiguous under Delaware law, Defendants recently revived that entity to ensure it is able to defend itself in this case, and due to the name "S2" now being in use by others, it had to be revived with a slightly different name: S2 Services, Inc.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 15 of the Complaint.

16.     Defendants admit that Surgeon Worldwide, Inc. d/b/a/ The Shoe Surgeon is a Delaware Corporation with a principal place of business located at 17595 Harvard Avenue C552, Irvine, CA 92614.

17.     Defendants admit that Mr. Ciambrone is an individual residing in Los Angeles, California and is the founder of The Shoe Surgeon and is listed in California Secretary of State filings as the Chief Executive Officer of Surgeon Worldwide, Inc.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 17 of the Complaint.

18.     Defendants admit that Mr. Imbimbo is an individual residing in Irvine, California and is listed in California Secretary of State filings as the Secretary and Chief Financial Executive Officer of Surgeon Worldwide, Inc.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 18 of the Complaint.

19.     Defendants admit that they operate https://www.thesurgeon.com/ ("The Shoe Surgeon Website"), https://www.srgnacademy.com/ ("The Shoe Surgeon Academy Website"), the Instagram accounts @thesurgeon, @srgnacademy, @srgnstudios, @srgnnyc, and @srgncustoms (together, "The Shoe Surgeon Instagram"), the YouTube account @TheShoeSurgeon ("The Shoe Surgeon YouTube"), the X account @TheShoeSurgeon ("The Shoe Surgeon X"), and the TikTok accounts @theshoesurgeon and @srgnacademy ("The Shoe Surgeon TikTok" and together with The Shoe Surgeon Instagram, The Shoe Surgeon YouTube, and The Shoe Surgeon X, "The Shoe Surgeon Social Media").  Except as expressly admitted herein, Defendants deny the allegations of paragraph 19 of the Complaint.

20.     Defendants admit that they operate brick and mortar locations for the "SRGN Academy" in New York, Los Angeles, and Las Vegas.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 20 of the Complaint.

## JURISDICTION AND VENUE

21.　　Defendants admit that the Complaint purports to assert claims under the trademark laws of the United States, i.e. the Lanham Act, 15 U.S.C. § 1051, *et seq.*, but deny the substance of all alleged claims.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 21 of the Complaint.

22.　　Defendants deny the allegations of paragraph 22 of the Complaint.

23.　　Defendants deny the allegations of paragraph 23 of the Complaint.

24.　　Defendants deny the allegations of paragraph 24 of the Complaint.

25.　　Defendants deny the allegations of paragraph 25 of the Complaint.

26.　　Defendants deny the allegations of paragraph 26 of the Complaint.

## FACTUAL ALLEGATIONS

***A.***　　***The Nike Brand is the Most Valuable and Recognizable Footwear and Apparel Brand In the World.[1]***

27.　　Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 27, and on that basis deny each and every such allegation.

28.　　Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 28, except as to Nike's extensive celebrity collaborations involving The Shoe Surgeon, and on that basis deny each and every such allegation except for that Nike has collaborated with The Shoe Surgeon and "prominent and influential athletes, influencers, and public figures."  Except as expressly admitted herein, Defendants deny the allegations of paragraph 28 of the Complaint.

---

[1]　Defendants include the original headers from Nike's Complaint as stated therein for clarity and do not thereby agree with any argument or allegation stated therein.  For clarity, Defendants expressly deny the allegations of each and every header stated in the Complaint.

29.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 29, except as to those facts stated in the Counterclaims (e.g. Nike opened its "House of Innovation on Fifth Avenue" in November 2018, just over a year after Nike requested and received a class on customization from Defendants in August 2017), and on that basis deny each and every such allegation.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 29 of the Complaint.

30.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 30, and on that basis deny each and every such allegation.

31.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 31, and on that basis deny each and every such allegation.

32.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 32, and on that basis deny each and every such allegation.

33.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 33, and on that basis deny each and every such allegation.

1.     *Nike has amassed significant goodwill in the "Nike" and "Swoosh" Marks*

34.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 34, and on that basis deny each and every such allegation.

35.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 35, and on that basis deny each and every such allegation.

36.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 36, and on that basis deny each and every such allegation.

37.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 37, and on that basis deny each and every such allegation.

38.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 38, and on that basis deny each and every such allegation.

39.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 39, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the United States Patent and Trademark Office ("USPTO"), those records are the best evidence of their content, and therefore, reference is hereby made to the same.

40.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 40, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

41.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 41, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

42.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 42, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

2.    _Nike has amassed significant goodwill in the "Nike" and "Swoosh"_
_Marks_

43.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 43, except as to those facts stated in the Counterclaims (e.g. as to Nike's requesting and receiving a class on customization from Defendants for its Jordan brand staff in August 2017), and on that basis deny each and every such allegation.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 43 of the Complaint.

44.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 44.

45.    Defendants deny the allegations of paragraph 45 of the Complaint with respect to Defendants' alleged infringement, counterfeiting, and/or dilution of Air Jordan shoes. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 45, and on that basis deny each and every such allegation.

46.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 46, and on that basis deny each and every such allegation.

47.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 47, except as to those facts stated in the Counterclaims (e.g. as to Nike's relying on The Shoe Surgeon to provide hundreds of pairs of Travis Scott's custom shoes for the White Party on July 4, 2024, less than two weeks before Nike sued Defendants on July 15, 2024), and on that basis deny each and every such allegation.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 47 of the Complaint.

48.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 48, and on that basis deny each and every such allegation.

49.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 49, and on that basis deny each and every such allegation.

50.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 50, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

51.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 51, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

52.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 52, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

3.    *Nike has amassed significant goodwill in the DUNK Mark*

53.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 53, and on that basis deny each and every such allegation.

54.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 54, and on that basis deny each and every such allegation.

55.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 55, and on that basis deny each and every such allegation.

56.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 56, and on that basis deny each and every such allegation.

57.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 57, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

58.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 58, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

59.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 59, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

4.     _Nike has amassed significant goodwill in the "Air Force 1" Mark_

60.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 60, and on that basis deny each and every such allegation.

61.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 61, except as to those facts stated in the Counterclaims (e.g. Nike's asking The Shoe Surgeon to provide multiple custom shoes to celebrate different Lebron James scoring titles, both of which garnered widespread positive publicity, or having The Shoe Surgeon provide hundreds of Travis Scott's custom Nike shoes for a White Party on July 4, 2024, less than two weeks before suing Defendants), and on that basis deny each and every such allegation.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 61 of the Complaint.

62.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 62, and on that basis deny each and every such allegation.

63.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 63, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

64.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 64, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

65.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 65, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

5.    *Nike protects the goodwill in the iconic silhouettes of Nike shoes through trademark registrations*

66.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 66, and on that basis deny each and every such allegation.

67.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 67, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.   For example, those reflect

that none of Nike's asserted trade dress registrations claim color, as shown in the following chart

summarizing Nike's claimed trade dress drawing vs. features, descriptions, and color claims:

| Reg. No. | Trade Dress Drawing vs. Features Claimed | Description | Color(s) Claimed |
|---|---|---|---|
| 3,451,904 |  | The mark consists of the design of the tread on the sole a shoe. *The broken lines show the position of the mark on the goods and are not claimed as a part of the mark.* | Color is **not** claimed as a feature of the mark. |
| 3,451,905 |  | The mark consists of the design of the stitching on the exterior of the shoe, the design of the material panels that form the exterior body of the shoe, the design of the wavy panel on top of the shoe that encompasses the eyelets for the shoe laces, the design of the vertical ridge pattern on the sides of the sole of the shoe, and the relative position of these elements to each other. *The broken lines show the position of the mark and are not claimed as part of the mark.* | Color is **not** claimed as a feature of the mark. |
| 5,820,374 |  | The mark consists of a three-dimensional configuration comprising the design of the vertical ridge pattern on the sides of the sole of the shoe, the repeating star pattern on the toe and heel of the sole of the shoe, and the relative position of these elements to each other. *The broken lines show the position of the mark and are not claimed as a feature of the mark.* | Color is **not** claimed as a feature of the mark. |

| <u>Reg. No.</u> | <u>Trade Dress Drawing vs. Features Claimed</u> | <u>Description</u> | <u>Color(s) Claimed</u> |
|---|---|---|---|
| 3,451,906 |  | The mark consists of the design of the stitching on the exterior of the shoe, the design of the material panels that form the exterior body of the shoe, the design of the wavy panel on top of the shoe that encompasses the eyelets for the shoe laces, the design of the vertical ridge pattern on the sides of the sole of the shoe, and the relative position of these elements to each other. *The broken lines show the position of the mark and are not claimed as part of the mark.* | Color is **<u>not</u>** claimed as a feature of the mark. |
| 3,451,907 |  | The mark consists of the design of the stitching on the exterior of the shoe, the design of the material panels that form the exterior body of the shoe, the design of the wavy panel on top of the shoe that encompasses the eyelets for the shoe laces, the design of the vertical ridge pattern on the sides of the sole of the shoe, and the relative position of these elements to each other. *The broken lines show the position of the mark and are not claimed as part of the mark.* | Color is **<u>not</u>** claimed as a feature of the mark. |

*(continued on next page to keep trade dress images together)*

| Reg. No. | Trade Dress Drawing vs. Features Claimed | Description | Color(s) Claimed |
|---|---|---|---|
| 3,711,303 |  | The mark consists of the design of the stitching on the exterior of the shoe, the design of the material panels that form the exterior body of the shoe, the design of the wavy panel on top of the shoe that encompasses the eyelets for the shoe laces, the design of the vertical ridge pattern on the sides of the sole of the shoe, and the relative position of these elements to each other. *The broken lines show the position of the mark and are not claimed as part of the mark.* | Color is **not** claimed as a feature of the mark. |
| 3,711,305 |  | The mark consists of the design of the stitching on the exterior of the shoe, the design of the material panels that form the exterior body of the shoe, the design of the wavy panel on top of the shoe that encompasses the eyelets for the shoe laces, the design of the vertical ridge pattern on the sides of the sole of the shoe, and the relative position of these elements to each other. *The broken lines show the position of the mark and are not claimed as part of the mark.* | Color is **not** claimed as a feature of the mark. |

*(continued on next page to keep trade dress images together)*

| Reg. No. | Trade Dress Drawing vs. Features Claimed | Description | Color(s) Claimed |
|---|---|---|---|
| 3,721,064 |  | The mark consists of the design of the tread on the sole a shoe. *The broken lines show the position of the mark on the goods and are not claimed as a part of the mark. Color is not claimed as a feature of the mark.* | Color is **not** claimed as a feature of the mark. |
| 6,368,691 |  | The mark consists of a three-dimensional configuration comprising the design of the material panels that form the exterior body of the shoe, the design of the panel on top of the shoe that includes the eyelets for the shoe laces, the design of the ridge pattern on the sides of the sole of the shoe, the design of a material panel on the heel, the design of a stitched line running along the midsole of the shoe, and the relative position of these elements to each other. *The broken lines show the position of the mark and are not claimed as part of the mark. Color is not claimed as a feature of the mark.* | Color is **not** claimed as a feature of the mark. |
| 6,368,694 |  | The mark consists of a three-dimensional configuration comprising the design of the material panels that form the exterior body of the shoe, the design of the panel on top of the shoe that includes the eyelets for the shoe laces, the design of the ridge pattern on the sides of the sole of the shoe, the design of a stitched line running along the midsole of the shoe, and the relative position of these elements to each other. *The* | Color is **not** claimed as a feature of the mark. |

| Reg. No. | Trade Dress Drawing vs. Features Claimed | Description | Color(s) Claimed |
|---|---|---|---|
| | | *broken lines show the position of the mark and are not claimed as part of the mark. Color is not claimed as a feature of the mark.* | |
| 6,368,693 |  | The mark consists of a three-dimensional configuration comprising the design of the material panels that form the exterior body of the shoe, the design of the panel on top of the shoe that includes the eyelets for the shoe laces, the design of the ridge pattern on the sides of the sole of the shoe, the design of a stitched line running along the midsole of the shoe, and the relative position of these elements to each other. *The broken lines show the position of the mark and are not claimed as part of the mark. Color is not claimed as a feature of the mark.* | Color is **not** claimed as a feature of the mark. |
| 6,639,127 |  | The mark consists of a three-dimensional configuration comprising the design of the material panels that form the exterior body of the shoe, the design of the material panels that form the midsole of the shoe, and the relative position of these elements to each other. *The broken lines show the position of the mark and are not claimed as part of the mark. Color is not a claimed feature of the mark.* | Color is **not** claimed as a feature of the mark. |

| Reg. No. | Trade Dress Drawing vs. Features Claimed | Description | Color(s) Claimed |
|---|---|---|---|
| 6,639,128 |  | The mark consists of a three-dimensional configuration comprising the design of the material panels that form the exterior body of the shoe, the design of a geometric shape across the body of the shoe to the upper eyelets for the shoelaces, the design of the shapes containing the upper and lower eyelets for the shoelaces, the design of the material panels that form the midsole of the shoe, and the relative position of these elements to each other. *The broken lines show the position of the mark and are not claimed as part of the mark. Color is not a claimed feature of the mark.* | Color is **not** claimed as a feature of the mark. |

68.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 68, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

69.     Paragraph 69 merely defines the "Nike Asserted Marks" as used in the Complaint; to the extent any response is required, Defendants deny any allegations of paragraph 69 of the Complaint.

6.     *Nike in the digital space.*

70.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 70, and on that basis deny each and every such allegation.

71.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 71, and on that basis deny each and every such allegation.

72.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 72, and on that basis deny each and every such allegation.

73.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 73, and on that basis deny each and every such allegation.

74.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 74, and on that basis deny each and every such allegation.

75.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 75, and on that basis deny each and every such allegation.

76.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 76, and on that basis deny each and every such allegation.

77.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 77, and on that basis deny each and every such allegation.

78.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 78, and on that basis deny each and every such allegation. To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

**B.    *Nike Maintains Strict Licensing and Quality Control Standards in Order To Protect Goodwill in the Nike Asserted Marks.***

79.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 79, and on that basis deny each and every such allegation.

80.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 80, except as to those facts stated in the Counterclaims (e.g. as to Nike's extensive partnerships, projects, and collaborations with The Shoe Surgeon from August 2017 through July 2024), and on that basis deny each and every such allegation.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 80 of the Complaint.

81.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 81, except as to those facts stated in the Counterclaims (e.g. as to Nike's extensive partnerships, projects, and collaborations with The Shoe Surgeon from August 2017 through July 2024, including The Shoe Surgeon providing hundreds of pairs of Travis Scott's custom Nike shoes for a White Party on July 4, 2024, less than two weeks before Nike sued Defendants on July 15, 2024), and on that basis deny each and every such allegation. Except as expressly admitted herein, Defendants deny the allegations of paragraph 81 of the Complaint.

82.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 82, and on that basis deny each and every such allegation.

83.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 83, except as to those facts stated in the Counterclaims (e.g. as to Nike's extensive partnerships, projects, and collaborations with The Shoe Surgeon from August 2017 through July 2024, during which Nike often relied on The Shoe Surgeon's expertise in customizing authentic Nike shoes without any oversight of the customization process, which is distinct from any "manufacturing process" Nike may engage in when it collaborates with others), and on that basis deny each and every such allegation.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 83 of the Complaint.

84.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 84, except as to those facts stated in the Counterclaims (e.g. as to Nike's lawsuits against actual counterfeiters who used inauthentic Nike shoes [Drip Creationz] or otherwise tarnished Nike's brand, as in the "Satan Shoes" that led to widespread negative public outcry against Nike), and on that basis deny each and every such allegation.  To the extent that Plaintiff cites records of the courts, those records are the best evidence of their content (including because Plaintiff provides an incorrect citation to the "Satan Shoes" case as *Nike, Inc. v. MSCHF Product Studio, Inc.*, Case No. 1:21-cv-01679 filed in "C.D. Cal." on March 29, 2021, when that case was in fact filed in the District Court for the Eastern District of New York ["E.D.N.Y."]), and therefore, reference is hereby made to the same.   Except as expressly admitted herein, Defendants deny the allegations of paragraph 84 of the Complaint.

**C.     *Nike Offers Its Own Customization Services.***

85.     Defendants deny the allegations of paragraph 85 of the Complaint.  When people customize shoes they bought from Nike (or anyone else), they make that pair truly their own with personal, creative choices as to how they want to transform the shoes; what Nike refers to as customizing "within Nike-controlled parameters" is really just another way of buying shoes from Nike, as the consumer is restricted to the limited input Nike grants them on pre-defined terms.

86.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 86, except as to those facts stated in the Counterclaims (e.g. as to Nike re-branding and re-launching "Nike By You" and opening its "House of Innovation" in 2018, shortly after learning the art of customization from The Shoe Surgeon in August 2017), and on that basis deny each and every such allegation.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 86 of the Complaint.

87.     Defendants admit that the "Nike By You" website "allows customers to choose the material and color" of certain "elements of a Nike shoe" before buying it, offering customers the ability to buy a shoe from Nike that is "customize[d] . . . within Nike-controlled parameters" while Nike "maintain[s] control over the design process."  Defendants deny that this strictly controlled "Nike By You" buying process constitutes "customization," as it severely restricts any personal, creative choices and is really just another way of buying shoes from Nike, with limited input on pre-defined terms.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 87 of the Complaint.

**D.     Defendants Were On Notice That They Required Nike's Consent To Customize, Alter, Or Otherwise Use In Commerce Any of the Nike Asserted Marks.**

88.     Defendants admit that Mr. Ciambrone gained notoriety as a pioneer in shoe customization, and formed Surgeon Worldwide, Inc. with help from Mr. Imbimbo.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 88 of the Complaint.

89.     Defendants admit that their business operations initially focused on bespoke customization of shoes, providing commissioned customizations sought by consumers. Defendants deny any implications from paragraph 89 that they shifted from that business model, which remains fundamental to the authentic and creative customizations that The Shoe Surgeon provides and empowers its students to achieve.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 89 of the Complaint.

90.     Defendants admit that Nike "recognized Ciambrone's talents" and entered into a creative services agreement with S2 back in 2017, asking The Shoe Surgeon to teach its own Jordan Brand division staff how to customize shoes as part of the "Shoe Surgeon x Jordan 13" collaboration in August 2017; as further detailed in the Counterclaims, Nike never indicated it

considered this class to be a class in counterfeiting, etc.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 90 of the Complaint.

91.    Defendants admit that Nike commissioned a pair of custom shoes in August 2018 for LeBron James to celebrate reaching 30,000 points, for which Mr. Ciambrone spent six months making a unique pair of crocodile-skin shoes finished in gold and diamonds (valued at $100,000), garnering widespread positive publicity for Nike.  Defendants deny any implications from paragraph 90 that the August 2017 class Mr. Ciambrone taught Nike/Jordan staff was a "commission," and as detailed in the Counterclaims, Nike never indicated it considered any of its commissions from The Shoe Surgeon (for LeBron James or any of its other athlete/celebrity partners) to be counterfeit, etc.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 91 of the Complaint.

**E.    *Defendants Create A False Air Of Credibility Through Their Past Nike Dealings.***

92.    Defendants admit that they featured The Shoe Surgeon's collaboration with Nike on the LeBron James shoes from August 2018 on their website, along with several other "Developments + Partnerships," as they have done for several (more than five) years.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 92 of the Complaint.

93.    Defendants admit that Mr. Ciambrone was interviewed by Sole Collector in a wide-ranging 2020 video discussion of The Shoe Surgeon's custom sneakers, *available at* https://www.youtube.com/watch?v=1INUPHn_xy8, and that his response at 9:57-10:18 of that over 34-minute video to the question ("You work on, you know, Jordan and adidas, all that sort of . . .  Nike, do you ever get like in legal trouble with those companies, or are they cool with you, like, redesigning their shoes and selling them, or . . . ?") starts off with the partially quoted phrase: "Yeah, I mean, I work with the brands, I work with adidas, I work with Nike."

Defendants deny that Mr. Ciambrone's statement is false or misleading in any way, and further note that his statements reflect his good faith belief that everything The Shoe Surgeon was doing with Nike shoes was both approved by Nike and above-board, legally.  Mr. Ciambrone goes on to note: "There's things that I could be doing that could get me in trouble, that it would, that I would, you know, be profiting a lot of money—like I've been asked: oh, why don't you order just soles from China or why don't you make shoes in China?  And it's like, because that's my integrity to the brand, is being able to purchase or have a client send me their shoe and then deconstruct it.  Like, we're paying resale prices just to take apart a shoe."  Except as expressly admitted herein, Defendants deny the allegations of paragraph 93 of the Complaint.

94.    Defendants deny the allegations of paragraph 94 of the Complaint.

**F.    *Defendants Reshape Their Business Around Copying, Counterfeiting, and Relying On the Nike Asserted Marks.***

95.    Defendants deny the allegations of paragraph 95 of the Complaint.

96.    Defendants deny the allegations of paragraph 96 of the Complaint.

97.    Defendants deny the allegations of paragraph 97 of the Complaint.

98.    Defendants deny the allegations of paragraph 98 of the Complaint, *inter alia* because Defendants have been offering their classes since 2016, with classes taking place at various locations (including the Nike/Jordan class in Chicago August 2017) including different locations in New York City starting in early 2018.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 98 of the Complaint.

99.    Defendants deny the allegations of paragraph 99 of the Complaint, *inter alia* because SRGN Studios opened in 2015.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 99 of the Complaint.

**G.      Defendants' Unlawful "Open Commissions" and Sale of New and Counterfeit "Nike" Shoes.**

100.    Defendants admit that they offer consumers made-to-order commissions through The Shoe Surgeon Website, and that this service is promoted from time to time by certain of The Shoe Surgeon Social Media.  Defendants admit that their customizations of Nike shoes involve using a purchased Nike shoe as the base for a customized Nike shoe, but deny that such customized shoes are infringing, and further deny the baseless allegation that Defendants produce any "Nike-branded shoes entirely from scratch (the 'Counterfeit 'Nike' Shoes')." Except as expressly admitted herein, Defendants deny the allegations of paragraph 100 of the Complaint.

101.    Defendants admit that, in addition to customizing based on designs customers provide, they also promote their ability to customize based on existing designs.  Defendants admit that, for these offered customization services, they purchase the original shoes to customize for the consumer (based on the size, etc. provided) and then charge a "sourcing fee" to cover the cost of that original shoe before it is customized.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 101 of the Complaint.

102.    Defendants deny the allegations of paragraph 102 of the Complaint.

103.    Defendants deny the allegations of paragraph 103 of the Complaint, *inter alia* because The Shoe Surgeon's customized Nike shoes advertised as customized Nike shoes are, in fact, customized Nike shoes.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 103 of the Complaint.

104.    Defendants deny the allegations of paragraph 104 of the Complaint, *inter alia* for the reasons explained in response to paragraphs 5 and 6 of the Complaint, i.e. Nike's sole

purported evidence of Defendants allegedly "manufacturing new 'Nike' shoes entirely from scratch, i.e. brand new shoes that look just like Nike shoes" actually shows that Mr. Ciambrone started with and customized an authentic pair of "Air Jordan 1 Retro High" sneakers, keeping the structural components of the gray-white-red AJ1s in the customized red-white-black AJ1s. Nothing is "entirely from scratch" except Nike's specious accusation.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 104 of the Complaint.

105.    Defendants deny the allegations of paragraph 105 of the Complaint.

106.    Defendants deny the allegations of paragraph 106 of the Complaint.

107.    Defendants deny the allegations of paragraph 107 of the Complaint.

108.    Defendants deny the allegations of paragraph 108 of the Complaint.

109.    Defendants deny the allegations of paragraph 109 of the Complaint.

110.    Defendants deny the allegations of paragraph 110 of the Complaint.

111.    Defendants deny the allegations of paragraph 111 of the Complaint.

112.    Defendants deny the allegations of paragraph 112 of the Complaint.

113.    Defendants deny the allegations of paragraph 113 of the Complaint.

**H.    *Defendants' Brand Partnerships & Unauthorized Collaborations with Third Parties Are Unlawful.***

114.    Defendants deny the allegations of paragraph 114 of the Complaint.

115.    Defendants deny the allegations of paragraph 115 of the Complaint.

116.    Defendants admit that they have customized Nike shoes at the request of various collaborators, who have requested that The Shoe Surgeon incorporate the colors, designs, or other elements of that collaborator's overall image into a customized Nike shoe.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 116 of the Complaint.

117.    Defendants admit that they have used authentic fabric purchased from non-parties to customize Nike shoes without their or Nike's express written authorization.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 117 of the Complaint.

*I.*    ***Defendants' Unlawful Activities In The Shoe Surgeon Workshops, Academies & Sale of "Nike"-Branded Patterns and Kits.***

118.    Defendants admit that they offer a variety of in-person and online customization classes.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 118 of the Complaint.

119.    Defendants admit that they offer customization workshops that teach people the skills needed to take an authentic original shoe and customize it into a new version of that shoe, which is why Defendants' cited website states: "**Bring your own shoe.** You may bring any shoe of your choice. We recommend simple models like Air Force 1's, Vans, and High Top Chucks as they are the easiest to customize."  Except as expressly admitted herein, Defendants deny the allegations of paragraph 119 of the Complaint.

120.    Defendants admit that they offer "Decon/Recon" classes that, by definition and per Defendants' advertising, teach students "how to deconstruct ['Decon'] and reconstruct ['Recon']" the shoes they bring in.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 120 of the Complaint.

121.    Defendants deny the allegations of paragraph 121 of the Complaint.

122.    Defendants deny the allegations of paragraph 122 of the Complaint.

123.    Defendants deny the allegations of paragraph 123 of the Complaint, *inter alia* because reconstructing/customizing an authentic pair of Nike shoes is legally and morally distinct from making a pair of shoes from nothing or turning non-Nike into Nike shoes.

124.     Defendants deny the allegations of paragraph 124 of the Complaint.

125.     Defendants admit that their "SRGN Creator Store" offers classes, tools, and content to master shoe customization, creating a new, custom shoe from an original.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 125 of the Complaint.

126.     Defendants admit that the offer a "Shoemakers' Starter Bundle" that is "designed for deconstruction and reconstruction and includes all the must-have tools and materials to create your own pair of custom AJ1s" from a base, authentic pair of AJ1s.  That bundle of tools would not enable anyone to make a pair of shoes from scratch, *inter alia* because the user would need the original sole (only sole thread is provided to reconnect that original sole).  Except as expressly admitted herein, Defendants deny the allegations of paragraph 126 of the Complaint.

127.     Defendants admit that the "Shoemakers' Starter Bundle" previously included a "NIKE AIR JORDAN 1" sewing pattern, which enabled people to customize their AJ1s with different colors or fabrics.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 127 of the Complaint.

128.     Defendants deny the allegations of paragraph 128 of the Complaint.

129.     Defendants deny the allegations of paragraph 129 of the Complaint.

130.     Defendants deny the allegations of paragraph 130 of the Complaint, *inter alia* because the high density plastic shoe molds (i.e. "lasts") that were sold on Defendants' website were specifically for customizing authentic Air Force 1s as taught in Defendants' classes, not for creating any pair of shoes from nothing.

131.     Defendants deny the allegations of paragraph 131 of the Complaint, *inter alia* because the high density plastic shoe molds (i.e. "lasts") sold on Defendants' website allow the owner of a Nike shoe to maintain that shape to customize the shoe, not "manufacture" such a

shoe from scratch; the very basic foot-shape within the shoe as shown in the "last" does not come close to any protected elements of Nike trade dress, as can be seen with a review of Defendants response to paragraph 67 detailing Nike's asserted trade dress above.

132.    Defendants deny the allegations of paragraph 130 of the Complaint, *inter alia* because the "Inner Construction Material Bundle" sold by Defendants allows its customization students to reconstruct the interior of any custom designed shoes; the fact that these materials "Can be used across all silhouettes" (into which Nike inserts: "across all [Nike] silhouettes") demonstrates that no part of these tools is specific to any Nike trade dress, even if Nike had claimed some interior aspect of its shoes as trade dress (which it has not, *see* paragraph 67).

133.    Defendants deny the allegations of paragraph 133 of the Complaint.

134.    Defendants deny the allegations of paragraph 134 of the Complaint.

135.    Defendants deny the allegations of paragraph 135 of the Complaint.

**J.    *Defendants' Infringing 3D/AR Digital Renderings.***

136.    Defendants admit that they announced a partnership with swatchbook, Inc. on May 22, 2024, as reflected in the article titled "SRGN Academy's 'Never Stop Creating' goes digital with swatchbook," *available at* https://www.swatchbook.us/news/srgn-academys-never-stop-creating-goes-digital-with-swatchbook.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 136 of the Complaint.

137.    Defendants admit that the Remix app gives users access to 3D assets and digital materials, allowing the user to apply those to individual parts of a an apparel item's design, and that the app also includes an integrated AR feature.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 137 of the Complaint.

138.    Defendants admit that the above-noted article states: "Subscribers will enjoy frequent drops of both silhouettes and materials, carefully curated by SRGN Academy and swatchbook."  Except as expressly admitted herein, Defendants deny the allegations of paragraph 138 of the Complaint.

139.    Defendants deny the allegations of paragraph 139 of the Complaint.

140.    Defendants deny the allegations of paragraph 140 of the Complaint.

141.    Defendants deny the allegations of paragraph 141 of the Complaint.

**K.    *Defendants Blatantly Ignore Nike's Repeated Demands To Cease And Desist.***

142.    Defendants deny the allegations of paragraph 142 of the Complaint.

143.    Defendants admit that they and Nike had several "friendly meetings between business teams."  Except as expressly admitted herein, Defendants deny the allegations of paragraph 143 of the Complaint.

144.    Defendants admit that they received a letter dated June 23, 2022 from Nike outlining certain concerns and concluding *inter alia*: "We request a meeting with you as soon as possible to discuss this matter and a potential resolution."  Except as expressly admitted herein, Defendants deny the allegations of paragraph 144 of the Complaint.

145.    Defendants admit that they took steps "to address Nike's concerns" stated in the June 23, 2022 letter, and that "the parties engaged in discussions concerning a potential relationship for future projects between Nike and Defendants."  Except as expressly admitted herein, Defendants deny the allegations of paragraph 145 of the Complaint.

146.    Defendants admit that, after several intervening projects with Nike, they received a letter dated August 21, 2023 from Nike outlining certain concerns; like the June 23, 2022 letter,

this letter did not set a date certain for the requested compliance.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 146 of the Complaint.

147.    Defendants admit that they took steps to address Nike's concerns stated in the August 21, 2023 letter and believed they had done so to Nike's satisfaction in view of the several ongoing and further projects the had with Nike through 2024.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 146 of the Complaint.

**L.     *Defendants' Conduct Causes Significant Harm To Nike.***

148.    Defendants deny the allegations of paragraph 148 of the Complaint.

149.    Defendants deny the allegations of paragraph 149 of the Complaint.

150.    Defendants deny the allegations of paragraph 150 of the Complaint.

151.    Defendants deny the allegations of paragraph 151 of the Complaint.

152.    Defendants deny the allegations of paragraph 152 of the Complaint.

## COUNT I

## DIRECT TRADEMARK INFRINGEMENT 15 U.S.C. § 1114

### (Against All Defendants)

153.    Defendants repeat and incorporate here the responses to the allegations contained in the preceding and following paragraphs as if set forth herein.

154.    Defendants deny the allegations of paragraph 154 of the Complaint.  To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

155.    Defendants deny the allegations of paragraph 155 of the Complaint.

156.    Defendants deny the allegations of paragraph 156 of the Complaint.

157.    Defendants deny the allegations of paragraph 157 of the Complaint.

158.    Defendants deny the allegations of paragraph 158 of the Complaint.

159.    Defendants deny the allegations of paragraph 159 of the Complaint.

160.    Defendants deny the allegations of paragraph 160 of the Complaint.

161.    Defendants deny the allegations of paragraph 161 of the Complaint.

162.    Defendants deny the allegations of paragraph 162 of the Complaint.

## COUNT II

## DIRECT COUNTERFEITING 15 U.S.C. § 1114

### (Against All Defendants)

163.    Defendants repeat and incorporate here the responses to the allegations contained in the preceding and following paragraphs as if set forth herein.

164.    Defendants deny the allegations of paragraph 164 of the Complaint.  To the extent that Plaintiff cites records of the USPTO, those records are the best evidence of their content, and therefore, reference is hereby made to the same.

165.    Defendants deny the allegations of paragraph 165 of the Complaint.

166.    Defendants deny the allegations of paragraph 166 of the Complaint.

167.    Defendants deny the allegations of paragraph 167 of the Complaint.

168.    Defendants deny the allegations of paragraph 168 of the Complaint.

169.    Defendants deny the allegations of paragraph 169 of the Complaint.

170.    Defendants deny the allegations of paragraph 170 of the Complaint.

171.    Defendants deny the allegations of paragraph 171 of the Complaint.

## COUNT III

## CONTRIBUTORY TRADEMARK INFRINGEMENT 15 U.S.C. § 1114

### (Against All Defendants)

172.    Defendants repeat and incorporate here the responses to the allegations contained in the preceding and following paragraphs as if set forth herein.

173.    Defendants deny the allegations of paragraph 173 of the Complaint.

174.    Defendants deny the allegations of paragraph 174 of the Complaint.

175.    Defendants deny the allegations of paragraph 175 of the Complaint.

176.    Defendants deny the allegations of paragraph 176 of the Complaint.

177.    Defendants deny the allegations of paragraph 177 of the Complaint.

178.    Defendants deny the allegations of paragraph 178 of the Complaint.

179.    Defendants deny the allegations of paragraph 179 of the Complaint.

## COUNT IV

## CONTRIBUTORY COUNTERFEITING 15 U.S.C. § 1114

### (Against All Defendants)

180.    Defendants repeat and incorporate here the responses to the allegations contained in the preceding and following paragraphs as if set forth herein.

181.    Defendants deny the allegations of paragraph 181 of the Complaint.

182.    Defendants deny the allegations of paragraph 182 of the Complaint.

183.    Defendants deny the allegations of paragraph 183 of the Complaint.

184.    Defendants deny the allegations of paragraph 184 of the Complaint.

185.    Defendants deny the allegations of paragraph 185 of the Complaint.

186.    Defendants deny the allegations of paragraph 186 of the Complaint.

187.    Defendants deny the allegations of paragraph 187 of the Complaint.

188.    Defendants deny the allegations of paragraph 188 of the Complaint.

## COUNT V

## UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN

## 15 U.S.C. § 1125(a)

### (Against All Defendants)

189.    Defendants repeat and incorporate here the responses to the allegations contained in the preceding and following paragraphs as if set forth herein.

190.    Defendants deny the allegations of paragraph 190 of the Complaint.

191.    Defendants deny the allegations of paragraph 191 of the Complaint.

192.    Defendants deny the allegations of paragraph 192 of the Complaint.

193.    Defendants deny the allegations of paragraph 193 of the Complaint.

194.    Defendants deny the allegations of paragraph 194 of the Complaint.

195.    Defendants deny the allegations of paragraph 195 of the Complaint.

## COUNT VI

## FEDERAL TRADEMARK DILUTION 15 U.S.C. § 1125(c)

### (Against All Defendants)

196.    Defendants repeat and incorporate here the responses to the allegations contained in the preceding and following paragraphs as if set forth herein.

197.    Defendants admit that certain of Nike's trademarks have been deemed famous, in contrast to Nike's asserted trade dress (which it does not allege or otherwise claim to be famous). Except as expressly admitted herein, Defendants deny the allegations of paragraph 197 of the Complaint.

198.    Defendants admit that prior courts have made the determination that certain of Nike's trademarks are famous, in contrast to Nike's asserted trade dress (which it does not allege or otherwise claim to be famous).  Except as expressly admitted herein, Defendants deny the allegations of paragraph 198 of the Complaint.

199.    Defendants deny the allegations of paragraph 199 of the Complaint.

200.    Defendants deny the allegations of paragraph 200 of the Complaint.

201.    Defendants deny the allegations of paragraph 201 of the Complaint.

202.    Defendants deny the allegations of paragraph 202 of the Complaint.

203.    Defendants deny the allegations of paragraph 203 of the Complaint.

204.    Defendants deny the allegations of paragraph 204 of the Complaint.

## COUNT VII – COMMON LAW TRADEMARK INFRINGEMENT

## AND UNFAIR COMPETITION

### (Against All Defendants)

205.    Defendants repeat and incorporate here the responses to the allegations contained in the preceding and following paragraphs as if set forth herein.

206.    Defendants deny the allegations of paragraph 206 of the Complaint.

207.    Defendants deny the allegations of paragraph 207 of the Complaint.

208.    Defendants deny the allegations of paragraph 208 of the Complaint.

209.    Defendants deny the allegations of paragraph 209 of the Complaint.

210.    Defendants deny the allegations of paragraph 210 of the Complaint.

211.    Defendants deny the allegations of paragraph 211 of the Complaint.

212.    Defendants deny the allegations of paragraph 212 of the Complaint.

## COUNT VIII

## INJURY TO BUSINESS REPUTATION AND DILUTION

## NEW YORK GENERAL BUSINESS LAW § 360-l

### (Against All Defendants)

213.    Defendants repeat and incorporate here the responses to the allegations contained in the preceding and following paragraphs as if set forth herein.

214.    Defendants admit that the Complaint purports to assert claims for violation of New York's Anti-Dilution Statute but deny the substance of all alleged claims and that Plaintiff is entitled to any of the relief it seeks; Defendants also deny that Nike brings such a claim on behalf of "the general consuming public," whose shoe customization rights it seeks to severely and unreasonably restrict per its Complaint.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 214 of the Complaint.

215.    Defendants deny the allegations of paragraph 215 of the Complaint.

216.    Defendants deny the allegations of paragraph 216 of the Complaint.

217.    Defendants deny the allegations of paragraph 217 of the Complaint.

218.    Defendants deny the allegations of paragraph 218 of the Complaint.

219.    Defendants deny the allegations of paragraph 219 of the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden that they would not otherwise bear, Defendants assert the following affirmative defenses and other defenses.  Defendants expressly incorporate the pleadings in their answer above as if fully incorporated herein.

## FIRST AFFIRMATIVE DEFENSE

### (Personal and/or Non-Commercial Use)

1.     The Complaint and the purported claims contained therein are barred, in whole or in part, by the fact that Defendants' and academy students' alleged use of any Nike shoes was artistic and non-commercial, providing a customization/personalization service sought by individuals for their own personal use and enjoyment, and/or only using any Nike trademark to truthfully represent the origin of the authentic shoe and for artistic and non-commercial meaning to enhance the aesthetic qualities of a shoe that was effectively already owned by the consumer.

## SECOND AFFIRMATIVE DEFENSE

### (Fair Use)

2.     The Complaint and the purported trademark claims and related claims contained therein are barred, in whole or in part, by the doctrine of fair use under Section 33(b)(4) of the Lanham Act, 15 U.S.C. § 1115(b)(4), permitting use "of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin."

## THIRD AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

3.     Plaintiff's claims are barred, in whole or in part, because Plaintiff has received the benefit of *inter alia* positive publicity from the use of Nike shoes (including at Nike's direction) in Defendants' accused customization services, which services are high-end and, if anything, only serve to increase the reputation and prestige of the maker of the shoe used, and any recovery would result in Plaintiff's unjust enrichment.

## FOURTH AFFIRMATIVE DEFENSE

### (First Sale Doctrine)

4.     The Complaint and the purported claims contained therein are barred, in whole or in part, by the first sale doctrine on the grounds that Defendants' accused customization services performed using authentic Nike shoes purchased from Nike amount to a resale and/or use by the first purchaser.

## FIFTH AFFIRMATIVE DEFENSE

### (Implied License)

5.     Plaintiff's claims are barred, in whole or in part, because Nike has issued to Defendant an implied license to customize or otherwise resell Nike products.

## SIXTH AFFIRMATIVE DEFENSE

### (Trade Dress Invalidity – Functionality)

6.     One or more of the asserted trade dress marks of Nike is invalid based upon its failure to operate as a mark, and/or Plaintiff's claims are barred, precluded, and/or limited by the doctrine of utilitarian functionality.  The purported trade dress embodied by the asserted registrations consists entirely of functional, non-distinctive features, some of which may have been potentially patentable at one point in time, which now cannot be validly subject to trade dress protection.

## SEVENTH AFFIRMATIVE DEFENSE

### (Estoppel and Laches)

7.     Plaintiff's unreasonable delay in challenging Defendants' alleged customization of Nike shoes is prejudicial to Defendants, and, as a result, Plaintiff's purported claims against Defendants are barred, in whole or in part, under the equitable doctrines of estoppel and laches.

## EIGHTH AFFIRMATIVE DEFENSE

### (Statutes of Limitation)

8.      Plaintiff's claims are barred, in whole or in part, by applicable statutes of limitations.

## NINTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

9.      Plaintiff's claims are barred, in whole or in part, because of Plaintiff's failure to mitigate damages, if such damages exist.

## TENTH AFFIRMATIVE DEFENSE

### (Consent/Acquiescence/Waiver)

10.     Plaintiff's claims are barred, in whole or in part, by the doctrine of consent, acquiescence, and/or waiver.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Good Faith)

11.     Plaintiff's claims are barred, in whole or in part, because Defendants' conduct was reasonable, justified, in good faith and/or innocent.

## TWELFTH AFFIRMATIVE DEFENSE

### (Good Faith)

12.     Plaintiff's claims are barred, in whole or in part, because Defendants' conduct was reasonable, justified, in good faith and/or innocent.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Lack of Personal Jurisdiction)

13.     Plaintiff's claims are not properly pursued here for lack of personal jurisdiction.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Improper Venue/Inconvenient Forum)

14.    Plaintiff's claims are barred, in whole or in part, because venue is improper and/or this is an inconvenient forum for the parties as well as non-party witnesses.

## RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES

Defendants have not knowingly or voluntarily waived any applicable affirmative defense, and reserve the right to assert and rely upon such other applicable affirmative defenses as may be or become available or apparent during discovery and investigation.  Defendants expressly reserve all affirmative defenses available under Rule 8(c) of the Federal Rules of Civil Procedure and/or the patent laws of the United States, and any other defenses, at law or in equity, that may now exist or in the future be available based on discovery and further factual investigation in this case.

## COUNTERCLAIM

Defendants and Counterclaimants Surgeon Worldwide, Inc. d/b/a The Shoe Surgeon, Dominic Chambrone a/k/a Dominic Ciambrone a/k/a "The Shoe Surgeon" ("Mr. Ciambrone"), and Dallas Imbimbo ("Mr. Imbimbo"; collectively "Defendants" or "The Shoe Surgeon"), as for their Counterclaims against Plaintiff Nike, Inc. ("Nike"), allege and state as follows:

### OVERVIEW AND NATURE OF COUNTERCLAIM

1.    Never Stop Creating.  That is the mantra The Shoe Surgeon has used to inspire creatives and sneaker enthusiasts since opening SRGN Studios in Los Angeles almost a decade ago, in 2015.  But that mantra's roots run deeper, to when Mr. Ciambrone created his first custom sneaker back in high school.  In a moment that now seems symbolic, he transformed a pair of all-white Air Force 1 Mids from a blank canvas into a striking camouflage colorway.  These were authentic Nike shoes that remained authentic Nike shoes, but were now also remade into something the world had never seen before: a piece of art, lovingly crafted by hand, and one that gave a kid a voice without having to speak.

2.    Nike now labels this fundamental act of creation—whether by Mr. Ciambrone, The Shoe Surgeon's students, or anyone else—as counterfeiting, infringement, dilution, and unfair competition.  That was not always the case.  Indeed, starting back in 2017, Nike fostered a relationship with The Shoe Surgeon to find out what had made this "humble self-taught cobbler" into the pioneering shoe-customizer and go-to artist for celebrities including will.i.am and Justin Bieber.  Nike makes much of a creative services agreement without explaining what it was for: in August 2017, Nike asked The Shoe Surgeon to teach its own Jordan Brand division staff how to customize shoes as part of the "Shoe Surgeon x Jordan 13" collaboration.  Clearly, Nike did not consider that sneaker class it sought for its own staff to be a class in counterfeiting, etc.

3.     That August 2017 class was not the last time Nike sought to take advantage of The Shoe Surgeon's (and in particular Mr. Ciambrone's) know-how and popularity as the innovator who brought the craft of shoe customization into popular culture.  As only vaguely alluded to in the Complaint, Nike reached out to The Shoe Surgeon on over a dozen projects and collaborations over the last seven years.  These included rush demands that could make or break a significant moment for Nike's reputation (e.g. the Super Bowl) and requests for which Nike indicated it would pay but ultimately failed to pay, after stringing The Shoe Surgeon along.

4.     Nike strung The Shoe Surgeon along not only as to payments that never came, but also as to "a potential relationship for future projects between Nike and Defendants."  In fact, Nike apparently used its June 2022 letter (which requested "a meeting with you as soon as possible to discuss this matter and a potential resolution") to gain more leverage in negotiating what a formal relationship would be, sending over a proposed agreement in March 2023.  Even Nike acknowledges The Shoe Surgeon took "steps to address Nike's concerns" after its June 2022 letter, and it should also acknowledge that the parties continued to have conversations in the year following Nike's further August 2023 letter.  Those numerous meetings, calls, etc. included addressing Nike's letter and handling several unrelated projects for Nike and its partners, including most notably Usher's Jordan 4 for the February 2024 Super Bowl.

5.     While Nike now pretends its August 2023 letter was the last word, the Complaint was the first time The Shoe Surgeon heard from Nike that their efforts to address that letter were not enough.  Meanwhile, Nike's statements and actions said otherwise: through the end of 2023 and well into 2024, Nike led The Shoe Surgeon to believe not only that its ongoing work for Nike would be compensated, but that a formal deal between the parties was on the table—as long as The Shoe Surgeon kept coming through regardless of Nike's failures to pay.  Nike thus lured

The Shoe Surgeon into a false sense of security that its continuing work for Nike was part of an ongoing business relationship where both parties would continue the dialog for any new concerns and could ultimately reach a formal agreement if desired.

6.    Nike's extensive further collaborations with The Shoe Surgeon after its August 2023 letter included customized cleats for Bo Nix and Micah Parsons to be auctioned for charity as part of the NFL's "My Cause My Cleats" campaign in November 2023, a collaboration that was coordinated through Henry Marcus at Nike's partner Intersport.  Nike also directly asked The Shoe Surgeon to customize Usher's Jordan 4 for the February 2024 Super Bowl, a project that became necessary on a rush basis when Nike's Jordan brand made one foot but could not come through with the other, and for which Jordan Brand Vice President, Reggie Saunders, personally texted Mr. Ciambrone on February 11, 2024 ("Appreciate ya").  That same month, Nike was informed that The Shoe Surgeon was brought in to execute on Travis Scott's custom pair of all-white Jordan 1s for hundreds of guests at an exclusive and famous White Party, that would take place on July 4, 2024.  Although Nike repeatedly references famous rapper and fashion icon Travis Scott as a key Nike partner, it does not mention The Shoe Surgeon's work for him in the Complaint, or give any other explanation as to why Nike waited until shortly after that work was done (i.e. the July 4, 2024 party) to file its lawsuit on July 15, 2024.

7.    Nike also does not mention that representatives of The Shoe Surgeon had several outstanding, unanswered messages to Nike representatives when it blindsided The Shoe Surgeon with the Complaint on July 15, 2024, claiming $60 million dollars in damages for purported "harm Defendants have caused Nike" and "ill-gotten profits."  The Complaint makes and repeats several false allegations, e.g. that Defendants and their students "manufacture fake 'Nike' shoes from scratch," which Nike knew to be false e.g. based on the very evidence it purports to cite.

8.      Around the same time Nike dropped its Complaint incorporating false allegations, Nike published to several online platforms an extrajudicial "statement" that was clearly intended to be re-published, and then was re-published, by those platforms and others across the internet. Nike wrote *inter alia* that:  "[T]he Shoe Surgeon is constructing counterfeit 'Nike' footwear from scratch and selling it as officially branded Nike product.  Further, the Shoe Surgeon is teaching others to create counterfeit 'Nike' sneakers."

9.      Both of these Nike statements are false, as Nike knows from almost a decade of working with The Shoe Surgeon.  First, The Shoe Surgeon never makes and has never made a Nike shoe from scratch, as in from only raw materials or even a non-Nike shoe, but instead always starts with authentic Nike shoes—already bought from Nike—then customizes them. The same is true for what The Shoe Surgeon has taught students who have taken part in its classes: The Shoe Surgeon never teaches and has never taught making a Nike shoe from anything other than a Nike shoe.  All classes, like the class Nike took in August 2017, use authentic shoes that undergo a "decon/recon" process, meaning The Shoe Surgeon (and/or its students) deconstruct and then reconstruct the authentic pair of shoes into a new version of itself. This process creates art out of a Nike shoe, not a Nike shoe from scratch.

10.      Even without the long history of Nike seeking out The Shoe Surgeon's services to benefit itself, what The Shoe Surgeon does (and what Nike knows it does) in customizing an authentic shoe to remake it into a new, custom work of art involves tough questions of at least fair use, the first sale doctrine, and whether the law should apply at all to restrict how a consumer can customize a shoe they bought for their own personal use and enjoyment.  To avoid wrestling with those tough questions, Nike executed a take-down in the court of public opinion, adding to the false allegations in its Complaint a public statement that paints The Shoe Surgeon as a greedy

counterfeiter engaged in what anyone would consider clearly illegal misconduct: "constructing counterfeit 'Nike' footwear from scratch and selling it as officially branded Nike product" and "teaching others to create counterfeit 'Nike' sneakers."

11.    Nike's false allegations in the Complaint would likely be considered privileged were that the only basis for Defendants' Counterclaims, although they are subject to Rule 11 of the Federal Rules of Civil Procedure (requiring attorneys to certify by signing a Complaint that "factual contentions have evidentiary support").  But Nike's smear campaign involved making a statement that was not as part of the proceedings before this Court, nor was it directed in any way to the Court or any aspect of the judicial process.  Nike willfully directed its knowingly false statements to third parties not involved in this lawsuit, with the intention that those statements spread as widely as possible to destroy The Shoe Surgeon's reputation: not a creator empowering consumers, but a counterfeit empire.  Those false statements were written maliciously and calculated to prevent others—individuals or businesses—from dealing with The Shoe Surgeon. Nike's deleterious lies had that intended result, with members of the public expressing shock and dismay that The Shoe Surgeon makes fakes, and multiple business partners cutting ties.

12.    The Shoe Surgeon respects intellectual property rights and is not a counterfeiter. Authenticity is key to everything it creates and inspires.  Further, the creatives, kids, and people from all walks of life who have taken part in The Shoe Surgeon's classes are not counterfeiters. Finding your voice through customizing a Nike shoe does not mean that Nike owns your voice. Because Nike took the benefit of years of services and customization know-how, then said "thank you" with a smear campaign aimed to crush a smaller business and stifle the broader creative community, The Shoe Surgeon must address at least Nike's defamation, trade libel, and unjust enrichment to mend its reputation and protect creators everywhere.  Never Stop Creating.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over Nike's claims that arise under the

trademark laws of the United States, Lanham Act, 15 U.S.C. § 1051, *et seq.*, under 15 U.S.C. §

1121 and 28 U.S.C. §§ 1331 and 1338.  The Court also has diversity jurisdiction and

supplemental jurisdiction over the Counterclaims under 28 U.S.C. §§ 1332(a) and U.S.C. 1367,

at least to the extent that the Court has subject matter jurisdiction over the Complaint.

14.     Venue is appropriate for the Counterclaims under 28 U.S.C. § 1391, at least to the

extent that venue is appropriate for the Complaint, because the Counterclaims herein arise out of

and are related to the same subject matter of Counterclaim-Defendant's Complaint.

15.     Counterclaim-Defendant Nike has voluntarily consented to the personal

jurisdiction of this Court by commencing the above-captioned litigation in this judicial district.

Counterclaim-Defendant has personally availed itself of the benefits and protections of this

jurisdiction by, among other things, filing the Complaint in this judicial district.

## THE PARTIES

16.     Surgeon Worldwide, Inc. is a corporation organized under the laws of the State of

Delaware with a principal place of business at 17595 Harvard Avenue C552, Irvine, California

92614.

17.     Dominic Ciambrone is an individual residing in Los Angeles, California and is

the Chief Executive Officer and founder of Surgeon Worldwide, Inc.

18.     Dallas Imbimbo is an individual residing in Irvine, California and is the Secretary

and Chief Financial Officer of Surgeon Worldwide, Inc.

19.     Nike is a corporation organized under the laws of the State of Oregon with a

principal place of business at One Bowerman Drive, Beaverton, Oregon 97005.

## FACTUAL ALLEGATIONS

**A.**    ***Dominic Ciambrone Transforms Shoe Customization from Cobbling To An Artform, Garnering Celebrity Clients from Justin Bieber to Travis Scott.***

20.    After early doodling on shoes with sharpies, Mr. Ciambrone created his first custom sneaker back in high school.  He transformed a pair of all-white Nike Air Force 1 Mids from a blank canvas into a striking camouflage colorway.  In other words, he airbrushed them. These were authentic Nike shoes that remained authentic Nike shoes, but were now also remade into something the world had never seen before: a piece of art, lovingly crafted by hand. Wearing those shoes, a 16-year-old kid who at times found it hard to connect with people now found that his art "gave me a voice without having to speak.  It gave me a special feeling."

21.    It was not just Mr. Ciambrone who felt special wearing his custom sneakers—his schoolmates also loved seeing them and praised his unique creation.  Their props catalyzed his creative spirit and passion: it "just clicked that I needed to create shoes."  After a graduation gift of a first sewing machine from his grandmother, plenty of "no," curses, and closed doors, then finally some artisan mentors and countless hours of trial and error, and apprenticeship, that passion would eventually become an artform where he could also make a living by bringing joy through creation.  Along the way, that passion also crystalized into an identity during his first trip to New York, when, around 2006, Mr. Ciambrone coined the "Shoe Surgeon" name.

22.    Mr. Ciambrone's first celebrity client came a few years later, as he customized a pair of Android Hommes for will.i.am to wear at the MTV Video Music Awards.  When Mr. Ciambrone delivered that custom pair to the owner of Android Homme, Javier Laval introduced Mr. Ciambrone to Justin Bieber and his stylist.  Some months later, Mr. Ciambrone was customizing two pairs for Justin Bieber at the American Music Awards (or AMAs).

23.    Mr. Ciambrone customized over 15 pairs of shoes for Justin Bieber in the next two years, including those shown here, some of which already feature The Shoe Surgeon's distinctive trademarks, including the name "SURGN" and the distinct skull and scalpels logo:







24.    Another amazing opportunity came up when *Law & Order: SVU* (the longest-running prime-time series in the United States), reached out to ask Mr. Ciambrone to customize a

pair of shoes for an episode titled "Personal Fouls," airing on September 28, 2011.  His custom shoes were prominently featured in the episode, as the killer leaves behind their unique footprint.

25.     These early opportunities slowly enabled Mr. Ciambrone to build a following through Instagram and word-of-mouth referrals, expanding The Shoe Surgeon's clientele.  The Shoe Surgeon's other celebrity clients over the years have included (in no particular order) the following Nike-affiliated athletes, artists, and other celebrities: Drake, Matte Babel, DJ Khaled, Fat Joe, Vinícius Júnior, Frances Tiafoe, Erling Haaland, Jerry Ferrara, P.J. Tucker, Riff Raff, Javon Walton, Mookie Betts, Fernando Tatís Jr., Walker Buehler, Nelly, LeBron James, Odell Beckham Jr., Usher, and Travis Scott.



Lebron James for GQ          Erling Haaland              Nia Archives

26.     In addition to working for celebrity clients, Mr. Ciambrone's works of art have been featured in museums, with exhibits and events reaching millions over the world.   Images from some of those displays, showing the deconstruction of a shoe as an educational exhibit along with The Shoe Surgeon's distinctive skull and scalpels logo, are displayed on the following page.

 

27.     At the same time, as detailed below, Mr. Ciambrone's primary goal in life and with The Shoe Surgeon quickly became to give others—everyone—the tools to be creative and shape their identity in a positive way.  Creating ground-breaking shoes for the rich and famous is great, but The Shoe Surgeon would not be what it is if Mr. Ciambrone were not sharing his passion for customization—and for art.

**B.     *The Shoe Surgeon Begins Teaching Classes in 2016, Inspiring Creativity, Furthering the Industry, and Pushing the Timeless Craft of Custom Shoe Design To New Heights.***

28.     After years of struggling to piece together knowledge from his experience, stitched together with the few resources and mentors he could find, Mr. Ciambrone wanted to use his success to teach the craft of customizing. He did not just want to sell people shoes, but "to inspire people to create and better themselves mentally," because sneaker customization is a craft where "taking something you love and using your hands to make it your own brings so much gratification." The goal was for teaching to help both his students, personally, and the custom sneaker industry, as a whole, to flourish.

29.     After the early successes noted above, Mr. Ciambrone worked to distill his years of learning through trial and error into a class that could jump-start young creators' customizing without the years of "nos," curses, and closed doors.  He had his first opportunity to teach these

customization skills in Brooklyn in 2016, at a shoemaker's shared space.  The second class was

hosted in downtown Los Angeles, and since then, The Shoe Surgeon Sneaker School (later also

known as SRGN Academy) has helped hundreds of students proudly customize their own shoes:





30.    The above images are a samples from The Shoe Surgeon's Alumni Directory, labeled "SL" for "Student Lab" with the number of the lab noted above, which shows some class photos taken over the years, from back in 2016 through 2024.

31.    Academy students have ranged from young teens to septuagenarians, and while many are Americans, some have sought out The Shoe Surgeon's classes from across the globe. Indeed, one enterprising 16-year-old from Iceland raised funds for his travel and class through sponsorships so that he could participate, and Mr. Ciambrone was honored by those efforts.

32.    As these multi-day programs can be out of reach for some in terms of pricing, The Shoe Surgeon also provides more accessible workshop formats for people (even young kids) to try their hand at a lighter introduction shoe customization within the course of a few hours. Students in either the multi-day academies or shorter workshops generally find them worthwhile for the skills and networking; many have had amazing, memorable, and even deeply meaningful

experiences. For example, one student who came to a workshop without a design in mind left

with a memento of his father who had recently passed away, as shown in this June 4, 2024 post:



33.    As detailed below, Nike has been aware of these classes since at least as early as

August 2017, when it asked The Shoe Surgeon to teach such a class to several Jordan brand staff.

Based on Nike's intimate familiarity with what happens during such a customization class, and

the extensive descriptions of these classes (almost always including the term "Decon/Recon,"

meaning deconstructing and reconstructing a shoe) available online and cited in the Complaint,

Nike was well aware when drafting that Complaint that people in the classes are shown how to

customize their own, authentic Nike shoes, not make new counterfeit Nikes from scratch.

34.    Indeed, Nike's Complaint notes that Matt Damon and Ben Affleck teamed up on

the Golden-Globe nominated 2023 film *Air*, but does not mention that the film's production team

approached The Shoe Surgeon to do the Nike shoes for that film. In what is a moment of pride

for The Shoe Surgeon, the project went to a past student, who made the shoes and also makes custom Nike shoes on a frequent basis.

35.      In short, Mr. Ciambrone decided early on not to be the cursing cobbler, worried that anyone who learned from him would steal his business.  Instead, Mr. Ciambrone and The Shoe Surgeon have approached creativity as a flame that can be spread without diminishing, with each person they empower to create as another person who can live and share that passion.

**C.**      ***Nike Asks The Shoe Surgeon To Teach Its Jordan How To Customize In August 2017, and Nike Collaborated on Another Jordan Class for Non-Nike Staff in February 2019***

36.      When Nike asked The Shoe Surgeon to share that passion for customization with its own Jordan brand staff, Mr. Ciambrone and Mr. Imbimbo did not hesitate.  As noted above, it was a Nike shoe that sparked Mr. Ciambrone's interest in customization, and both he and Mr. Imbimbo, along with others at The Shoe Surgeon, had long been some of Nike's biggest fans.

37.      Since the first class in 2016, many of The Shoe Surgeon's classes had customized Nike shoes, and the August 2017 class for Nike's Jordan Brand division staff was no different. In a two-hour interactive master class from Mr. Ciambrone, a dozen or so participants selected by Jordan learned to customize a pair of AJXIII (i.e. Jordan 13) sneakers.

38.      While Nike recently removed its webpage featuring this collaboration, including images of cutting out fabric to customize the shoes, Nike proudly featured this class on its website from August 17, 2017 (the day after it occurred) to at least as recently as July 16, 2024. Two true and correct copies from that webpage ([https://www.nike.com/launch/t/air-jordan-13-remix-shoe-surgeon](https://www.nike.com/launch/t/air-jordan-13-remix-shoe-surgeon)) from July 16, 2024 (immediately after the Complaint was filed) and November 18, 2024 (showing "404 ERROR") are attached here as **Exhibit 1** and **Exhibit 2**.

39.    Pictures and quotes that appeared on that original Nike page are included here for ease of reference:



**AIR JORDAN XIII**

REMIXING THE 13

Based in Downtown Los Angeles, the Shoe Surgeon (Dominic Chambrone) has built a reputation - and highly successful business- re-crafting sneakers using premium and unexpected materials.

Yesterday, Chambrone took 12 friends of Jordan Brand through a class to rebuild the Air Jordan 13 'Bred' in anticipation of the shoe's release on Saturday, 8.19.

The Shoe Surgeon used a black Italian suede python, perforated suede, Japanese fabric, which is one of the highest end lining materials, and some tools. The first AJXIII he built was a Low, and this is the first high top, in the 'Bred' colorway.





40.    Mr. Ciambrone was quoted in that post on Nike's webpage as noting that "[t]his was probably one of the most difficult shoes I've done." Still, this class for Jordan Brand had the

same general toolkit as in The Shoe Surgeon's other classes, and involved doing the same steps as in other classes (from sole removal, to deconstruction, to patterning, sewing, adhesion, etc.). Indeed, while The Shoe Surgeon provided décor with its own logo, the Jordan Brand team was responsible for decorating the space with displays for all of those various stages of decon/recon for teaching.  Pictures from this class, including Defendants' logo next to the Jumpman logo to show the "Shoe Surgeon x Jordan 13" collaboration, are below and follow on the next pages:











41.     The August 2017 class for Jordan Brand was not even The Shoe Surgeon's only collaboration with Nike involving such a customization class.  In February of 2019, the Nike team again invited The Shoe Surgeon to teach a class featuring Jordans, this time an NBA All Star Weekend Workshop at Social Status in North Carolina.  As shown in the following images, this class also featured The Shoe Surgeon logo with the Jumpman logo, and a similar process:









**thesurgeon** and **srgnacademy**
🎵 thesurgeon · Original audio

❤️ 1,107    💬 44    ✈️ 36

Liked by **eileenkristina** and **others**
**thesurgeon** All-Star Weekend Jordan Workshop
Charlotte, NC... more



42.     Nike's recent removal of the "Shoe Surgeon x Jordan 13" collaboration from its website, where Nike had posted pictures and quotes from that August 16, 2017 class for almost seven years, may indicate that Nike wants to forget (or wants the public to forget) that it asked The Shoe Surgeon to teach its Jordan Brand how to customize back in 2017, and that they collaborated on yet another class together for several young people (not Jordan staff) in 2019. But on information and belief, Nike has not forgotten either class; moreover, Nike has been taking advantage of what it learned from The Shoe Surgeon's customization classes—and has continued to learn from their collaborations—to develop its own customization businesses, preparing to take over a market The Shoe Surgeon's passion for teaching had created.

**C.     *Nike Executes Plans To Exploit The Shoe Surgeon's Lifetime of Know-How, Opening Stores with Bespoke Shoe Design Services and Trying To Acquire Surgeon in 2018, Then Re-Branding the Tired NikeiD As "Nike by You" Customization Service in 2019.***

43.     While Nike's business plans are not always public, its trademark filings are. Those filings indicate that Nike first took an interest in customization, and specifically rebranding NikeiD as "Nike By You," in 2017, when it sought a class from The Shoe Surgeon.

44.     Specifically, on March 22, 2019, Nike filed its "Nike By You" application (now U.S. Reg. No. 6,038,468) for "Custom design of footwear." That application filed in 2019 shows that Nike told the USPTO that it "first use[d]" that trademark on "Custom design of footwear" in May 2017. But notably, Nike did not submit a "specimen" showing use of the "Nike By You" trademark until March 2020, almost three years after its alleged first use in May 2017.

45.     Moreover, Nike's specimen submitted to the USPTO in 2020 shows an undated printout of the https://www.nike.com/nike-by-you website. However, The Wayback Machine (which scrolls available websites to archive existing versions) does not show that Nike By You

website back to May 2017; instead, the archiving service only shows the "Nike By You" website

going back to June 20, 2019, as shown by visiting the following URL, with a screenshot below:

https://web.archive.org/web/20190620075143/https://www.nike.com/nike-by-you.



46.    That June 20, 2019 page is fairly similar to the current Nike By You shopping

experience, except that the black button with white lettering that said "Customize" in 2019 now

just says "Shop,"[2] as shown on the excerpts from the current Nike By You website shown on the

following page (the first the landing page, https://www.nike.com/nike-by-you, and the second

accessed by clicking the "Shop" button on https://www.nike.com/nike-by-you):

---

[2]    This change from "Customize" to "Shop" may be Nike's tacit recognition that the experience
of buying a shoe online, no matter the quantity of delimited features available, lacks the energy
of live customization, such as the February 2019 NBA All Star Weekend Workshop in North
Carolina, where Nike representatives saw young people thrilled to customize their own Jordans.



47.    Further, an article (dated 09/04/2019) titled "Nike ID rebrands as Nike By You" (*available at* https://www.creativereview.co.uk/nike-id-rebrands-as-nike-by-you/) indicates that Nike was at that time—in 2019—just rebranding its Nike ID as "Nike By You."  The article does not indicate that Nike made any earlier use of that trademark, in 2018 or in 2017.

48.    Instead, that article further details how Nike had "launched Nike ID in 2000," but had since expanded a mere personalization feature on its website into broader customization offerings, including (as of 2019) "over 100 in-store 'studios' all over the world," with its "flagship store in New York" opened in 2018 offering "a bespoke shoe design service where customers can book an appointment with a consultant and have custom trainers created on-site."

49.    Nike's own press release corroborates that Nike opened its New York "House of Innovation" around November 14, 2018, while the only other "HOI locations" were Shanghai and Paris, not the "over 100 in-store" studios referenced in the article the following year.  *See* https://about.nike.com/en/newsroom/releases/nike-nyc-house-of-innovation-000.  This confirms that Nike's first U.S. "House of Innovation" was opened in late 2018, a little over a year after taking The Shoe Surgeon's class in August 2017, and indicates that Nike opened over 100 other stores in less than a year (i.e. by the time of the 2019 article noted above).

50.    Nike thus submitted a statement of use verified declaration to the USPTO that its first use of Nike By You for "Custom design of footwear" was on May 2017, but there does not appear to be publicly available evidence that Nike was using the mark at that time.  Instead, on information and belief based on the available evidence, Nike was (at most) just beginning to develop its "Nike By You" plans in May 2017, precisely the timeframe when it reached out to The Shoe Surgeon to coordinate the August 2017 Jordan 13 Workshop.

51.    Furthermore, based on the 2019 contemporaneous article noted above and other evidence (whether or not Nike's statement of use declaration is incorrect), Nike used the years immediately following the August 2017 class to build competing customization businesses from what they had learned from The Shoe Surgeon, while at the same time exploring acquisition or other means of incorporating The Shoe Surgeon into the Nike empire.[3]

52.    Specifically, while Nike pursued the new customization business flagged above (i.e. opening hundreds of in-store studios with bespoke customization services starting in 2018, then re-launching Nike ID as "Nike By You" in 2019), Nike also continued to pursue projects, collaborations, and even a potential partnership with The Shoe Surgeon.  Of these many projects, the most notable was perhaps The Shoe Surgeon's August 2018 custom pair of shoes made for Nike to celebrate LeBron James reaching the milestone of 30,000 points.  Mr. Ciambrone spent six months making crocodile-skin shoes finished in gold and diamonds, and the strikingly unique pair of custom Nike shoes garnered widespread positive publicity for Nike.  A photograph of the customized shoes (with Mr. Ciambrone's hand holding one of them) is shown below:



---

[3]    Nike's repeated references to Defendants as e.g. a faux-Nike "empire" are laughable, both because The Shoe Surgeon does not make "faux" Nikes, and because a public company like Nike (with revenue of over $51.3 billion dollars in 2024) is seeking to crush a far smaller target with a lawsuit seeking $60 million (<0.1% of Nike revenue), but calling its target an "empire."

53.     Around the time The Shoe Surgeon dropped off the 30,000-point gold shoes for LeBron James, one of Nike's directors met with The Shoe Surgeon team at a café on Nike's campus, and that Nike Senior Director (who had wanted to get The Shoe Surgeon team up to Oregon the year prior to pitch doing customization workshops to Nike's then-CEO, Mark Parker) showed The Shoe Surgeon a slide deck of the "Nike x You" (i.e "Nike By You") that he indicated had the customization services Nike was looking to launch.  Although that slide deck was supposed to show Nike's own future customization services, it contained images taken from The Shoe Surgeon's social media, including using The Shoe Surgeon's longstanding trademarks (shown above and discussed in the next section) without prior consent or authorization.

54.     While The Shoe Surgeon continued to collaborate with Nike in the years to come, in hindsight, Nike's slide deck shared in 2018 showed an apparent business plan to incorporate The Shoe Surgeon as a mere arm for Nike, as if Nike may as well own them already, or perhaps just replace The Shoe Surgeon with Nike's replica services.

**D.      *The Shoe Surgeon Formally Registers Its Distinctive Trademarks That Mr. Ciambrone Has Used Since 2007, Including in the Nike Collaborations and Classes Shown Above.***

55.     The Shoe Surgeon respects the intellectual property rights of others and is also the owner of two federally registered trademarks.

56.     On September 21, 2018, The Shoe Surgeon applied to register its two key marks: (1) standard character mark (THE SHOE SURGEON) and (2) its logo (skull and scalpels shown below), which the USPTO granted on April 30, 2019 as U.S. Reg. Nos. 5,739,296 and 5,739,300. True and correct copies of printouts from the USPTO's Trademark Status & Document Retrieval (TSDR) Database, showing the current status and title for these trademarks, are attached hereto as **Exhibit 3** and **Exhibit 4**, and the mark drawings are copied below for ease of reference:

| The Shoe Surgeon's Trademarked Name, U.S. Reg. No. 5,739,296 | The Shoe Surgeon's Trademarked Logo, U.S. Reg. No. 5,739,300 |
|---|---|
| THE SHOE SURGEON |  |

57.    The first use dates provided to the USPTO for both registrations confirm that these marks were in use at least as early as December 31, 2007 on "custom tailoring" and at least as early as August 31, 2016 on "educational services, namely, classes to teach shoe making." The Shoe Surgeon worked hard to maintain its customization and educational offerings as its services were  limited by the global COVID-19 pandemic that took hold in 2020, as those services are at the core of what it is and has always been.

**D.    *Nike Doubles Down On Its Online Initiatives During the COVID-19 Pandemic, Shifting Away from Retail and So Losing Consumer Demand and Brand Cachet.***

58.    According to Nike and analysts, Nike took a different tack in response to the global COVID-19 pandemic, de-emphasizing any in-person experience—whether the customization classes launched in 2018 (modeled off of The Shoe Surgeon) or retail shopping—and shifting to an online shopping focus as part of a "Consumer Direct Acceleration" strategy.

59.    This change in strategy appears to have been prompted both by the pandemic and a management shakeup in 2020, with Mark Parker's 16-year leadership as CEO ending so that

John Donahoe could step in as Nike's fourth-ever CEO.  While Mark Parker stayed involved in

Nike leadership, this and other senior leadership changes were, according to Nike, "supporting

the company's Consumer Direct Acceleration" strategy, which was a drastic shift in Nike's

business model, aimed to "create a more premium, consistent and seamless consumer experience

across NIKE's owned and strategic partner ecosystem, align around a new simpler consumer

construct and also unify investments in an end-to-end technology foundation to accelerate our

digital transformation."  *See* July 22, 2020 Nike Investor News titled "Nike Announces Senior

Leadership Changes to Unlock Future Growth Through the Consumer Direct Acceleration," *at*

https://investors.nike.com/investors/news-events-and-reports/investor-news/investor-news-
details/2020/Nike-Announces-Senior-Leadership-Changes-to-Unlock-Future-Growth-Through-
the-Consumer-Direct-Acceleration/default.aspx.

60.     That shift away from in-person and retail has been considered an aggressive

move, as Nike severed a third of its relationships with sales partners.  The SNKRS app

referenced in the Complaint was already 20% of Nike's business when the pandemic hit, but

with new CEO John Donahoe at the helm, Nike doubled down on its online initiatives, investing

in four apps and pronouncing that digital buyers would not revert after the pandemic ended.

61.     Fortunately for the world, the worst of the pandemic did end, but unfortunately

for Nike, digital buyers did, indeed, start to revert to in-person purchasing.  Because Nike had cut

so many retail sales partners, and its direct-to-consumer channels were not as successful as

hoped, Nike experienced a 2022-2023 inventory surge.  Nike was not able to sell its goods online

as it has expected, and it could not get those unsold goods back into retail stores quickly enough.

62.     Nike's stumble meant that consumer demand moved elsewhere.  In addition,

broader competitive pressures were shifting sales not only away from Nike but also from other

incumbent brands (like adidas, Under Armour, Puma, and Vans) to newer challenger brands (like On, Hoka, Lululemon, Asics, and New Balance).

63.     When Nike shoes did finally start making it back into stores, retailers ended up slashing prices on those overstocked Nikes: on average, eight national chains cut prices on 19.4% of Nike sneakers in 2022, but the cut prices on a whopping 44% of Nikes in 2024, as researchers found. *See, e.g.*, https://www.reuters.com/business/retail-consumer/retailers-slash-prices-more-nike-sneakers-2024-data-shows-2024-02-02/.

64.     One way in which Nike has tried to counteract its inventory backlog problem is with limited releases of certain shoes, using scarcity to drive back up demand.  A variety of sources, from plentiful online memes made by Nike enthusiasts, to reports of police having to get involved in crowd control for the lines outside of in-person limited releases, have shown there is widespread frustration among those not able to snatch a pair.  Many such frustrated consumers posted screenshots of their failed attempts to commiserate, e.g. as shown here:



65.    Meanwhile, ironically, when Nike has brought back certain rare and/or retro Nike sneakers based on popular demand, those re-releases have also angered many sneakerheads, who believe that the now-less-limited shoes should not be made more widely available.  *See, e.g.*, "Nike's Panda Dunks Were a Collector's Dream, Until Everyone Started Wearing Them," article The Wall Street Journal dated February 7, 2023: https://www.wsj.com/articles/sneakerheads-nightmare-limited-edition-nike-panda-dunks-11675713466; *see also* May 5, 2022 post *available at* https://www.instagram.com/atatf/p/CdMvscvAX4F/?hl=en, commenting "Nike looking at these memes and "too many panda" convos like, "damn y'all asked us to give y'all more shoes and this how y'all do us???"" on the meme as shown on the following page:



66.    Realistically, this recent Catch-22 for Nike is most relevant to the sneakerhead community, which makes up only a small percentage of the overall shoe and apparel market. However, Nike may well have been increasingly interested in customization like that offered by

The Shoe Surgeon over the past few years as a way to overcome the scarcity/excess dilemma. Specifically, when someone customizes a Nike shoe, they will typically start with a more widely available base Nike shoe, then transform elements to make it their own.  Nike already profits from the sale of the base shoe, so long as the customizer uses authentic Nike shoes (as The Shoe Surgeon does).  But what if Nike could also own the profits from the customization process?  Nike's persistent interest in The Shoe Surgeon, especially its presentation of Nike's future customizing business in 2018 using The Shoe Surgeon's images, seems driven by that question.

67.      Nike is a juggernaut compared to its competitors (e.g. over 25% of the athletic footwear market, and four times the size of adidas), and can pay anything and outspend anyone to do basically whatever it wants (e.g. paying $1 billion dollars to add the Nike Swoosh to MLB uniforms in late 2019, as reported by Forbes).  However, its sales have not been trending upward as quickly as some competitors and fell significantly in Q1 of 2024.  In particular, that dip in performance has been reported as Nike's worst since the 1990s, with the only exceptions for the pandemic in 2020 and the recession in 2009.  These difficulties continued into Q2, as noted in a June 27, 2024 Marketwatch article on Nike's stock "tumbled" after it dimmed its expectations for the year, grappling with many of the issues noted above.  A true and correct copy of that article is attached hereto as **Exhibit 5**.

68.      Considering all of the above context for Nike's dealings with The Shoe Surgeon, Nike or at least some of its leading voices may have been genuinely interested in partnering with The Shoe Surgeon for the long-term, but then Nike's difficulties at the start of 2024 created a broader loss aversion that drove those voices out, pushed the need for new markets to the fore, and ultimately changed the tone towards the customization market The Shoe Surgeon had created and helped Nike enter from friendly competition to predatory conflict.

69.     Alternatively, Nike may have targeted The Shoe Surgeon with a long-term, large-scale "pig butchering scam" from when it first invited The Shoe Surgeon to teach the Jordan brand how to customize in 2017.  If so, The Shoe Surgeon was, as most victims of such scams, unaware that Nike was looking to: (1) gain trust; (2) introduce an investment to the victim; (3) collect;[4] and (4) disappear.  Either theory is plausible given what The Shoe Surgeon experienced, which was a collaborative relationship for seven years, but ended in Nike ghosting and suing Defendants.

E.     *Nike Uses The Shoe Surgeon To Stay Relevant To Sneakerheads and the Broader Market, Engaging Defendants for Several Projects that Remained Largely Unpaid.*

70.     The Shoe Surgeon has collaborated with or been involved by Nike in over a dozen projects over the last seven years, i.e. starting with the August 2017 Jordan 13 Workshop and including the February 2019 Jordan All Star Weekend Workshop, both detailed above.

71.     Between those classes, The Shoe Surgeon completed the gold-plated custom shoes to celebrate 30,000 points for LeBron James in August 2018 (as also detailed above), which was coordinated by Josette Last and Kati Cho of Nike.  Then, in November 2018, other Nike staff (Ashten Johnson, Desmond Marzette, and Albert Ceniceros) coordinated with The Shoe Surgeon to put out a Jordan 11 commercial.

72.     After the February 2019 Jordan All Star Weekend Workshop, The Shoe Surgeon customized an exclusively made pair of custom cleats for Todd Gurley for the NFL's "My Cause My Cleats" program, receiving wide acclaim while Mr. Gurley was on the Los Angeles Rams.  That NFL partnership was followed by another, with The Shoe Surgeon providing the Boys &

---

4     In this case, steps (2) and (3) were combined and took place over time, as Nike first invited The Shoe Surgeon to invest in Nike through the August 2017 class, then drew The Shoe Surgeon into more and more collaborations and projects, even while previous work had not been paid.

Girls Club x NFL Customization Workshop in January 2020. The Shoe Surgeon then made a custom "My Cause My Cleats" pair for another NFL athlete, Kyler Murray, in December 2021.

73.    In early 2022, The Shoe Surgeon provided the Nike x Foot Locker Air Max Workshop, with classes hosted January-March in Los Angeles and San Francisco, California.







74.     Next, Drake's team brought in The Shoe Surgeon in April 2022 to work on his "Tailwind."  After other projects noted below, in August of 2023, Drake and his sublabel with Nike brought The Shoe Surgeon in to create a custom Nocta x Nike Glide, making headlines

(*see, e.g.*, https://footwearnews.com/shoes/sneaker-news/drake-nocta-nike-glide-pink-custom-shoe-surgeon-1203509805/) and garnering positive attention for the "bold pink sneakers":





75.     The Shoe Surgeon's other Nike projects, in between those two customs for Drake,

included In early 2022, The Shoe Surgeon provided the Nike x Foot Locker Air Max Workshop,

with classes hosted January-March in Los Angeles and San Francisco, California.

76.     In January 2023, Nike asked The Shoe Surgeon to customize a shoe to gift Lebron

James in recognition of James scoring his 38,888th point, breaking the NBA all time scoring

record previously held by Laker Kareem Abdul-Jabbar.  Images of that unique milestone

customization are shown on the next page:





77.    Unfortunately, Nike used this milestone project in heading into 2023 to lure The

Shoe Surgeon's into a series of unpaid projects that Nike continually promised would be paid.

Indeed, while The Shoe Surgeon provided a statement of work for $50,000-$100,000 in view of

the cost of the materials, Nike sabotaged the project be indicating in the final week (after the

design was set and materials mostly purchased) that its budget was only $10,000.

78.    The Shoe Surgeon came through on the project for Nike, and for Lebron James, but was only paid $10,000 after pointing out the project had cost much more due to Nike's delayed budget cut.  After this project, Nike repeatedly suggested that The Shoe Surgeon would properly compensated for this brand-saving effort, and be paid for future projects, as part of some overall deal.  Unfortunately, that deal never materialized, while unfounded claims did.

**F.    *Nike Reaches Out To Discuss Partnership, Sends Two Cease and Desist Letters Before and After Sending A Draft Agreement, Then Continues To Work with The Shoe Surgeon Into 2024, Dangling Payment for Past Work or a Future Deal Out of Reach.***

79.    In the midst of the projects noted above, in early 2022, Nike reached out to The Shoe Surgeon about a potential partnership that would involve a go-forward relationship on projects for LeBron JAmes.  In a strange way to move those partnership discussions forward, shortly thereafter, Nike sent its June 23, 2022 letter.

80.    That letter notes in the beginning that the in-house counsel reaching out on behalf of Nike is writing "to follow up on a matter raised with you by Nike's Chief Marketing Officer, DJ van Hameren" (a person who had not spoken with The Shoe Surgeon), then proceeds to outline a purported conflict with Nike's intellectual property rights that came to Nike's attention regarding what it calls The Shoe Surgeon's "product offerings," despite the fact that The Shoe Surgeon offers the service of customizing shoes.

81.    While that letter was an odd way to kick off partnership discussions, which could easily begin with a term sheet or memorandum of proposed changes to The Shoe Surgeon's business model, it makes sense as a power play to put The Shoe Surgeon on the defensive, outlining purported intellectual property ("IP") violations that would force The Shoe Surgeon to stop customizing based on Nike's assertion of the right to halt "unauthorized customizations."

82.     A few other key points that Nike does not mention about its June 23, 2022 letter: first, it states that "Nike respects your talent as a designer and customizer" but then instructs The Shoe Surgeon to "permanently cease-and-desist" from unauthorized customization, which Nike defined to include the use of any "materials, stitching, . . . and/or colorways that are not and have never been approved, authorized, or offered by Nike."  As a "colorway" is an arrangement of colors, this assertion of IP rights would prohibit the high school version of Mr. Ciambrone from air brushing his own pair of Nikes, or anyone else from playing around with their pair of Nikes.

83.     Next, Nike's 2022 letter did not assert that The Shoe Surgeon makes any fake Nike shoes entirely from something other than a Nike shoe.  Instead, that letter was clear in Nike's assertion that even the deconstruction and reconstruction of a Nike shoe (as the Jordan Brand team had learned from The Shoe Surgeon in August 2017) becomes counterfeit when it retains only "some portions of the soles" or add "uppers fabricated from scratch by you – not Nike."  Nike's argument goes to a far side of the continuum of what might be problematic—from maintaining all original Nike components, to replacing some, to adding something different, to remaking all but the sole—but critically, Nike did *not* assert that The Shoe Surgeon had stepped off of that continuum into making a fake Nike from scratch.  Instead, after five years of dealings with The Shoe Surgeon, including two customization classes involve decon/recon, Nike knew that the most offensive of The Shoe Surgeon's customizations started from an authentic Nike shoe and maintained original components of that shoe.

84.     While the letter did outline some legitimate concerns (which The Shoe Surgeon sought to address—other than with shutting down its entire customization business), it did not lay out any deadline or even a particular timeline for addressing Nike's concerns.  Instead, in line

with the parties ongoing partnership discussions, it requested "a meeting with you as soon as possible to discuss this matter and a potential resolution."

85.     In the year following Nike's June 2022 letter, Nike continued to invite The Shoe Surgeon to perform customization services, and The Shoe Surgeon performed the requested services.  For project after project, Nike strung The Shoe Surgeon along with talk of reaching a deal that would result in reasonable payments going forward, and make up for the "LeBron" discount Nike had sprung in January 2023.  Nike provided a proposed agreement in March 2023, which was so restrictive, it would essentially halt The Shoe Surgeon's customization business without any guarantee that Nike would pay for authorized customization services.

86.     Importantly, Nike's August 2023 letter did not change its overall pattern of extorting further, unpaid work from The Shoe Surgeon well into 2024.  When Nike could only make one shoe out of a pair for Usher to play the Super Bowl in February 2024, it turned to The Shoe Surgeon to get it done.  The Shoe Surgeon came through, for Usher and for Nike:



87.     Nor did the asks stop there, as Nike and Travis Scott relied on The Shoe Surgeon to provide hundreds of pairs of Travis Scott's custom shoes for the White Party on July 4, 2024. Once again, The Shoe Surgeon came through, for Travis Scott and for Nike.  A mere eleven days later, Nike sued Defendants on July 15, 2024.  Through 2023 and 2024, The Shoe Surgeon was frequently reaching out to Nike contacts to confirm what was happening with the agreement. Among other things, Nike's Reggie Saunders told Mr. Ciambrone not to worry, "got u."  Based on Nike's Complaint, maybe that did not mean what it seemed.

## G.     *Nike Crushes Several Customizers But Loses Battle To Make O'Dell Beckham Jr. Pay $20 Million for Alleged Glove/Shoe Violations Based on Unauthorized Customization.*

88.     Nike's claim that it is "not anti-customization," but encourages consumers to customize Nike shoes "within Nike-controlled parameters," is oxymoronic and cabins the meaning of "customization" to only what is Nike-controlled.  Stated otherwise, Nike does not permit any "unauthorized customizations," i.e. any customization that is not controlled by Nike.

89.     Indeed, keeping customization "within Nike-controlled parameters" forces consumers who what to customize their own pair of Nikes to seek out a "House of Innovation" (with design services Nike modeled off of The Shoe Surgeon, but which may not allow all customizations the customer requests), or if there is none nearby, use Nike's "Nike By You" digital customization service to effectively shop for a pair of Nikes with specific, delimited inputs pre-defined by Nike.  But that platform, unlike customizing a shoe yourself or using a customizer like The Shoe Surgeon, does not let the owner of Nike shoes define any vision for those shoes other than what Nike has already dictated.

90.     Nike has demonstrated that it is anti-customization—outside of customization controlled by Nike—with a spree of lawsuits against a wide array of customizers it has painted

(rightly or wrongly) as counterfeiters.  While there are too many to be able to survey them all or go into detail here, one notable feature of Nike's strategy seems to be its effort to leverage claims against using inauthentic Nike shoes (i.e. counterfeiting) to shut down customizations of authentic shoes that were simply not authorized by Nike (i.e. unauthorized customization).

91.     As an example, Nike's recent First Amended Complaint against Drip Creationz filed on August 18, 2022 alleged claims of counterfeiting as well as other, more typical Lanham Act claims.  Case No. 5:21-cv-01201-JWH-SP.  That complaint alleged that "Drip Creationz advertises and sells many of its designs on what it purports to be '100% authentic' Nike Air Force 1 shoes," but "[u]pon investigation, Nike has discovered that there are, in fact, counterfeit Air Force 1 shoes being sold instead."  Unlike the pending Complaint against The Shoe Surgeon, then, Nike expressly alleged in the Drip Creationz complaint that its "investigation" had revealed the use of counterfeit, not "100% authentic," Nike shoes used as a base for customization.  However, as with the pending action, Nike swept in that counterfeiting with a broader array of what it deemed "unauthorized customizations."  Nike pursued that case against Drip Creationz until, a little over a year later, that defendant stipulated to a broad consented judgment prohibiting it from making any "unauthorized customizations of Nike sneakers."

92.     On information and belief, that is the relief Nike is ultimately seeking as to The Shoe Surgeon and any other customizer of Nike shoes: they cannot customize Nike shoes at all.  This is a legal bludgeon crushing all Nike-related customization, not the scalpel needed to carve out personal freedoms.

93.     The case cited in Nike's Complaint, *Nike, Inc. v. MSCHF Product Studio, Inc.*, Case No. 1:21-cv-01679, provides an interesting counterpoint to this case; in it, Nike specifically

alleged that it was being harmed by the widespread outcry of "consumers who believe that Nike

is endorsing satanism," and provided several examples like the following:



**Michelle** Mar 26, 2021 At 11:27 pm

I'm appalled. Words cannot describe the amount of disgust and disbelief that this
is truly happening. Jesus please save us!!!! Never supporting or buying Nike
again!!!!

Reply



**Amber Hovater** Mar 26, 2021 At 11:29 pm

I WILL NEVER WEAR ANOTHER PAIR OF NIKE AN IM THROWING AWAY ALL THE
ONES I HAVE NOW..WHAT A DISGRACE THIS IS PURE EVIL..

Reply

94.    In this case, by contrast, Nike does even mention the word "tarnish," let alone

provide any concrete notion of what the harm is to its brand from The Shoe Surgeon's largely

extremely satisfied customers.

95.    Also, unlike with cases involving counterfeit Nikes, there is not a zero-sum

equation looking a shoe Nike have sold that was replaced by a counterfeit.  On the contrary,

there is an economic benefit to Nike from the customization services The Shoe Surgeon

provides, as people either bring their own pre-owned shoes or else (more regularly) buy an

authentic pair of Nikes from The Shoe Surgeon that they would not otherwise have purchased

but-for seeking out customization.  When the Shoe Surgeon buys or recommends that customers

bring their own "Air Force 1s," for example, that person buy a Nike shoe that they would not

otherwise have bought for its own sake to use it as a blank canvas.  Plain white Nike Air Force

1s on Nike's website currently sell for $115 (*see* https://www.nike.com/t/air-force-1-07-mens-

shoes-jBrhbr/).  Then, the customized Air Force 1—that maintains some features of the original

and is proudly touted as an authentic, customized Air Force 1—is a walking advertisement for

something new someone else could do if they buy their own Nike.

96.    Although Nike has largely focused its ire on creatives and customizers who are not as well-equipped to handle costly litigation, Nike has strayed into the field of suing athletes. Conspicuously absent from Nike's "influential athlete" partners per its Complaint is Odell Beckham Jr. ("Mr. Beckham"), a famous football star who agreed to an endorsement contract with Nike USA, Inc. back in 2014.  After an almost decade-long relationship, Nike and Mr. Beckham got into a contract dispute in 2022, with Mr. Beckham filing a Complaint for breach of contract based on Nike failing to pay him per the matched terms of an adidas offer.  As alleged in that Complaint, as that dispute over Nike's underpayment "was getting underway, in March 2022, an attorney for Nike informed Mr. Beckham" that he was being docked more than $2 million for alleged footwear and glove violations from more than two months earlier.  In other words, Nike was taking money back from its athlete for wearing unauthorized customizations.

97.    Nike ultimately did not prevail on its counterclaims against Mr. Beckham for "$20,625,000 plus prejudgment interest," as on July 18, 2024, the jury found that Mr. Beckham had not violated his Nike contract, including based on any glove or footwear violation (wearing unauthorized customizations).  Mr. Beckham posted as follows:

98.     While Mr. Beckham's defeating Nike's effectively anti-customization claims before a jury present a silver lining, Nike's litigation conduct against creatives and even athletes casts a dark and exceedingly large cloud over the creative community and even the famous athletes and other celebrities who enjoy their services *without* "Nike-controlled parameters."

**H.     Nike Decides a $60 Million Complaint Lobbing False Allegations Is Not Enough, and Runs a Smear Campaign To Spread Lies That The Shoe Surgeon Makes Fake Nikes.**

99.     As indicated in specific denials to each of Nike's allegations, many of the allegations in its Complaint are not just debatable, but outright false.  Nike knew these allegations to be false, because that information was available to them from the very evidence they purport to cite and Nike's longstanding relationship with The Shoe Surgeon, including requesting and participating in two full customization classes.

100.     For example, Nike takes advantage of the fact that The Shoe Surgeon often uses the phrase "from scratch" as a term of art to make it seem like Defendants are blatantly

advertising their creation of counterfeit Nike's from whole cloth, not the customization of authentic Nike shoes (as they actually do and have done for over a decade). But as Nike knows from taking two of these classes, and seeing the publicized "decon/recon" process firsthand, making a pair of custom sneakers "from scratch" in these classes means making a custom pair from materials that include the original, authentic pair. Indeed, Defendants expressly state that the class participants need to bring their own pair, or else offer to purchase an authentic pair for them to customize. If a student showed up without a shoe, and did not buy an authentic Nike sourced by The Shoe Surgeon, they would not be able to sit in the class and manufacture a fake.

101.    Notably, many of the participants in The Shoe Surgeons workshops are children. Seeing these kids learn about authentic Nikes for the first time (as Mr. Ciambrone did at a young age), playing around with the fabrics and colors, and ultimately creating something the world had never before imagined, is a thing of beauty. To be perfectly clear, this is part of what Nike is alleging is illegal contributory infringement or counterfeiting. Per Nike, below is a picture of a fledgling counterfeiter at one of Defendants' Sneaker Customization Workshops, caught immediately following the act of creating "Infringing New Shoes" (or perhaps even "Counterfeit 'Nike' Shoes"), and so violating Nike's intellectual property rights:



102.    These Counterclaims will avoid repeating every point made in the Answer, but the chart in paragraph 5 of the Complaint and Answer are another telling example of how Nike's own evidence shows its most extreme allegations are false.  The Complaint's chart does not show Mr. Ciambrone manufacturing fakes (or teaching that skill as "Counterfeiting 101"); instead, as with the other websites and images Nike cites in part, the evidence—when reviewed in whole without misleading excerpts—shows that The Shoe Surgeon holds to its values and only customizes or helps others customize authentic Nike's into customized Nikes.

103.    While making knowingly false allegations before this Court is bad enough, Nike did not let its allegations speak for themselves.  Instead, Nike launched another assault against The Shoe Surgeon's reputation directly into the court of public opinion, issuing a statement to select outlets (including e.g. Sneaker Freaker) that appeared targeted to The Shoe Surgeon's friends, fanbase, business partners, and customers.

104.    The false statements within Nike's statement include the following, which blatantly ignore and misrepresent The Shoe Surgeon's customization process using authentic Nikes, with which Nike was very familiar through its multiple classes and the materials it reviewed and incorporated into its Complaint: "[T]he Shoe Surgeon is constructing counterfeit 'Nike' footwear from scratch and selling it as officially branded product. Further, the Shoe Surgeon is teaching others to create counterfeit 'Nike' sneakers."

105.    These statements do not imply any sort of subtle reasoning about an authentic customization technically infringing—instead, they play upon the plain meaning and popular understanding of incendiary terms like "counterfeit" to tell the public that The Shoe Surgeon makes fake Nikes and teaches others to do the same.  That is not what The Shoe Surgeon does, and not what The Shoe Surgeon has ever done, and Nike knows it.

106.    Although it is unclear how Nike issued the original written statement shortly after filing its Complaint, it was apparently issued to (or at least picked up on by) at least the following online outlets:

1.  https://robbreport.com/style/footwear/nike-shoe-surgeon-lawsuit-1235775183/
2.  https://www.sneakerfreaker.com/features/nike-60-million-lawsuit-against-the-shoe-surgeon-explained/
3.  https://finance.yahoo.com/news/shoe-surgeon-responds-nike-lawsuit-164202190.html
4.  https://www.complex.com/sneakers/a/victor-deng/nike-suing-shoe-surgeon-trademark-infringement
5.  https://www.maxim.com/style/shoe-surgeon-responds-to-60-million-nike-lawsuit-we-are-confused/
6.  https://footwearnews.com/shoes/sneaker-news/shoe-surgeon-nike-lawsuit-statement-1203666841/
7.  https://x.com/itsavibe/status/1812888815368835115
8.  https://www.edwhitelaw.com/blog/nike-files-60m-usd-lawsuit-against-the-shoe-surgeon
9.  https://www.nicekicks.com/nike-the-shoe-surgeon-lawsuit/
10.  https://sneakernews.com/2024/07/15/nike-sues-the-shoe-surgeon-lawsuit/
11.  https://joseph.legal/2024/08/22/nike-accuses-the-shoe-surgeon-of-counterfeit-and-trademark-infringement-in-a-60-million-suit/
12.  https://hypebeast.com/uk/2024/7/nike-the-shoe-surgeon-lawsuit-info
13.  https://www.instagram.com/modernnotoriety/p/C9c2PMguQRr/?hl=en&img_index=1
14.  https://houseofheat.co/nike/nike-sues-the-shoe-suergon
15.  https://www.newsbreak.com/news/3532871406124-nike-sues-the-shoe-surgeon-for-trademark-infringement
16.  https://kicksaddictny.tumblr.com/post/756183649367605248/embed
17.  https://www.linkedin.com/pulse/wise-reputational-move-nike-sue-sneaker-customiser-60-conway-gordon-ck9vf/
18.  https://hiphopwired.com/2268132/nike-sues-shoe-surgeon-trademark-infringement/

107.    Nike obviously issued its statement with the intent that it spread from these online platforms across the internet to third parties who will think less of The Shoe Surgeon based on Nike's false and malicious assertions that it makes fakes.

*I.*    ***Nike's False Allegations and Out-of-Court Smear Campaign Have the Intended Effect, Causing The Shoe Surgeon To Lose Business Deals and Its Good Reputation.***

108.    The Shoe Surgeon has already sustained significant damages from Nike's false allegations, especially as amplified through Nike's separate, out-of-court statement amplifying the worst false claims.

109.    These damages include concrete economic losses, in the form of business deals that were well underway or even near-final, in which The Shoe Surgeon's business partner cut ties shortly after learning Nike's false claims.  Nike has also inflicted extensive reputational harm to Defendants personally (as Nike named Mr. Ciambrone and Mr. Imbimbo personally in the Complaint) and to The Shoe Surgeon's business reputation for providing reputable services customizing authentic Nike shoes.

110.    That reputational harm may be difficult to measure, but it is easy to see.  Any online search for "The Shoe Surgeon" (alone or with other terms) is likely to turn up the widespread news of Nike's lawsuit.  Indeed, the top question shown on "Google" when you search "the shoe surgeon" is: "Why is Nike suing shoe surgeons?"  The answer highlights an especially flashy turn-of-phrase that encapsulates many of Nike's false allegations, i.e.: "Nike goes on to state that The Shoe Surgeon is teaching a course in 'Nike counterfeiting 101'."  A copy of this top "People also ask" search result is shown here:



111.    As shown above, that result links to an article by "Sneaker Freaker" (a publication targeted to sneaker enthusiasts like The Shoe Surgeon and its customers), *available at* https://www.sneakerfreaker.com/features/nike-60-million-lawsuit-against-the-shoe-surgeon-explained/#:~:text=Nike%20goes%20on%20to%20state,is%20affiliated%20with%20their%20business.  This article is one of numerous articles quoting Nike's "statement."

112.    Nike's statement and above all its false claims amplified from the Complaint in that statement have echoed across the creative community, sneaker cultures, and the broader public.  Across potentially countless social media posts, comment sections, and in blogs, people who knew nothing of The Shoe Surgeon or even thought highly of Defendants express dismay, outrage, and above all disappointment that The Shoe Surgeon is not as authentic as advertised.

113.    A prime example of this is shown in the video "ARE SNEAKER CUSTOMS FAKE ??? NIKE SUE SHOE SURGEON FOR 60 MILLION," *available at* https://www.youtube.com/watch?v=Cq13w9dvaUo.  A true and correct copy of the transcript of the video is attached hereto as **Exhibit 6.**  This video reflects how a fan of customizations, who has even done his own Nike customizations, has to side against The Shoe Surgeon if it is really doing the terrible things alleged by Nike.  Notably, too, this clear sneakerhead worries about the fate of customizations and the creative community more broadly based on Nike's lawsuit:



114.    On the parties' Rule 26(f) discussion of "the nature and basis of their claims," The Shoe Surgeon presented concerns about the false allegations, but Nike was unwilling to provide a specific basis of the apparently baseless claims that Defendants "manufacture fake 'Nike' shoes from scratch" and teach the public how to do the same.  As with Nike's Complaint, there was no indication that any investigation had taken place that provided evidentiary support for the allegation, with Nike offering only allusions to future discovery.  Most concerning, Nike made the point that it did not make a difference, legally, whether Defendants customized authentic Nike shoes (as they do) or made new Nike shoes entirely from scratch (which they don't), apparently to justify alleging the latter even if untrue.

115.    Nike appears poised to use its vast resources to try to bury The Shoe Surgeon in costly discovery as a litigation tactic.  Alleging an unsupported "$60 million dollars" in damages out of thin air, based largely on false allegations of making new Nikes from scratch, then refusing to state what those allegations are based on, and finally ending the discussion by alluding to coming discovery, are the typical tactics of bullies, not truth-seekers.

116.    At least one court has found that Nike's "particularly aggressive litigation strategy" against another rights-holder (Lontex) merited nearly $5 million in attorney's fees spent defending itself from Nike acting on its threats to "kill" Lontex's business through costly legal battles.  *See* https://sgbonline.com/nike-ordered-to-pay-legal-fees-in-trademark-dispute/ (October 22, 2024).  Nike's conduct so far indicates that The Shoe Surgeon is not a former and potential partner with which Nike would like to work out any of its legitimate disputes, but the next litigation adversary on Nike's "kill" list.  It is hard to imagine any other motivation for not only a $60 million lawsuit with false statements, but an accompanying PR hit piece to make sure reputational onslaught inflicted maximum damage.

**I.**    ***Whether a Customization Is "Unauthorized" Cannot Be The Sole Basis of Liability:***
***The Creation of Authentic Customizations (Versus Counterfeit Shoes) Is Lawful.***

117.    If The Shoe Surgeon's long history of working with Nike—to Nike's great
benefit, and often without appropriate pay—does not insulate Defendants from this kind of
attack, it is not so unreasonable to assume it will continue to go after far smaller operations or
even individuals who customize for fun or to support themselves.  *See, e.g.* "*Nike cracking down
on people customizing its sneakers. But is it shooting itself in the foot?*"
https://www.cbsnews.com/news/nike-shoes-sneakers-customizers-air-force-one-lawsuit/.

118.    Contrary to Nike's cavalier attitude towards facts, it does matter—legally and
morally—whether The Shoe Surgeon customizes real Nikes or makes new, fake Nikes.  Not only
is there no apparent evidentiary support in the Complaint for the latter, that is what people think
of when they hear "counterfeiting," not some Ship of Theseus argument about replacing too
much of an authentic Nike shoe when you customize it.

119.    The justice system must preserve the freedoms that lie between "doing something
Nike did not say you could do" and "doing something the law says you cannot do."  Because the
Lanham Act and related laws are built on preventing confusion and blurring or tarnishment of a
famous mark.  As noted above, the real facts of this case raise several close questions, which it is
critical for the Court to address with full consideration of what the laws are trying to accomplish.

120.    When no one is confused about the source or sponsorship of a Nike shoe, *because*
the shoe maintains the original Nike trademarks that show it was an authentic Nike shoe, the act
of "unauthorized customization" does not violate the law.  When a kid or a grandpa or anyone
takes an authentic Nike shoe and adds their own expression to make it a custom shoe, whether
doodling or taking out the laces or tearing it apart and putting it back together with a new look,

these acts of "unauthorized customization" do not violate the law. Creators know that anyone who makes or has a custom pair of shoes made for them will proudly share that their already valuable, authentic Nike shoes are now a unique, and so more precious, work of art. Simply put, there is no likelihood of confusion from The Shoe Surgeon's customization services.

121.    In those instances when The Shoe Surgeon further adds its trademarks to show that an authentic Nike shoe was customized by The Shoe Surgeon (as it did with many Nike collaborations), with the same process it taught to Nike back in 2017, that communicates both the authenticity of Nike's underlying shoe and that The Shoe Surgeon has made that shoe into something new and even more desirable, adding goodwill and renown to the Nike brand. Countless pictures of The Shoe Surgeon's students and fans, holding up their custom Nike shoes with looks of subtle pride, unbridled joy, or just a secret, inner moment of self-realization do not show counterfeiting, dilution, or infringement. These images show the Nike brand realizing a preeminent hallmark of its heightened status as perhaps the world's greatest shoe manufacturer: creators around the world want to customize what they make. That is a rare achievement to be cherished, not a threat to be snuffed out.

122.    Like a low quality paint inexpertly sprayed on a shoe, Nike's false allegations will come off eventually. However, they will continue to make a mess for The Shoe Surgeon and everyone who comes into contact with the false picture Nike has willfully sprayed over its sterling reputation for authenticity.

123.    Nike's Complaint is a serious concern not just for The Shoe Surgeon, but for all creators, potential members of the creative community, and anyone who might want a shoe customized. Because Nike weaves together the false allegations with partial truths, as it seems to have done in other cases, it becomes far too easy to condemn beautiful, creative acts of

customization as somehow manufacturing fake Nikes.  But the distinction is not just a matter of semantics: it is a boundary around our creative freedoms that no law is supposed to touch.

124.    Fair use, the first sale doctrine, and principles around non-commercial use that limit the law's application to restrict how a consumer can customize a shoe they bought for their own personal use and enjoyment are not technicalities.  These are well-established boundaries that protect against an over-extension of intellectual property rights that could stifle creation.  Because otherwise, it is clear what careless legal arguments do.  They make someone who is on the fence about taking a chance avoid the risk.  They make someone who considers trying something new stick to well-trodden paths.  What is worse, in this case, Nike's bleeding together the innocent and the immoral, the lawful and unlawful, the creations it inspires and the shoes it owns, might keep someone from discovering the kind of creative spark that shines a light.

125.    Nike's current CEO, Elliott Hill, clearly loves sports, and took the helm recently with a clear and inspiring vision: "Nike's at it's best when we're celebrating the passion and emotion of sport… when we're listening to the voice of the athlete."  That vision is contrary to engaging in lawsuits against its athletes who seek "unauthorized customizations."  It also has nothing to do with crushing creatives, and exploiting or exterminating any surviving customizers.

126.    If Mr. Elliott and Nike indeed want "to put the athlete at the center of everything we do, and show them that magic you can only get from Nike," customization only adds to that magic.  The Shoe Surgeon hopes that Nike will take a hard look inside at its own motivations and goals with this litigation, and find a resolution that will be a win for the creative community, like all of the previous Nike x Surgeon collaborations that added so much value to both brands.  Then, The Shoe Surgeon's mantra will not have to be a rallying defensive cry, but a vision that Nike and all of its fans at The Shoe Surgeon and beyond can share once more: Never Stop Creating.

## COUNTERCLAIM COUNT I

### (Defamation and/or Trade Libel)

127.    Defendants reallege and incorporate here the allegations contained in the preceding and following paragraphs as if set forth herein.

128.    Nike published false, defamatory statements about The Shoe Surgeon, as set forth above in both these Counterclaims and in the Answer.  For example, Nike issued false statements to several online outlets, stating falsely that: "[T]he Shoe Surgeon is constructing counterfeit 'Nike' footwear from scratch and selling it as officially branded product. Further, the Shoe Surgeon is teaching others to create counterfeit 'Nike' sneakers."  These statements play upon the popular understanding of incendiary terms like "counterfeit" to tell the public in no uncertain terms that The Shoe Surgeon makes fake Nikes and teaches others to do the same.

129.    On information and belief, Nike published these false and defamatory statements to encourage those interested in customization services to avoid The Shoe Surgeon and its creation of fake Nikes, and/or to seek out Nike's authorized and above-board customization services instead.  Nike published these statements to at least eighteen online platforms, and in turn thousands or even hundreds of thousands of consumers on social media, despite knowing that such statements are false and would harm The Shoe Surgeon's reputation.

130.    Nike's defamatory statements impugned The Shoe Surgeon's reputation, prejudiced The Shoe Surgeon in the conduct of its business, and deterred prospective customers of The Shoe Surgeon from doing business with The Shoe Surgeon, such that these statements constitute defamation *per se*.

131.    On information and belief, based on the full scope of Nike's allegations (which did not require such false statements to allege a claim), as well as Nike's statements in response

to requests to explain the basis, Nike knew these statements were false and fully intended to disparage The Shoe Surgeon by making them.

132.    As a direct and proximate result of Nike's defamatory statements, The Shoe Surgeon has sustained and will continue to sustain substantial injury to its business and reputation, including direct financial harm to its business, in an amount to be determined at trial.

133.    Nike's conduct was intentional, willful, malicious and knowing, thus justifying an award of punitive damages to deter such egregious conduct in the future.

## COUNTERCLAIM COUNT II

### (Unjust Enrichment)

134.    Defendants reallege and incorporate here the allegations contained in the preceding and following paragraphs as if set forth herein.

135.    As detailed above, Nike was enriched based on the services it repeatedly asked The Shoe Surgeon to provide, starting with a customization class in August 2017 from which Nike acquired Mr. Ciambrone's lifetime of customization know how to use for its soon to be launched and re-branded customization businesses, and continuing through several projects.

136.    Nike was further enriched at the expense of The Shoe Surgeon, which expended its time, effort, and resources to come through on projects for which Nike did not pay.

137.    It would be inequitable to permit Nike to retain the value of services, and the significant value-add of The Shoe Surgeon's efforts to Nike's brand, both of which Nike has claimed from The Shoe Surgeon without appropriate compensation.  This is especially true in light of Nike now trying to shut down the innovator that pioneered the and inspired the customization market it is now trying to exclusively acquire.

## COUNTERCLAIM COUNT III

### (Declaratory Judgment of Invalidity; Cancellation for Functionality)

138.    Defendants reallege and incorporate here the allegations contained in the preceding and following paragraphs as if set forth herein.

139.    The Shoe Surgeon seeks a declaratory judgment under the Trademark Laws of the United States, 15 U.S.C. § 1051 *et seq*., the Lanham Act, 15 U.S.C. § 1125, *et seq.,* the Patent Act of 1952, as amended, the Declaratory Judgement Act, 28 U.S.C. §§ 2201 and 2202, that Nike's U.S. Trademark Registrations alleged in the Complaint are invalid and unenforceable as a matter of law because the purported trade dress embodied by the registrations consists entirely of functional, non-distinctive features.  Further, some of those elements may have potentially been patentable or patented at one point in time (ending in the 1980s and 1990's) but were never timely patented, and cannot be validly registered.

140.    Among other things, Nike's trade dress compared to other shoes, including its New Balance shoes, show that other shoes on the market incorporate the functional features claimed in Nike's thirteen asserted registrations.  These trade dress registrations are therefor invalid, and subject to cancellation, based on their failure to function as a mark, and/or Plaintiff's claims are barred, precluded, and/or limited by the doctrine of utilitarian functionality.  The purported trade dress embodied by the asserted registrations consists entirely of functional, non-distinctive features, some of which may have been potentially patentable at one point in time, which now cannot be validly subject to trade dress protection.

141.    As such, all thirteen of Nike's asserted trade dress registrations (or at least all that the Court finds to be functional or non-distinctive) should be declared invalid, and an order issued to the Director of the USPTO to cancel such registrations pursuant to 15 U.S.C. § 1064.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), The Shoe Surgeon hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, The Shoe Surgeon requests that the Court enter judgment as follows:

1.      That Nike take nothing by its Complaint, and that the Court enter judgment in Defendants' favor dismissing the Complaint with prejudice;

2.      That Nike be ordered to pay The Shoe Surgeon, as damages, a sum reflecting the harm inflicted on The Shoe Surgeon from Nike's false, defamatory, and injurious trade libel statements, in an amount to be determined and proved at trial;

3.      That Nike be ordered to pay The Shoe Surgeon, in restitution, a sum which will make The Shoe Surgeon whole for all of the uncompensated services provided to Nike and/or know-how, goodwill, and favorable reputation Nike misappropriated from The Shoe Surgeon, in an amount to be determined and proved at trial;

4.      That Defendants be awarded their reasonable expenses and costs of suit herein;

5.      That Defendants be awarded their attorneys' fees pursuant to all applicable statutes and otherwise, including the Lanham Act;

6.      That Defendants be awarded their costs of suit; and

7.      That Defendants be awarded any further relief the Court deems just and proper.

Dated:  November 18, 2024

/s/ Michael D. Adams

Michael D. Adams
madams@rutan.com
Meredith L. Williams
mwilliams@rutan.com
RUTAN & TUCKER, LLP
18575 Jamboree Road, 9th Floor
Irvine, California 92612
Telephone:  (714) 641-5100

*Attorneys for Defendants*
*S2 Services, Inc.; Surgeon Worldwide, Inc.*
*d/b/a The Shoe Surgeon; Dominic*
*Chambrone a/k/a Dominic Ciambrone, and*
*Dallas Imbimbo*